## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| PETHINAIDU VELUCHAMY and | ) | Bankruptcy Case No. 11-33413 |
| PARAMESWARI VELUCHAMY, | ) | Chapter 7 |
| | ) | Hon. Eugene R. Wedoff |
| Debtors. | ) | |
| | ) | |
| BANK OF AMERICA, N.A., not individually | ) | |
| but derivatively on behalf of | ) | |
| THE ESTATE OF PETHINAIDU and | ) | |
| PARAMESWARI VELUCHAMY, | ) | |
| | ) | Adversary Case No. 12-AP-01715 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ARUN VELUCHAMY, | ) | |
| ANU VELUCHAMY, | ) | |
| SONIA VELUCHAMY, | ) | |
| OAKBROOK FINANCIAL, INC., | ) | |
| VELUCHAMY 2009 DYNASTY TRUST, | ) | |
| VASUDEVAKI NAIDU, | ) | |
| JAGANATH NAIDU, | ) | |
| RAJIV PARTHASARATHY, | ) | |
| ARJUN PARTHASARATHY, | ) | |
| PETHINAIDU VELUCHAMY, and | ) | |
| PARAMESWARI VELUCHAMY, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Bank of America, N.A., not individually but derivatively on behalf of the Estate of

Pethinaidu and Parameswari Veluchamy (in such capacity, the "Estate Representative"), by and

through its attorneys, hereby complains against defendants Arun Veluchamy, Anu Veluchamy,

Sonia Veluchamy, Oakbrook Financial, Inc., Veluchamy 2009 Dynasty Trust, Vasudevaki

Naidu, Jaganath Naidu, Rajiv Parthasarathy, Arjun Parthasarathy, Pethinaidu Veluchamy, and

Parameswari Veluchamy as follows:

## NATURE OF THE ACTION

1.     This is an action pursuant to Sections 544(b)(1), 547, 548, and 550 of the Bankruptcy Code, 11 U.S.C. §§ 544(b)(1), 547, 548, and 550, to avoid and recover fraudulent and/or preferential transfers made by Chapter 7 debtors Pethinaidu Veluchamy ("Mr. Veluchamy") and/or Parameswari Veluchamy ("Mrs. Veluchamy") (collectively the "Veluchamys") to their adult children, Arun Veluchamy ("Arun") and Anu Veluchamy ("Anu"); to other relatives and related entities, Sonia Veluchamy ("Sonia," Arun's wife), Oakbrook Financial, Inc., Veluchamy 2009 Dynasty Trust, Vasudevaki Naidu (Mrs. Veluchamy's sister), Dr. Jaganath Naidu (Mrs. Veluchamy's brother-in-law), Rajiv Parthasarathy (Mrs. Veluchamy's nephew), and Arjun Parthasarathy (Mrs. Veluchamy's nephew); and to others. This is also an action pursuant to Sections 521(a)(4) and 542 of the Bankruptcy Code, 11 U.S.C. § 521(a)(4) and 542, to compel the debtors, the Veluchamys, and their adult children, Arun and Anu, to surrender and/or turn over property of the estate to the trustee.

2.     In August 2009, after the Veluchamys defaulted on approximately $40 million of loan obligations, Bank of America, N.A., in its individual capacity (in such capacity, "Bank of America"), sued the Veluchamys. By then, the Veluchamys had embarked on an extensive scheme to fraudulently transfer or hide all of their vast wealth: cash, securities, real estate, jewelry, and other assets worth far in excess of the debt owed to Bank of America. Most of the fraudulent transactions were transfers or pledges to the Veluchamys' adult children, other close relatives, or entities controlled by the Veluchamys or their relatives. Although the Veluchamys tried to dress up these transactions to make them appear to be legitimate transfers or pledges, in reality they were a charade designed to protect and safeguard the Veluchamys' wealth, while at the same time avoiding paying creditors. The Veluchamys sent more than $20 million in cash to

India and many of the fraudulent and other purported transfers were done in or through India in an effort to hide or disguise them.

3.        Before the fraudulent and other purported transfers occurred, the Veluchamys owned real property in the United States and India, at least $18 million in cash in the United States, and controlling ownership interests in numerous businesses in the United States and India worth many tens of millions of dollars. After the transfers, nearly all of the Veluchamys' real property interests were no longer in their names, they claimed they had no money either in the United States or India, and, with respect to their businesses, they claimed they either no longer owned the interests or owned only a small portion of the businesses' shares. After transferring virtually all of their property to their children and other close relatives, the Veluchamys pledged whatever shares were left to family-owned companies and relatives and orchestrated two collusive lawsuits against themselves, all in an effort to make sure any remaining assets ended up with their relatives, not their creditors. When they filed for bankruptcy, the Veluchamys claimed that they had no material assets and were unable to pay their creditors. This scheme included dozens of separate transactions, all of which were fraudulent transfers.

4.        On December 30, 2010, the United States District Court for the Northern District of Illinois entered judgments in Bank of America's favor against the Veluchamys for more than $43 million. On August 16, 2011 (the "Petition Date"), shortly before the commencement of a trial before Judge Shadur on Bank of America's motion to compel Veluchamy family members and others to return the fraudulently transferred property, the Veluchamys filed their Chapter 7 case. The automatic bankruptcy stay stopped the trial from proceeding.

5.        Despite their unequivocal statutory obligations as debtors in bankruptcy to make full and honest disclosures, after the Petition Date, the Veluchamys expanded their relentless

fraudulent transfer scheme into a cover up that included false filings in their bankruptcy case, dozens of brazenly false statements in 341 meetings, and forged and fabricated documents, all in an attempt to hide or conceal both their assets and the true nature and timing of the transfers to their children, other close relatives, and affiliated entities.

6.     The Estate Representative, on behalf of the estate, seeks to avoid and recover the Veluchamys' fraudulent transfers and preference payments pursuant to Sections 544, 547, 548, and 550 of the Bankruptcy Code, 11 U.S.C. §§ 544, 547, 548, and 550. The Estate Representative also seeks to compel the Veluchamys and others to surrender and/or turn over property of the estate to the trustee pursuant to Sections 521(a)(4) and 542 of the Bankruptcy Code, 11 U.S.C. § 521(a)(4) and 542.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this civil proceeding under title 11 pursuant to 28 U.S.C. § 1334(b).

8.     This adversary proceeding is properly before the Court pursuant to 28 U.S.C. § 157 and District Court Internal Operating Procedure 15(a).

9.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(E), (F), and (H).

10.     Venue is proper before the Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

11.     Defendants Pethinaidu Veluchamy and Parameswari Veluchamy, husband and wife, are Chapter 7 debtors in Case No. 11-33413 filed in the United States Bankruptcy Court for the Northern District of Illinois on August 16, 2011.

12.     Brenda Porter Helms has been appointed as the Chapter 7 Trustee for the Veluchamys' bankruptcy estate.

13.     Bank of America, N.A. is a national banking association chartered under the laws of the United States.

14.     On June 19, 2012, the Bankruptcy Court (Judge Wedoff) granted the Chapter 7 Trustee's motion to confer derivative standing on Bank of America, in its capacity as the Estate Representative, to pursue fraudulent transfer claims and any related claims or causes of action on behalf of the estate (Dkt. #506) (Exhibit A).

15.     Defendant Arun Veluchamy is a citizen and resident of the State of Illinois. Arun, the Veluchamys' adult son, is the older of the Veluchamys' two children.

16.     Defendant Anu Veluchamy is a citizen and resident of the State of Illinois. Anu, the Veluchamys' adult daughter, is the younger of the Veluchamys' two children.

17.     Defendant Sonia Veluchamy is a citizen and resident of the State of Illinois. Sonia is Arun's wife.

18.     Defendant Oakbrook Financial, Inc. ("OBF") is an Illinois corporation with its principal place of business in Illinois. Mrs. Veluchamy and others incorporated OBF, a finance company, in July 2010 for the purpose of receiving fraudulently-transferred funds and providing purported loans to Veluchamy companies. OBF's office was located at one of the Veluchamys' homes. Anu and Sonia are the purported majority shareholders of OBF. The other purported shareholders are the Veluchamys' nephews, Rajiv Parthasarathy and Arjun Parthasarathy.

19.     Defendant Veluchamy 2009 Dynasty Trust is a trust formed by the Veluchamys, as described below. Mr. Veluchamy, Arun, and Anu are trustees.

20.     Defendant Vasudevaki Naidu is a citizen and resident of the State of California and is Mrs. Veluchamy's sister.

21.    Defendant Dr. Jaganath Naidu is a citizen and resident of the State of California. Dr. Naidu is Mrs. Naidu's husband and Mrs. Veluchamy's brother-in-law. Dr. and Mrs. Naidu filed a claim (#20) in the Veluchamys' Chapter 7 case, asserting a secured claim in the amount of $1,517,366.66.

22.    Defendant Rajiv Parthasarathy is a United States citizen and resident of India, and is Mrs. Veluchamy's nephew. Rajiv filed a claim (#25) in the Veluchamys' Chapter 7 case, asserting a secured claim in the amount of $1,474,443.66.

23.    Defendant Arjun Parthasarathy is a resident of India and is Mrs. Veluchamy's nephew.

## FACTUAL ALLEGATIONS

24.    Before 2008, the Veluchamys were wealthy individuals owning vast business holdings, real estate, and other assets. In their financial statements, the Veluchamys represented to Bank of America their net worth at close to $500 million.

25.    Together, the Veluchamys were the majority shareholders in First Mutual Bancorp of Illinois, a holding company that owned Mutual Bank in Harvey, Illinois.

26.    The Veluchamys also owned a holding company known as VMark, Inc. ("VMark"), which in turn owned seven domestic direct marketing companies known as Automated Presort, Inc. ("Automated Presort"), Global Card Services, Inc., Versatile Card Technology, Inc. ("VCT"), Creative Automation Co., Fulfillment Xcellence, Inc., Unique Embossing Services, Inc., and Unique Data Services, Inc. The Veluchamys also owned affiliated companies known as Unique Mailing Services, Inc. ("Unique Mailing"), University Subscription Services, Inc. ("USS"), Veluchamy LLC, Jayavilas Logistics, Inc., Veluchamy DISC, Inc., Arun

Enterprises, Inc., Anu Enterprises, Inc., and a general Illinois partnership known as Creative Investments.

27.     Moreover, the Veluchamys owned substantial assets in India, including real property in Chennai, India, homes in India, and ownership interests in various Indian businesses, including Appu (Le Meridien) Hotels, Parameswari Spinning Mill, Jayavelu Spinning Mill, Versatile Card Technology (P) Ltd., Dharani Sugars, Aruppukotai Shri Vijayalakshmi Textile Mills, CAC Software Consultancy, Paragon Paper, and others.

28.     Between December 2005 and February 2008, the Veluchamys borrowed $30 million from Bank of America's predecessor, LaSalle Bank. In addition, Mr. Veluchamy personally guaranteed an additional $10 million loan made to First Mutual Bancorp. These loans were not secured by any of the Veluchamys' property. Thus, Bank of America's original unsecured claims against the Veluchamys arose prior to the date of the subject transfers.

29.     On November 30, 2008, many of the Veluchamys' loan obligations to Bank of America came due but were not paid. After entering into forbearance agreements, the Veluchamys defaulted again on June 30, 2009.

30.     On August 4, 2009, Bank of America wrote to the Veluchamys demanding payment in full by August 14, 2009. Again, the Veluchamys did not pay. Thus, on August 19, 2009, Bank of America sued the Veluchamys in the United States District Court for the Northern District of Illinois. *Bank of America v. First Mutual* and *Bank of America v. Veluchamy*, Case Nos. 09-cv-5108 and 09-cv-5109 (the "Veluchamy Lawsuits"). Bank of America later obtained judgments against the Veluchamys totaling more than $43 million.

31.     Also in July 2009, regulators shut down Mutual Bank. From May 2005 through July 2008, the Federal Deposit Insurance Corporation, in its regulatory capacity ("FDIC"), and

the Illinois Department of Financial and Professional Regulations conducted a series of investigations that raised increasing concerns about Mutual Bank's loan practices and finances. The regulators shared the results of those investigations with Mutual Bank's board of directors, including the Veluchamys, Arun, and Anu. In September 2008, regulators deemed Mutual Bank undercapitalized and required the infusion of additional capital. On July 31, 2009, regulators ultimately shut down Mutual Bank after the Veluchamys' efforts to raise additional capital failed. The Federal Deposit Insurance Corporation, as receiver for Mutual Bank ("FDIC-R"), later sued the Veluchamys, Arun, Anu, and others to recover more than $115 million in losses. *See FDIC v. Mahajan et al.*, Case No. 11-cv-7590 (N.D. Ill. Oct. 25, 2011).

32.     By the time Bank of America sued the Veluchamys for their loan default, the Veluchamys, assisted by their children Arun and Anu and other relatives, had embarked on an elaborate scheme to fraudulently transfer or hide their vast assets.

33.     The Veluchamys made most of these transfers within 2 years of the Petition Date and with the actual intent to hinder, delay, or defraud creditors. Accordingly, the transfers were fraudulent pursuant to 11 U.S.C. § 548(a)(1)(A), and are therefore voidable and recoverable pursuant to 11 U.S.C. § 550(a).

34.     The Veluchamys also made most of these transfers within 2 years of the Petition Date, did not receive reasonably equivalent (if any) value in exchange for the transfers, and made these transfers at a time when the Veluchamys were insolvent, rendered insolvent by the transfers, and/or had incurred, or believed or reasonably should have believed that they had incurred, debts beyond their ability to pay as they matured. Accordingly, these transfers were constructively fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B), and are therefore voidable and recoverable pursuant to 11 U.S.C. § 550(a).

35.     Moreover, the Veluchamys made all of these transfers within 4 years of the Petition Date and with the actual intent to hinder, delay, or defraud creditors. Accordingly, these transfers were fraudulent as to a creditor (like Bank of America), whether the creditor's claim arose before or after the transfers were made, pursuant to the Illinois Uniform Fraudulent Transfer Act (the "IUFTA"), 740 ILCS 160/5(a)(1) and 10(a). Thus, these fraudulent transfers could have been avoided or recovered by a creditor pursuant to the IUFTA, 740 ILCS 160/8(a)(1) and 9(b). Because a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code could have avoided these transfers under the IUFTA, the Estate Representative in its derivative capacity may avoid and recover these transfers under 11 U.S.C. §§ 544(b)(1) and 550(a).

36.     The Veluchamys also made all of these transfers within 4 years of the Petition Date, did not receive reasonably equivalent (if any) value in exchange for the transfers, and made these transfers at a time when the Veluchamys were insolvent, rendered insolvent by such transfer, and/or had incurred, or believed or reasonably should have believed that they had incurred, debts beyond their ability to pay as the debts matured. Accordingly, these transfers were constructively fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, pursuant to the IUFTA, 740 ILCS 160/5(a)(2), 6(a), and 10(b). Thus, these fraudulent transfers could have been avoided or recovered by a creditor pursuant to the IUFTA, 740 ILCS 160/8(a)(1) and 9(b). Because a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code could have avoided these transfers under the IUFTA, the Estate Representative in its derivative capacity may avoid and recover these transfers under 11 U.S.C. §§ 544(b)(1) and 550(a).

37.     To the extent these transfers are not otherwise fraudulent transfers, certain of the transfers were made within 1 year of the Petition Date and were made for the benefit of a purported creditor, for or on account of an antecedent debt purportedly owed by the Veluchamys before the transfer was made, to an insider, and therefore enabled the purported creditor to receive more than the creditor would have received if the transfer had not been made and the creditor received payment to the extent provided by the Bankruptcy Code. Accordingly, certain of these transfers are preferences and avoidable pursuant to 11 U.S.C. § 547(b) and may be recovered by the Estate Representative in its derivative capacity under 11 U.S.C. § 550(a).

38.     The Veluchamys also made certain of these transfers within 1 year of the Petition Date, to an insider, for a purported antecedent debt, and at a time when the Veluchamys were insolvent and the insider had reasonable cause to believe that the Veluchamys were insolvent. Accordingly, certain of these transfers were fraudulent as to a creditor whose claim arose prior to the transfer pursuant to IUFTA, 740 ILCS 160/6(b) and 10(c). Thus, those transfers could have been avoided and recovered by a creditor pursuant to the IUFTA, 740 ILCS 160/8(a)(1) and 9(b). Specifically, because a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code could have avoided certain of these transfers under the IUFTA, the Estate Representative in its derivative capacity may avoid and recover the transfers under 11 U.S.C. §§ 544(b)(1) and 550(a).

### $18.6 Million Cash Transfers To Arun And Anu

39.     Between September 1, 2009 and October 20, 2010, the Veluchamys transferred at least $8.5 million in cash to Arun and $10.1 million in cash to Anu, all within 2 years of the Petition Date. Moreover, of those funds, the Veluchamys transferred $884,307 to Arun and $2,050,305 to Anu after August 16, 2010, within one year of the Petition Date.

40.    Initially, the Veluchamys attempted to conceal their massive cash transfers to Arun and Anu. Rather than transferring the funds directly to Arun and Anu in the United States, the Veluchamys made a series of international wire transfers totaling more than $20 million from their bank accounts in the United States to bank accounts the Veluchamys owned at Canara Bank in India. The Veluchamys subsequently transferred approximately $17.6 million of that money to two different bank accounts at Canara Bank owned by Arun and Anu.[1] Arun and Anu then transferred most of this money back to the United States, where they used much of it supposedly to "buy" the Veluchamys' interests in various family companies and property.

41.    When Bank of America discovered in the Veluchamy Lawsuits that the Veluchamys had transferred more than $20 million to India (including the $17.6 million transferred to Arun and Anu), the Veluchamys initially represented that they transferred the funds to pay "legitimate debts in India." That representation was false.

42.    After Bank of America discovered that the Veluchamys gave virtually all of the money they sent to India to their children, not Indian creditors, the Veluchamys came up with a new version of events: they produced a series of "Indemnity Agreements," which purportedly required the Veluchamys to pay some $19 million to their children (hereinafter "Purported Indemnity Funds"). Under the "Indemnity Agreements," which are dated "as of" July 31, 2008, "as of" September 29, 2008 and "as of" March 31, 2009, the Veluchamys purported to promise that if and when their family-owned bank, Mutual Bank, failed, the Veluchamys would indemnify Arun and Anu for the loss of approximately $15 million they allegedly had invested in Mutual Bank over the prior decade and would reimburse Arun and Anu for the loss of approximately $3.6 million they allegedly invested in 2008 and 2009.

---

[1] The Veluchamys transferred another $1 million directly to their children in the United States.

43.    The "Indemnity Agreements" are nothing more than fabricated, backdated documents. The Veluchamys never disclosed these purported $18.6 million indemnity obligations on financial statements (or anything else) they submitted to Bank of America to induce Bank of America to enter into loan and/or forbearance agreements. The Veluchamys, Arun, and Anu likewise failed to include any "indemnity" payments on their tax returns, as they would have been required to do if these were in fact legitimate indemnity payments.

44.    Indeed, although the Veluchamys initially testified in the Veluchamy Lawsuits that the "Indemnity Agreements" were executed on or about the "as of" dates specified on each document, the Veluchamys recently testified in the 341 meetings that they did not even remember if the "Indemnity Agreements" were actually executed on or about the "as of" dates, and did not remember whether the documents, in fact, were not drafted until 2010 or 2011. Moreover, Mr. Veluchamy admitted in the 341 meetings that "[t]here may be some" backdated documents among the documents the Veluchamys produced to Bank of America in the Veluchamy Lawsuits. In the Veluchamy Lawsuits, Bank of America also asked the Veluchamys and their children to identify the attorney who supposedly drafted the Indemnity Agreements in order to verify when the agreements were drafted and signed. In their depositions and interrogatory responses, the Veluchamys and their children repeatedly claimed that they did not remember which of their "many" attorneys drafted the agreements. Bank of America then contacted the law firms that it knew had represented the Veluchamy family; all of them denied that they were involved in drafting the Indemnity Agreements.

45.    But even if the "Indemnity Agreements" were bona fide documents (and they are not), the Veluchamys still transferred the Purported Indemnity Funds to their children Arun and

Anu with actual intent to hinder, delay, or defraud creditors, and purportedly undertook $18.6 million in "indemnity" obligations for which they did not receive reasonably equivalent value.

46.    Moreover, although the Veluchamys purportedly agreed to indemnify Arun and Anu in 2008 for contributions they allegedly made to Mutual Bank over the prior decade, Arun and Anu had not actually invested $18.6 million of their own money in Mutual Bank. The Veluchamys concede that they have no documentation for the bulk of the $18.6 million that Arun and Anu supposedly invested in Mutual Bank dating back to the late 1990s, when they were teenagers. The two "Indemnity Agreements" for the largest amounts of money, $15 million in total dating back to the late 1990s, are also unsupported by consideration.

47.    The "Indemnity Agreements" also expressly allowed the Veluchamys to maintain control over the Purported Indemnity Funds by requiring Arun and Anu to use the funds "for the benefit of … VMark … and its affiliates" and "to provide whatever personal guaranties and/or use of personally owned collateral is required for the benefit of Indemnitors [the Veluchamys]."

48.    After Arun and Anu transferred most of the Purported Indemnity Funds from their bank accounts in India back to their bank accounts in the United States, they used some of the "Purported Indemnity Funds" as follows:

(a)    on or about September 8, 2009, to acquire a controlling interest in VMark ($4.8 million), with the vast majority of the acquisition funds being used by Veluchamy-affiliated companies to make alleged "loan" repayments to the Veluchamys;

(b)    from October 2009 through March 2010, to acquire real estate the Veluchamys owned in Downers Grove, Illinois: 5300 Katrine ("Katrine"), 1400 Centre Circle ("Centre Circle"), and 5200 Thatcher ("Thatcher") ($2.8 million); and

(c)      in July 2010, to set up and capitalize OBF ($5.9 million), a finance company incorporated for the purpose of receiving fraudulently-transferred funds and purportedly lending to Veluchamy companies, which issued shares in Anu's and Sonia's names even though it was capitalized with Purported Indemnity Funds.

49.      The Veluchamys did not receive reasonably equivalent value for any of the foregoing transfers to Arun and Anu pursuant to the purported Indemnity Agreements or for the purported obligations incurred pursuant to the Indemnity Agreements.

### VMark Shares

50.      With respect to VMark, the Veluchamys originally owned the vast majority of VMark's stock and had complete control over VMark. The Veluchamys' ownership interest in VMark, on information and belief, was worth, at a minimum, tens of millions of dollars, and perhaps $100 million or more. According to VMark's corporate records, as of December 31, 2008, Mr. Veluchamy owned 51% of the shares, Mrs. Veluchamy owned 19%, and Arun and Anu each owned 15%.

51.      As a result of a series of transactions the Veluchamys engineered in 2009, Mr. Veluchamy's ownership interest in VMark was eliminated completely, Mrs. Veluchamy's interest in VMark's voting and non-voting common stock was diluted to 20% and 52%, respectively, and Arun's and Anu's respective interests in voting and non-voting common stock was increased to 40 percent and 24 percent, respectively. As described in paragraphs 77-81 below, Mrs. Veluchamy later purported to pledge all of her remaining VMark stock to family members and OBF, an entity owned by family members, in order to keep the shares away from legitimate creditors.

52.     First, on January 1, 2009, Mr. Veluchamy gave his entire 51% interest in VMark to Mrs. Veluchamy "for and in consideration of the love and affection that [Mr. Veluchamy] bears to his wife." After this gift, Mrs. Veluchamy owned 70% of VMark's stock, and Arun and Anu each owned 15% of VMark's stock.

53.     Then, the Veluchamys caused VMark to issue new VMark shares to Arun and Anu such that Arun and Anu became the principal owners of VMark and Mrs. Veluchamys' prior 70% ownership of VMark was significantly diluted. This dilution transaction had precisely the same effect as if the Veluchamys had directly transferred a substantial portion of the Veluchamys' ownership interest in VMark (and the companies directly or indirectly owned by VMark) to Arun and Anu.

54.     Thus, VMark's Board of Directors (including the Veluchamys, Arun, and Anu) consented to create a new class of non-voting common stock and to declare a stock dividend (by way of a stock split) of 19 shares of non-voting common stock for each issued and outstanding share of voting common stock of VMark.

55.     On September 8, 2009, Arun and Anu "purchased" 1,540,000 voting shares (770,000 shares each) and 6,384,600 non-voting shares (3,192,300 shares each) of VMark stock. Purportedly in exchange, Arun and Anu paid VMark $4.8 million, all from the Purported Indemnity Funds that the Veluchamys gave to Arun and Anu. These VMark shares purportedly "purchased" by Arun and Anu were worth far in excess of $4.8 million.

56.     The Veluchamys orchestrated this transaction diluting their ownership interest in VMark with the actual intent to hinder, delay, or defraud creditors, and did not receive reasonably equivalent value in exchange for the dilution.

57.    In addition to the Purported Indemnity Funds and related transfers, including diluting their VMark shares, the Veluchamys transferred other property and business interests in the United States to Arun and Anu and other close relatives.

### Avadamma LLC and the Veluchamy 2009 Dynasty Trust

58.    On March 4, 2009, the Veluchamys formed Avadamma LLC. According to its Limited Liability Company Agreement, Avadamma LLC was formed in an attempt "to provide protection of family assets from claims of future creditors" and "to prevent the transfer of family assets to persons with outside and possible adverse interests." The next day, on March 5, 2009, the Veluchamys transferred their ownership interest in four commercial properties—North Park Mall in Villa Park, Meadowbrook Mall in Downers Grove, University Plaza in Downers Grove, and 500 North LaSalle Street in Chicago, Illinois—to Avadamma LLC. At the time, Avadamma LLC was owned by Mr. and Mrs. Veluchamy in equal shares.

59.    On April 30, 2009, the Veluchamys created Veluchamy 2009 Dynasty Trust in a related attempt to provide that "the interest of the beneficiaries in principal or income shall not be subject to the claims of creditors or others." Mr. Veluchamy, Arun, and Anu are trustees of the Veluchamy 2009 Dynasty Trust; the beneficiaries include Arun and Anu.

60.    On May 14, 2009 and April 16, 2010, Mrs. Veluchamy transferred almost all of her interest in Avadamma LLC to the Veluchamy 2009 Dynasty Trust, and Veluchamy 2009 Dynasty Trust became a member of Avadamma LLC. On or about November 23, 2010, Mr. Veluchamy transferred most of his interest in Avadamma LLC to Arun and Anu.

61.    Through these transfers, according to its Chapter 11 bankruptcy filings, Avadamma LLC is now owned 49% by Veluchamy 2009 Dynasty Trust (its beneficiaries are Arun, Anu, and their descendants), 22.45% by Arun, and 22.45% by Anu. The Veluchamys

thereby reduced their ownership interest in Avadamma LLC to 5.1% for Mr. Veluchamy and 1% for Mrs. Veluchamy.

62.     The Veluchamys transferred their ownership interests in these four properties, and subsequently 93.9% of their ownership interest in Avadamma LLC, with the actual intent to hinder, delay, or defraud creditors, and did not receive reasonably equivalent value in exchange for the transfers.

### Bear Stearns Venture Partners, L.P.

63.     On or about July 1, 2010, the Veluchamys transferred their limited partner interest in a Bear Stearns Venture Partners, L.P. fund to Arun and Anu. Although the Veluchamys ordinarily did not document transactions with their children, in this case they created a written transfer agreement and "promissory notes" under which Arun and Anu were supposed to pay the Veluchamys $650,000 ($325,000 each) for the Bear Stearns fund, with the money to be paid from the cash flow from three properties Arun and Anu acquired from the Veluchamys.

64.     As a threshold matter, Arun and Anu acquired the three properties (Katrine, Center Circle, and Thatcher) using Purported Indemnity Funds, as more fully described in paragraph 48(b) above.

65.     Moreover, although the Veluchamys created or participated in the creation of fictitious and conflicting financial records and offered a variety of conflicting stories purporting to show that Arun and Anu paid the $650,000 purchase price, in reality the Veluchamys received no cash from their children and were not paid for the transfer of the Bear Stearns fund.

66.     The Veluchamys transferred their interest in the Bear Stearns fund to Arun and Anu with the actual intent to hinder, delay, or defraud creditors, and did not receive reasonably equivalent value in exchange for the transfer.

## Other Transfers Of Domestic Businesses

67.    Between November 18 and 23, 2010, Mr. Veluchamy fraudulently transferred his interests in several other domestic companies to Arun and Anu with the actual intent to hinder, delay, or defraud creditors and without receiving reasonably equivalent value:

(a)    On November 18, 2010, Mr. Veluchamy transferred his interest in Creative Investments to Arun and Anu;

(b)    On November 23, 2010, Mr. Veluchamy transferred his interest in Veluchamy, LLC to Arun and Anu;

(c)    On November 23, 2010, Mr. Veluchamy transferred his interest in Unique Mailing to Arun and Anu; and

(d)    On November 23, 2010, Mr. Veluchamy transferred his interest in USS to Arun and Anu.

## Indian Businesses

68.    Between late 2009 and early 2011, the Veluchamys also fraudulently transferred their ownership interests in various Indian companies to Arun and Anu, including:

(a)    On or about October 12, 2009, the Veluchamys transferred 1,245,584 shares in Parameswari Spinning Mill to Arun and Anu (622,792 shares each);

(b)    On or about October 12, 2009, the Veluchamys transferred 7,999,998 shares in Jayavelu Spinning Mill to Arun and Anu (3,999,999 shares each);

(c)    On or about February 28, 2010, the Veluchamys transferred 2.3 million shares in Appu Hotels to Arun and 1.9 million shares to Anu;

(d)    On or about July 10, 2010, the Veluchamys transferred 3,776,800 shares in Versatile Card Technology (P) Ltd. to Arun and Anu (1,888,400 shares each);

(e)    On or about August 2, 2010, Mrs. Veluchamy transferred approximately $315,000 in cash to Appu Hotels; in exchange, Appu Hotels issued shares to Arun and Anu, not Mrs. Veluchamy; and

(f)    Sometime between December 31, 2009 and September 30, 2010, Mr. Veluchamy transferred 550,474 shares in Dharani Sugars to Arun and Anu.

69.    Separately, pursuant to other documents dated "as of" June 3, 2009, the Veluchamys also purported to pledge shares in Parameswari Spinning Mill, Jayavelu Spinning Mill, and Versatile Card Technology (P) Ltd. to Arjun Parthasarathy, Mrs. Veluchamy's nephew. According to the Veluchamys, they gave Arjun signed pledge certificates for these shares, which Arjun could then exercise at any time. After the Veluchamys filed their Chapter 7 case, according to the Veluchamys, Arjun did in fact take the pledged shares as his own, without any court process and in violation of the automatic stay in the Veluchamys' bankruptcy case. Although the purported "pledge agreements" are dated "as of" June 3, 2009, these documents appear to be backdated, and the Veluchamys conceded in the 341 meeting that they do not know when the documents were actually drafted and signed.

70.    The Veluchamys transferred or pledged their interests in these Indian businesses to Arun, Anu, and Arjun with the actual intent to hinder, delay, or defraud creditors, and did not receive reasonably equivalent value in exchange for the transfers and pledges.

**Collusive State Court Judgments**

71.    In December 2010, shortly before the District Court entered judgments in favor of Bank of America and against the Veluchamys for more than $43 million, Mr. Veluchamy manufactured fictitious obligations to other relatives, Vasudevaki Naidu (Mrs. Veluchamy's

sister), Jaganath Naidu (Mrs. Veluchamy's brother-in-law), and Rajiv Parthasarathy (Mrs. Veluchamy's nephew) (collectively the "Collusive Judgment Recipients").

72.     On December 1, 2010, the Collusive Judgment Recipients, with the assistance of the Veluchamys and their children, filed two lawsuits against Mr. Veluchamy in Cook County Circuit Court. Mr. Veluchamy then immediately (on December 2 and 3, 2010) consented to entry of judgments against him totaling about $2.8 million.

73.     The Collusive Judgment Recipients later moved to intervene in the post-judgment proceedings in the Veluchamy Lawsuits, claiming that their Circuit Court of Cook County judgment liens predated, and therefore had priority over, Bank of America's December 30, 2010 judgments against the Veluchamys. The Collusive Judgment Recipients have since filed claims in the Veluchamys' Chapter 7 case.

74.     The Collusive Judgment Recipients attempted to conceal the nature of their judgments by objecting to discovery concerning the judgments in the Veluchamy Lawsuits. The District Court rejected those efforts and allowed discovery to proceed.

75.     The Collusive Judgment Recipients initially were less than candid about their relationship with the Veluchamys, but discovery soon revealed that the Collusive Judgment Recipients are in fact Mrs. Veluchamy's sister, brother-in-law, and nephew. Moreover, the Collusive Judgment Recipients admitted while testifying under oath in the Veluchamy Lawsuits that Mr. Veluchamy chose and paid for their lawyers, that Mr. Veluchamy and his lawyers reviewed the Collusive Judgment Recipients' retention agreements with their lawyers, that the purported loans underlying the judgments were based on backdated promissory notes created by Mr. Veluchamy, that the backdated promissory notes were inaccurate in nearly every material respect (including the supposed loan dates, amounts, and identity of the borrowers), and that

much of the money that the Collusive Judgment Recipients supposedly "loaned" to Mr. Veluchamy or to companies owned by Mr. Veluchamy actually originated from Mr. Veluchamy himself or from other companies owned and controlled by the Veluchamys.

76.     In short, the state court judgments against Mr. Veluchamy were orchestrated from start to finish by Mr. Veluchamy with the actual intent to hinder, delay, or defraud legitimate creditors. Moreover, Mr. Veluchamy did not receive reasonably equivalent value from the Collusive Judgment Recipients in exchange for the judgments against him. Indeed, the collusive judgments against Mr. Veluchamy were so problematic that the District Court referred the matter to the U.S. Attorney's Office for investigation of potential criminal wrongdoing.

77.     As part of the alleged loans that formed the basis for the collusive judgments, the Veluchamys granted Rajiv Parthasarathy a second mortgage on an apartment owned by the Veluchamys at 25 E. Superior in Chicago, Illinois. The mortgage is purportedly dated in 2009, but in reality the mortgage document was not signed, notarized, or recorded until May 2010. An unsigned, unrecorded, and incomplete copy of the mortgage was filed as part of the state court lawsuit purporting to show the transaction had occurred in 2009 when it had not.

78.     As part of the alleged loans that formed the basis for the collusive judgments, the Veluchamys also prepared phony, backdated pledge agreements to match the phony, backdated promissory notes. These backdated documents purportedly pledged 6.5 million of Mrs. Veluchamy's VMark shares to Mrs. Veluchamy's sister and nephew, in an attempt to place them ahead of legitimate creditors, including Bank of America.

79.     The Veluchamys granted Rajiv Parthasarathy a second mortgage on the 25 E. Superior property and purported to pledge Mrs. Veluchamy's VMark shares with the actual

intent to hinder, delay, or defraud creditors, and did not receive reasonably equivalent value in exchange for the mortgage and pledges.

**Additional OBF Pledges and Transfers**

80.    Mrs. Veluchamy purported to pledge her remaining VMark shares to OBF on July 15, 2010 in connection with an alleged $4 million loan from OBF to Creative Automation, which OBF funded with Purported Indemnity Funds. The value of the pledged VMark shares was far greater than the amount of the alleged loan. This transaction was not at arms length. Mrs. Veluchamy was an incorporator of OBF and an officer of Creative Automation.

81.    Moreover, although the Veluchamys ordinarily did not document loan transactions between their companies, in this case they prepared a written "loan agreement" to make the loan appear legitimate. But the loan agreement itself shows that Mrs. Veluchamy's purported pledge of her VMark shares was entirely unnecessary. The loan agreement did not require Mrs. Veluchamy or anyone else to pledge VMark shares. According to the loan agreement, the loan was already secured by all of the assets of Creative Automation, which as of its own bankruptcy filing in August 2011, reported assets of $10.8 million and liabilities of only $8.7 million (including the balance of the alleged OBF loan listed at $3.6 million).

82.    Also on or about July 15, 2010, separate and apart from the alleged $4 million loan to OBF from Creative Automation, Mrs. Veluchamy transferred $600,000 in cash to OBF. Mrs. Veluchamy explained that Automated Presort owed her $600,000 and she caused Automated Presort to write a check to OBF on her behalf, as if Automated Presort repaid her the $600,000 and she then transferred $600,000 to OBF.

83.    On or about July 29, 2010, Mrs. Veluchamy transferred an additional $10,000 to OBF.

84.     Mrs. Veluchamy purported to pledge her remaining VMark shares to OBF and separately transferred $610,000 in cash to OBF with the actual intent to hinder, delay, or defraud creditors, and did not receive reasonably equivalent value in exchange for the purported pledges and transfers.

### Chennai Property

85.     On December 30, 2010—the same day the District Court in the Veluchamy Lawsuits entered judgments in favor of Bank of America against the Veluchamys—the Veluchamys gave real property they owned in Chennai, India (the "Chennai Property") to Arun and Anu in consideration of "the love and affection" that the Veluchamys had for their children. The Veluchamys did not receive reasonably equivalent (or any) value for this transfer of the Chennai Property, which may be worth $6 million to $8 million, perhaps more.

86.     The Veluchamys, Arun, and Anu attempted to conceal their ownership and the value of the Chennai Property, falsely testifying in the Veluchamy Lawsuits and the 341 meetings that the property was really owned by the Indian government and that the Veluchamys only transferred a lease interest in the property to Arun and Anu.

87.     In reality, the Indian government does not own the Chennai Property. The December 30, 2010 deeds transferring the property to Arun and Anu state that each is "the absolute owner of the property"; that Arun and Anu "shall have absolute right, title and interest to the property"; that the Veluchamys had previously "purchased the property" pursuant to a "deed of sale"; and that the property "is free of encumbrance." Moreover, as recently as September 2011, the Veluchamys continued to represent to another lender in India that Arun and Anu did in fact own the Chennai Property, and Anu encumbered her share of this fraudulently

transferred property (which share was valued at approximately $4.4 million) by using it as security for a new loan to VCT India.

*          *          *

88.    With respect to all of the foregoing transfers, pledges, and obligations in paragraphs 39 to 87 above:

(a)    The Veluchamys made such transfers and incurred such obligations to insiders within the meaning of Section 547 of the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act, *i.e.*, to their children and other relatives;

(b)    One or more of the Veluchamys exercised possession or control over the subject property after the transfers and pledges were made or the obligations incurred;

(c)    The transfers and obligations were not disclosed and were actively concealed;

(d)    Before the transfers were made or the obligations incurred, the Veluchamys had been threatened with suit, including by Bank of America and the FDIC-R;

(e)    The transfers were of substantially all of the Veluchamys' known assets;

(f)    The value of the consideration (if any) the Veluchamys received was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

(g)    The Veluchamys were insolvent or became insolvent shortly after the transfers were made or the obligations were incurred; and

(h)    Each of the Veluchamys' children, other family members, and entities controlled by family members had reasonable cause to believe that the Veluchamys were

insolvent within the meaning of the Illinois Uniform Fraudulent Transfer Act at the time of each of the subject transfers.

89.    The full extent of the Veluchamys' fraudulent transfers of assets to Arun and Anu and others is likely not yet known.

90.    At all times relevant hereto, Arun, Anu, Sonia Veluchamy, OBF, Veluchamy 2009 Dynasty Trust, Vasudevaki Naidu, Jaganath Naidu, Rajiv Parthasarathy, and Arjun Parthasarathy knew that the Veluchamys owed Bank of America and other creditors money and that Bank of America was seeking repayment of loans from the Veluchamys.

91.    Each of Arun, Anu, Sonia Veluchamy, OBF, Veluchamy 2009 Dynasty Trust, Vasudevaki Naidu, Jaganath Naidu, Rajiv Parthasarathy, and Arjun Parthasarathy did not take any of the subject transfers in good faith and did not provide reasonably equivalent value in exchange for the subject transfers.

**Other Purported Transfers and Hidden Assets**

92.    In addition, the Veluchamys continue to exert control over property that they purportedly transferred away. The property is held by others in name only and remains property of the Veluchamys' bankruptcy estate. The Veluchamys are also hiding property, which likewise remains property of the bankruptcy estate. This property is recoverable by the Estate Representative in its derivative capacity under 11 U.S.C. § 521(a)(4), which requires the Veluchamys to surrender property of the estate to the trustee, and 11 U.S.C. § 542, which requires parties to turn over property of the estate to the trustee.

93.    For example, after Bank of America sued the Veluchamys in August 2009, the Veluchamys, with assistance from Arun and Anu, purported to transfer their ownership interests in various Indian companies to relatives or other individuals in India, including:

(a)    After initially transferring 1,245,584 shares in Parameswari Spinning Mill to Arun and Anu on or about October 12, 2009 (as discussed in paragraph 68(a) above), on or about December 6, 2010, the Veluchamys caused Arun and Anu to transfer those shares back to them; a few days later, on or about December 9, 2010, the Veluchamys purportedly transferred those shares to Mrs. Veluchamy's sister, Renugadevi.

(b)    After initially transferring 7,999,998 shares in Jayavelu Spinning Mill to Arun and Anu on or about October 12, 2009 (as discussed in paragraph 68(b) above), on or about December 6, 2010, the Veluchamys caused Arun and Anu to transfer those shares back to them; a few days later, on or about December 9, 2010, the Veluchamys purportedly transferred those shares to Mrs. Veluchamy's sister, Renugadevi.

(c)    On or about October 1, 2010, the Veluchamys purportedly transferred 5,506,563 shares in Versatile Card Technology (P) Ltd. to Renugadevi and another 5,506,563 shares to Mrs. Veluchamy's brother-in-law, Rajaram (Renugadevi's husband).

(d)    On or about October 1, 2010, the Veluchamys purportedly transferred 43,000 shares in CAC Software Consultancy to Rajaram and another 43,000 shares to Renugadevi.

(e)    On or about December 9, 2010, the Veluchamys purportedly transferred 1,293,300 shares in Paragon Paper to Renugadevi.

(f)    On or about May 25, 2011, Parameswari Veluchamy purportedly transferred 4,125 shares in Aruppukotai Shri Vijayalakshmi Textile Mills to Rajaram.

94.    Although the Veluchamys claimed in the 341 meetings that these purported transfers to Renugadevi and Rajaram all occurred on or about May 1, 2008, each company's

annual reports and other contemporaneous public filings in India show that the purported transfers did not begin until 2010, after Bank of America sued the Veluchamys.

95.     Mr. Veluchamy also claims that he purportedly transferred 5.5 million shares in Appu Hotels to Kathi Anand in May 2008 to repay alleged loans for which Mr. Veluchamy has no documentation.

96.     The Veluchamys continued to control the Indian businesses and/or their ownership interests in the businesses despite the purported transfers to Renugadevi and Rajaram, Mrs. Veluchamy's sister and brother-in-law, and to Kathi Anand.

97.     In July 2010, the Veluchamys also transferred additional funds from their own bank accounts to accounts owned by their businesses in India which they controlled. On or about July 21, 2010, Mr. Veluchamy transferred about $1.2 million to Jayavelu Spinning Mills. On or about July 23, 2010, Mr. Veluchamy transferred about $2.35 million to Parameswari Spinning Mills. Mrs. Veluchamy also transferred about $2 million to Jayavelu Spinning Mills. Although the Veluchamys claim that they made these transfers to the spinning mills because they were guarantors of the spinning mills' debt to Canara Bank, the Veluchamys admit that the spinning mills were not in default on their loans and that Canara Bank had not demanded that the Veluchamys make payments under their guarantees.

98.     The Veluchamys also own millions of dollars worth of jewelry that they have attempted to conceal by telling a series of false and inconsistent stories. Initially, in the supplemental proceedings in the Veluchamy Lawsuits, the Veluchamys testified that they did not own and had never owned a large amount of expensive jewelry. That testimony was false. Although the Veluchamys failed to produce complete copies of their homeowners insurance

policies, Bank of America learned from their insurance carriers that the Veluchamys had insured specific pieces of jewelry valued at more than $1.5 million.

99.     After their insurance policies were discovered, the Veluchamys proffered a second version of events: they represented through their counsel, and their daughter Anu testified, that although the Veluchamys insured that jewelry on their policies, the jewelry was really owned by relatives from India who supposedly left the jewelry at the Veluchamys' home beginning in 2004 for a series of family weddings, and then took the jewelry back to India in 2009. Those representations and testimony also were false. Documents produced by the insurance carriers showed that much of the jewelry had been insured by the Veluchamys well before 2004, in some instances since as early as 1998.

100.     Third, after the canard about the jewelry being owned by Indian relatives was proven false, Mrs. Veluchamy admitted that the jewelry had belonged to her for many years (except for a few pieces owned by Mr. Veluchamy or Anu). However, Mrs. Veluchamy then asserted that she sold most of the jewelry in India in 2009 or 2010 for a fraction of its appraised value and that she either spent the proceeds or gave it to a family company in India. The Veluchamys repeated this third version of events in the 341 meetings. This testimony is also false. The Veluchamys had cited a significant drop in their jewelry coverage as of November 2009 to support their story that they no longer had much jewelry, but Bank of America discovered that the Veluchamys simply moved the coverage to separate policies in Arun's and Anu's name that insured property at the Veluchamys' Oak Brook home. Some of those items stayed on Anu's policy until May 2011, days before Mrs. Veluchamy traveled to India. Mrs. Veluchamy admitted that she had no documents to support her claim of a fire sale of her jewelry in India.

101.    The Veluchamys also caused approximately $474,000 to be paid to the Internal Revenue Service ("IRS") for taxes that they do not owe.

102.    In particular, in July 2011, the Veluchamys caused several of their domestic companies to transfer $474,000 to the U.S. Treasury to pay the Veluchamys' 2010 estimated personal income taxes. But when the Veluchamys filed their 2010 tax return, they did not report these estimated tax payments. As a result, this overpayment was not refunded to the Veluchamys and, on information in belief, remains at the IRS.

103.    In the 341 meetings, the Veluchamys and Arun[2] testified that the payments were for the companies' own corporate tax liability. This testimony was false. The companies are all subchapter S corporations which do not independently owe federal income taxes. In reality, each check was accompanied by an IRS Form 1040-ES (estimated tax for individuals) Payment Voucher. And the memo line of each check sent to the IRS—checks signed by Arun—listed the personal social security numbers for the Veluchamys and "2010 Form 1040-ES."

104.    The Veluchamys did not owe the IRS $474,000, but as noted above did not report this $474,000 estimated tax payment on their 2010 tax returns. As of mid-2012, the Veluchamys testified that they had not yet filed amended returns disclosing this payment.

105.    The Chapter 7 Trustee has since filed an amended return on the Veluchamys' behalf, but has yet to recover any of the $474,000 overpayment.

## COUNT I
### (Against Defendants Arun Veluchamy and Anu Veluchamy for Fraudulent Transfer of $18.6 Million in Purported Indemnity Funds)

106.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

---

[2] Arun's testimony was in a 341 meeting in the Qualteq bankruptcy.

107.    The Veluchamys fraudulently transferred $18.6 million in Purported Indemnity Funds to Arun ($8.5 million) and Anu ($10.1 million) between September 1, 2009 and October 20, 2010. These transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1) and are recoverable from Arun and Anu, as the initial transferees of the transfers and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the initial transferees of the transfers and/or the person for whose benefit such transfers were made, to return the avoided $18.6 million (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT II
### (Against Defendants Arun Veluchamy and Anu Veluchamy for Preferential Payment of $2,934,612 in Purported Indemnity Funds)

108.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

109.    To the extent the Veluchamys' transfer of $18.6 million in Purported Indemnity Funds to Arun ($8.5 million) and Anu ($10.1 million) between September 1, 2009 and October 20, 2010, is not otherwise voidable as a fraudulent transfer, the Veluchamys transferred $2,934,612 of the Purported Indemnity Funds to Arun ($884,307) and Anu ($2,050,305) after August 16, 2010. Even if the so-called "Indemnity Agreements" are what they purport to be and are valid, binding, and non-voidable agreements (and they are not), the Veluchamys' payments of $2,934,612 of Purported Indemnity Funds to Arun and Anu within one year of the Petition

Date are preference payments and avoidable pursuant to 11 U.S.C. §§ 544(b)(1) and 547(b), and

are recoverable from Arun and Anu, as the initial transferees of the transfers and/or the persons

for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of judgment in its favor and

against Arun and Anu (a) avoiding the preference payments under 11 U.S.C. §§ 544(b)(1) and

547(b), (b) subject to 11 U.S.C. § 550(d), directing Arun and Anu, as the initial transferees of

such transfers and/or the person for whose benefit the transfers were made, to return the avoided

$2,934,612 (or the value thereof), together with such interest as legally owing with respect

thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting

further relief as may be just and proper under the circumstances.

## COUNT III
### (Against Defendants Arun Veluchamy and Anu Veluchamy for Fraudulent Transfer of the Majority Ownership Interest in VMark)

110.     The Estate Representative restates and realleges paragraphs 1-105 as if fully set

forth in this paragraph.

111.     The Veluchamys fraudulently transferred their majority ownership interest in

VMark to Arun and Anu on or about September 8, 2009 when they caused VMark to issue

1,540,000 voting shares (770,000 shares each) and 6,384,600 non-voting shares (3,192,300

shares each) to Arun and Anu. These transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1)

and 548(a)(1) and are recoverable from Arun and Anu, as the initial transferees of the transfers

and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor

and against Arun and Anu (a) avoiding the transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1),

(b) directing Arun and Anu, as the initial transferees of the transfers and/or the person for whose

benefit such transfers were made, to return the shares so received by them (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT IV
**(Against Defendants Arun Veluchamy and Anu Veluchamy For Fraudulent Transfer of Interest in Bear Stearns Venture Partners, L.P.)**

112.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

113.    The Veluchamys fraudulently transferred one million shares in Bear Stearns Venture Partners, L.P., to Arun and Anu on or about July 1, 2010. This transfer is voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1) and is recoverable from Arun and Anu, as the initial transferees of the transfer and/or the persons for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfer under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the initial transferees of the transfer and/or the person for whose benefit such transfer was made, to return the shares so received by them (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT V

### (Against Defendants Oak Brook Financial as Subsequent Transferee of $5.9 Million in Fraudulently-Transferred Purported Indemnity Funds and Sonia Veluchamy)

114.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

115.    OBF is a subsequent transferee of $5.9 million of Purported Indemnity Funds that the Veluchamys fraudulently transferred to Arun and Anu, and was not a good-faith transferee for value.

116.    Sonia, as the recipient of stock in OBF, is either, through her stock ownership, one of the parties for whose benefit the original transfer of at least $500,000 of the $5.9 million of Purported Indemnity Funds was made to Arun and Anu, or a subsequent transferee of such funds and, in the latter case, was not a good-faith transferee for value.

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against OBF and Sonia (a) subject to 11 U.S.C. § 550(d), directing OBF, as a subsequent transferee, to return the avoided $5.9 million (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), (b) avoiding the transfer as to Sonia under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (c) subject to 11 U.S.C. § 550(d), directing Sonia to return either the avoided $500,000 (or the value thereof) or the OBF stock she received when OBF was incorporated with Purported Indemnity Funds (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (d) granting further relief as may be just and proper under the circumstances.

## COUNT VI
### (Against Defendant Oak Brook Financial for Fraudulent Transfer of $610,000)

117.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

118.    In addition to the Purported Indemnity Funds that Arun and Anu transferred to OBF, Mrs. Veluchamy transferred or caused an additional $610,000 to be transferred to OBF.

119.    Mrs. Veluchamy transferred $610,000 to OBF with the actual intent to hinder, delay, or defraud creditors, including Bank of America, and did not receive reasonably equivalent value in exchange for the transfers

120.    Mrs. Veluchamys' transfers of $610,000 to OBF are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1) and are recoverable from OBF, as the initial transferee of the transfers and/or the person for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against OBF (a) avoiding the transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing OBF, as the initial transferee of the transfers and/or the person for whose benefit such transfers were made, to return the avoided $610,000 (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT VII
### (Against Defendants Arun and Anu Veluchamy For Fraudulent Transfer Of Real Property In Illinois)

121.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

122.    The Veluchamys fraudulently transferred the Katrine, Center Circle, and Thatcher properties in Downers Grove, Illinois to Arun and Anu from October 2009 through March 2010, along with the income streams generated by leasing those properties to entities controlled by the Veluchamys. These transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1) and are recoverable from Arun and Anu, as the initial transferees of the transfers and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfers of the property and any leases created for the purpose of transferring the income streams for those properties under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the initial transferees of the transfers and/or the person for whose benefit such transfers was made, to return the avoided properties and any rents received on the avoided properties (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT VIII
### (Against Defendants Arun Veluchamy and Anu Veluchamy for Fraudulent Transfer of Interests in Creative Investments, Veluchamy LLC, Unique Mailing Services, and University Subscription Services)

123.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

124.    The Veluchamys fraudulently transferred their interests in Creative Investments, Veluchamy LLC, Unique Mailing Services, and USS to Arun and Anu between November 18 and 23, 2010. These transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1) and are recoverable from Arun and Anu, as the initial transferees of the transfers and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the initial transferees of the transfers and/or the person for whose benefit such transfers were made, to return the shares so received by them (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

### COUNT IX
**(Against Defendants Arun Veluchamy and Anu Veluchamy for Fraudulent Transfer of Interests in Parameswari Spinning Mill and Jayavelu Spinning Mill)**

125.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

126.    The Veluchamys fraudulently transferred their interests in Parameswari Spinning Mill and Jayavelu Spinning Mill to Arun and Anu on or about October 12, 2009. These transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1) and are recoverable from Arun and Anu, as the initial transferees of the transfers and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the initial transferees of the transfers and/or the persons for whose benefit such transfers were made, to return the shares so received by them (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

**COUNT X**
**(Against Defendants Arun Veluchamy and Anu Veluchamy for Fraudulent Transfer of Interests in Dharani Sugars, Appu Hotels, and Versatile Card Technology (P) Ltd.)**

127.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

128.    The Veluchamys also fraudulently transferred their ownership interests in several other Indian businesses to Arun and Anu. Sometime between December 31, 2009 and September 30, 2010, the Veluchamys transferred their ownership interest in Dharani Sugars. On or about February 28, 2010, the Veluchamys transferred 4.3 million shares in Appu Hotels (2.3 million shares to Arun and 1.9 million shares to Anu). On or about July 10, 2010, the Veluchamys transferred 3,776,800 shares in Versatile Card Technology (P) Ltd. (1,888,400 shares each to Arun and Anu). These transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1) and are recoverable from Arun and Anu, as the initial transferees of the transfers and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfers under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the initial transferees of the transfers and/or the person for whose benefit such transfers were made, to return the shares so received by them (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT XI
### (Against Defendants Arun Veluchamy, Anu Veluchamy, and Veluchamy 2009 Dynasty Trust for Fraudulent Transfer of Avadamma LLC Shares)

129.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

130.    The Veluchamys fraudulently transferred their interest in Avadamma LLC to Arun, Anu, and the Veluchamy 2009 Dynasty Trust on May 14, 2009, April 16, 2010, and November 23, 2010. These transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and/or 548(a)(1) and are recoverable from Arun, Anu, and the Veluchamy 2009 Dynasty Trust as the initial transferees of the transfer and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun, Anu, and the Veluchamy 2009 Dynasty Trust (a) avoiding the transfers under 11 U.S.C. §§ 544(b)(1) and/or 548(a)(1), (b) directing Arun, Anu, and the Veluchamy 2009 Dynasty Trust, as the initial transferees of the transfers and/or the persons for whose benefit such transfers were made, to return the shares or interests in Avadamma LLC so received by them (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT XII
### (Against Defendants Arun Veluchamy and Anu Veluchamy for Fraudulent Transfer of the Chennai Property)

131.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

132.    The Veluchamys fraudulently transferred the Chennai Property to Arun and Anu on December 30, 2010. The transfer is voidable pursuant to 11 U.S.C. §§ 544(b)(1) and

548(a)(1) and is recoverable from Arun and Anu, as the initial transferees of the transfer and/or the persons for whose benefit the transfer was made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfer under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the initial transferees of the transfer and/or the person for whose benefit such transfer was made, to return the avoided properties (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

### COUNT XIII
### (Against Defendants Vasudevaki Naidu, Jaganath Naidu, and Rajiv Parthasarathy for Fraudulent Transfer of $2.8 Million Judgment, Pledge of VMark Shares, and Second Mortgage In 25 East Superior)

133.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

134.    The Veluchamys fraudulently incurred $2.8 million in collusive judgments in favor of Vasudevaki Naidu, Jaganath Naidu, and Rajiv Parthasarathy. In connection with the phony transactions underlying those judgments, Mrs. Veluchamy purported to pledge 6.5 million of her VMark shares to Mrs. Naidu and Rajiv Parthasarathy, and the Veluchamys purported to grant Rajiv Parthasarathy a second mortage on an apartment located at 25 E. Superior in Chicago, Illinois. These obligations incurred and transfers made by the Veluchamys—the $2.8 million judgment, the pledge of VMark shares, and the second mortgage on the 25 E. Superior apartment—are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and 548(a)(1).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Vasudevaki Naidu, Jaganath Naidu, and Rajiv Parthasarathy (a) avoiding the $2.8

million judgment, the pledge of VMark shares, and the second mortgage on the 25 E. Superior

apartment under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Mrs. Naidu and Rajiv

Parthasarathy to return the pledged VMark shares to the Trustee (c) directing Rajiv Parthasarathy

to file a release of his second mortgage interest in the 25 E. Superior apartment, and (d) granting

further relief as may be just and proper under the circumstances.

## COUNT XIV
### (Against Defendant Oak Brook Financial for Fraudulent Transfer of Pledge of VMark Shares)

135.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set

forth in this paragraph.

136.    Mrs. Veluchamy fraudulently pledged approximately 15.8 million VMark shares

to OBF on or about August 3, 2009 and July 15, 2010. These transfers are voidable pursuant to

11 U.S.C §§ 544(b)(1) and/or 548(a)(1) and are recoverable from OBF, as the initial transferee of

the transfers and/or the person for whose benefit the transfers were made, pursuant to 11 U.S.C.

§ 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor

and against OBF (a) avoiding the pledges of VMark shares under 11 U.S.C. §§ 544(b)(1) and/or

548(a)(1), (b) directing OBF  to return the pledged VMark shares to the Trustee, and (c) granting

further relief as may be just and proper under the circumstances.

## COUNT XV
### (Against Defendant Arjun Parthasarathy for Fraudulent Transfer of Interests in Parameswari Spinning Mill, Jayavelu Spinning Mill, and Versatile Card Technology (P) Ltd)

137.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set

forth in this paragraph.

138.   Mr. Veluchamy fraudulently pledged his interests in Parameswari Spinning Mill, Jayavelu Spinning Mill, and Versatile Card Technology (P) Ltd to Arjun Parthasarathy. In violation of the automatic stay, Arjun subsequently took the pledged shares as his own after the Veluchamys filed their Chapter 7 case. The pledges and subsequent transfers are voidable pursuant to 11 U.S.C. §§ 544(b)(1) and/or 548(a)(1) and the transfers are recoverable from Arjun, as the initial transferee of the transfers and/or the persons for whose benefit the transfers were made, pursuant to 11 U.S.C. § 550(a).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arjun (a) avoiding the pledges and transfers under 11 U.S.C. §§ 544(b)(1) and/or 548(a)(1), (b) directing Arjun, as the initial transferee of the transfers and/or the person for whose benefit such transfers were made, to return the shares (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

## COUNT XVI
### (Against Defendants Pethinaidu Veluchamy and  Parameswari Veluchamy for Surrender of $5.55 Million Held By Jayavelu Spinning Mills and Parameswari Spinning Mills)

139.   The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

140.   The Veluchamys sent approximately $5.55 million to Javavelu Spinning Mills and Parameswari Spinning Mills in July 2010, which, although nominally held by the spinning mills, remains property of the estate under the Veluchamys' control.

141.   The Veluchamys have not surrendered these funds to the trustee as required by 11 U.S.C. § 521(a)(4).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against the Veluchamys (a) directing the Veluchamys to surrender the $5.55 million to the trustee under 11 U.S.C. § 521(a)(4), and (b) granting further relief as may be just and proper under the circumstances.

## COUNT XVII

**(Against Defendants Pethinaidu Veluchamy and  Parameswari Veluchamy for Surrender of Parameswari Spinning Mill, Jayavelu Spinning Mill, Versatile Card Technology (P) Ltd., CAC Software Consultancy, Paragon Paper, and Aruppukotai Shri Vijayalakshmi Textile Mills Shares Purportedly Held By Renugadevi and Rajaram and Appu Hotels Shares Purportedly Held By Kathi Anand)**

142.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

143.    The Veluchamys purportedly transferred ownership interests in Parameswari Spinning Mill, Jayavelu Spinning Mill, Versatile Card Technology (P) Ltd., CAC Software Consultancy, Paragon Paper, and Aruppukotai Shri Vijayalakshmi Textile Mills to Renugadevi and Rajaram between late 2009 and 2011. Mr. Veluchamy also purportedly transferred ownership interests in Appu Hotels to Kathi Anand in or about May 2008. Although these shares are nominally held by Renugadevi, Rajaram, and (allegedly) Kathi Anand, the shares remain property of the estate under the Veluchamys' control.

144.    The Veluchamys have not surrendered these ownership interests to the trustee as required by 11 U.S.C. § 521(a)(4).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against the Veluchamys (a) directing the Veluchamys to surrender the Parameswari Spinning Mill, Jayavelu Spinning Mill, Versatile Card Technology (P) Ltd., CAC Software Consultancy, Paragon Paper, and Aruppukotai Shri Vijayalakshmi Textile Mills shares nominally held by Renugadevi and Rajaram and the Appu Hotels shares nominally held by Kathi Anand to the

trustee under 11 U.S.C. § 521(a)(4), and (b) granting further relief as may be just and proper under the circumstances.

## COUNT XVIII
### (Against Defendants Pethinaidu Veluchamy and Parameswari Veluchamy for Surrender of Jewelry)

145.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

146.    The Veluchamys continue to hide jewelry worth well in excess of $1 million. The jewelry remains property of the estate under the Veluchamys' control.

147.    The Veluchamys have not surrendered the jewelry to the trustee as required by 11 U.S.C. § 521(a)(4).

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against the Veluchamys (a) directing the Veluchamys to surrender their jewelry to the trustee under 11 U.S.C. § 521(a)(4), and (b) granting further relief as may be just and proper under the circumstances.

## COUNT XIX
### (Against Defendants Arun Veluchamy and Anu Veluchamy for Turnover of Jewelry)

148.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

149.    Arun and Anu have possession, custody, or control of jewelry that is property of the estate and subject to turnover pursuant to 11 U.S.C. § 542.

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) directing Arun and Anu to turn over the jewelry (or the value thereof) to the trustee under 11 U.S.C. § 542, and (b) granting further relief as may be just and proper under the circumstances.

## COUNT XX
**(Against Defendants Arun Veluchamy and Anu Veluchamy for Aiding and Abetting the Veluchamys' Fraudulent Transfer and Concealment Scheme)**

150.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

151.    As alleged throughout this Complaint, Arun and Anu played a central role in aiding and abetting the Veluchamys' efforts to hide or fraudulently transfer all of their vast wealth not only to Arun and Anu, but also to other close relatives or entities controlled by Veluchamy family members. The scheme was designed to protect and safeguard the Veluchamys' vast wealth, while at the same time avoiding paying creditors. Arun and Anu were well aware of their roles in the scheme when they provided assistance to the Veluchamys and knowingly and substantially assisted in the fraudulent transfers and concealments.

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) subject to 11 U.S.C. § 550(d), directing Arun and Anu, as aiders and abetters of the Veluchamys' fraudulent transfer and concealment scheme, to return the avoided transfers (or the value thereof) to the trustee, together with such interest as legally owing with respect thereto, and (b) granting further relief as may be just and proper under the circumstances.

## COUNT XXI
**(Against Defendants Arun Veluchamy and Anu Veluchamy for Conspiracy to Commit Fraud)**

152.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

153.    In and after 2009, as the Veluchamys' financial condition deteriorated, Arun and Anu entered into an agreement with the Veluchamys to help carry out their scheme to hide or

fraudulently transfer all of their vast wealth to Arun, Anu, other close relatives, or entities controlled by the Veluchamys and their relatives. As alleged throughout this Complaint, Arun and Anu committed repeated overt acts in furtherance of the scheme.

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) subject to 11 U.S.C. § 550(d), directing Arun and Anu, as co-conspirators of the Veluchamys' fraudulent transfer and concealment scheme, to return the avoided transfers (or the value thereof) to the trustee, together with such interest as legally owing with respect thereto, and (b) granting further relief as may be just and proper under the circumstances.

**COUNT XXII**
**(Against Defendants Pethinaidu Veluchamy and Parameswari Veluchamy for Turnover of Any Refund of $474,000 Held by the U.S. Treasury)**

154. The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

155. The Veluchamys caused $474,000 to be sent to the IRS in their names for federal income taxes which they do not owe. Although the Chapter 7 Trustee has filed an amended return on the Veluchamys' behalf in an attempt to obtain a refund of the $474,000 overpayment, the Trustee has not yet recovered those funds for the estate.

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against the Veluchamys (a) in the event that the Veluchamys are or come in possession, custody, or control of any refund from the IRS related to the $474,000 overpayment, directing the Veluchamys to immediately turn over the refund to the trustee under 11 U.S.C. § 542, and (b) granting further relief as may be just and proper under the circumstances.

## COUNT XXIII
### (Against Defendants Arun Veluchamy and Anu Veluchamy for Fraudulent Transfer of $315,000 in Appu Hotels Stock)

156.    The Estate Representative restates and realleges paragraphs 1-105 as if fully set forth in this paragraph.

157.    Arun and Anu, as the recipients of stock in Appu Hotels, are either, through their stock ownership, parties for whose benefit the original transfer of approximately $315,000 from Mrs. Veluchamy to Appu Hotels was made, or subsequent transferees of such funds and, in the latter case, were not good-faith transferees for value.

WHEREFORE, the Estate Representative prays for the entry of a judgment in its favor and against Arun and Anu (a) avoiding the transfer under 11 U.S.C. §§ 544(b)(1) and 548(a)(1), (b) directing Arun and Anu, as the persons for whose benefit the transfer was made and/or the subsequent transferees of the transfer, to return either the avoided $315,000 (or the value thereof) or the Appu Hotels stock they received when Mrs. Veluchamy transferred approximately $315,000 to Appu Hotels (or the value thereof), together with such interest as legally owing with respect thereto, to the Veluchamys' bankruptcy estate pursuant to 11 U.S.C. § 550(a), and (c) granting further relief as may be just and proper under the circumstances.

Dated:  November 15, 2012

Respectfully submitted,

BANK OF AMERICA, N.A., *not individually but derivatively on behalf of the Estate of Pethinaidu and Parameswari Veluchamy*

Howard J. Roin
Thomas S. Kiriakos
Beverley J. Klein
Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone:  (312) 782-0600
Facsimile:  (312) 701-7711

By:  /s/ Thomas S. Kiriakos
     One of its Attorneys

*Counsel to Bank of America, N.A.,
not individually but derivatively on behalf of the
Estate of Pethinaidu and Parameswari Veluchamy*