10.     I have included a list of sources and documents reviewed and/or relied upon in the preparation of this report as **Appendix B**.[3]  It is my understanding that discovery in this matter is ongoing.  To the extent that additional documents or information are produced and provided to me, I may supplement or amend my findings after reviewing and analyzing any such additional documents or information.

11.     My conclusions and observations are based on my skills, knowledge, education, experience and training; my review of the facts and information regarding these cases as made available to me thus far; and the analysis that I, or those working under my direct supervision, have performed to date.  I reserve the right to supplement, amend, or alter my findings based on information that later becomes available to me.  The conclusions and observations that I have formed as of the date of this report, along with their bases, are detailed in the remainder of this report and the exhibits attached hereto.  This report does not address and is not intended to address all of the issues that may be raised from the documents.

> B. *Fraud Red Flags Observed During My Engagement*

12.     During the course of my review of the documents and testimony in this matter, I noted a number of what forensic accountants and auditors refer to as "red flags," or indicators of potential fraud, on the part of the Veluchamys, their children, and Veluchamy family businesses.[4]  Because such red flags may impact my observations throughout this report, it is important to note them from the onset.  The red flags included, but are not limited to, the following:

> i.   The Veluchamys engaged in a high volume of unusual related party transactions with their children, Veluchamy family businesses (both in the

---

[3]     In general, when citing to documents in this report and within **Appendix B,** I refer to the document identifier on the document.  In certain circumstances when documents were provided to me that were Bates stamped with duplicative identifiers, I have utilized the internal naming convention "-AP."

[4]     The existence of fraud is a legal determination. Forensic accountants are often engaged to investigate potential fraud.

United States and in India), and other members of their extended family during 2009 and 2010.  Many of these transactions lacked documentation, were unnecessarily complex in their execution, and obfuscated the nature of the transactions.

ii.   The Veluchamys, their children, and Veluchamy family businesses acknowledged backdating a number of documents related to purported transactions by and among them.  It also appears that backdating may have occurred at Oakbrook Financial.

iii.   The Veluchamys failed to identify and/or concealed important information from creditors, accountants, and other advisors with respect to their personal financial condition and the transactions they purportedly engaged in. Beginning in early 2011, after this information began to be uncovered from other sources, the Veluchamys began to identify this important information.

iv.   The Veluchamys and their children provided only photocopied or electronically scanned versions of key document and alleged lack of custody of the original records or native files.  The Veluchamys allege that electronic evidence with respect to these key documents is unavailable or missing.

v.   The Veluchamys repeatedly provided photocopied or electronically transmitted documents from India and alleged lack of custody of the original records.

vi.   Mr. Veluchamy appears to have altered or directed alteration of financial records of Veluchamy family businesses prior to response to citations.  The Veluchamys and Veluchamy family businesses produced only the altered versions of the documents.

vii.   The Veluchamys and their children have provided significant contradictory evidentiary material and testimony since at least early 2011.

viii.   The Veluchamys and their children were not forthcoming, testified evasively, testified inconsistently, and/or were unable to recall information with respect to many key transactions.  The Veluchamys often appear to have provided

inconsistent, vague, or implausible responses to inquiry. Both the Veluchamys and their children asserted their Fifth Amendment rights in response to many inquiries.

ix.   The Veluchamys described using their children as agents without any apparent business purpose in a number of transactions in India.

x.   The Veluchamys and their children have opened and employed numerous bank accounts subsequent to November 30, 2008.

xi.   The Veluchamys and their children unnecessarily used corporate bank accounts of Veluchamy family businesses in the U.S. to complete transactions by and among one another.

xii.   The Veluchamys and their children unnecessarily used foreign bank accounts in India to complete transactions by and among one another.

xiii.   There have been allegations that the Veluchamys destroyed documents and other evidence. If true, this would represent an additional red flag.

### C.  *Summary Observations*[5]

13.   Beginning "as of" January 1, 2009 and continuing through at least the date of their bankruptcy, the Veluchamys commenced a large-scale transfer of their assets (both in the United States and in India) to their relatives. Domestically, the Veluchamys primarily made these transfers to their adult children, Arun and Anu. Many of these transfers were accomplished using money transferred by the Veluchamys to India, provided to their children in India, and then immediately returned by the Veluchamys' children to the United States. Other transfers appear to have been made with nominal or no apparent documented consideration. Domestic assets that the Veluchamys retained ownership of were in nearly all instances pledged (or allegedly pledged) to obtain purported loans from the Veluchamys' relatives (*i.e.*, Rajiv Parthasarathy,

---

[5]   In this section I summarize certain of my observations during my review of documents and testimony provided to me in this matter.

Arjun Parthasarathy, Vasudevaki Naidu, Jaganath Naidu) or Oakbrook Financial, a finance company incorporated by Mrs. Veluchamy and largely capitalized with monies provided by the Veluchamys to their family members.  In India, contemporaneously filed corporate records with the Ministry of Corporate Affairs show a similar, large-scale transfer of the Veluchamys' numerous business interests there to family members for no apparent consideration, and property records show that the Veluchamys gave their children a commercial property in India as a gift on December 30, 2010 that their daughter asserted was worth millions.  These transfers by the Veluchamys appear to have lacked business purpose (and potentially economic substance), and had the effect of eliminating the Veluchamys' potential claims of against their family businesses, while transferring to other family members money, business interests, real estate, and claims to the Veluchamys' assets.  Concurrent with these transfer activities, the Veluchamys appear to have acted, in form if not in substance, to financially disengage themselves from their family businesses—liquidating claims they had against those businesses, relinquishing corporate control of those businesses to their children, and resigning from directorship roles.  By the time Bank of America obtained judgments against the Veluchamys on December 30, 2010, or shortly thereafter, the Veluchamys had transferred or encumbered substantially all of their assets and alleged they were unable to pay their debt to Bank of America.  Nonetheless, even as the Veluchamys formally parted with ownership interests in various family assets, these assets appear to have continued to fund their living expenses through the date of their bankruptcy filing under the alleged custody and management of their adult children.

14.    A large-scale transfer of the Veluchamys' cash during 2009 and 2010—the legitimacy of which I understand is disputed—was fundamental to the Veluchamys' transfer of their domestic assets to their children.  After November 30, 2008—the maturity date and date of default on both the Second Amendment to the Loan Agreement dated December 1, 2005 and the Revolving Loan Agreement dated February 15, 2008—the Veluchamys deposited approximately $28.3 million in a number of newly opened bank accounts at banks including PNC (National City Bank), State Bank of India (Chicago), and Citibank in 2009 and 2010.  Approximately $26.9 million of these deposits were sourced from income tax refunds paid by the U.S. Treasury

and the State of Illinois in 2009 and 2010, salaries, purported debt capital extracted from the Veluchamys' various domestic business interests, and their children's repayment[6] of purported loans from their parents.  In every case in which a sizable deposit was made into their personal bank accounts from these sources, within days, the Veluchamys wired funds to their personal accounts at Canara Bank in India as shown at **Exhibit 1**.  The Veluchamys commenced the transfers to India on July 3, 2009, shortly after the Veluchamys' deposit of $8.1 million of federal income tax refunds at the State Bank of India (Chicago) on Tuesday, June 30, 2009.  Beginning with a $4 million wire on July 3, 2009 and continuing through September 23, 2010, the Veluchamys initiated transfers of *at least* $25.6 million[7,8] from accounts in the United States to their accounts at Canara Bank in India as shown at **Exhibit 2**.  My analysis of activity in the Veluchamys' domestic bank accounts, including transfers to India, is detailed in Section IV below.

---

[6]      The monies the children used to "repay" these purported loans from their parents appear to have come from their parents.

[7]      The Veluchamys wired approximately $24 million of this amount directly from their domestic bank accounts, and $1.6 million was wired as a result of the sale of the property at 5200-5220 Thatcher Road in Downers Grove, IL in March 2010.

[8]      Approximately $800,000 of wire transfers made in late July 2010 by Global Card Services that appear to repay the Veluchamys' capital investments in that entity may match approximately $800,000 of unexplained "FCNR" deposits in the Veluchamys' Canara Bank accounts in India in August 2010.  As discussed further in this report, it appears that a number of wires from the Veluchamys and their children to Canara Bank may have passed through one or more unidentified Foreign Currency Non-Resident ("FCNR") account(s), which are held at Indian banks by non-residents and are denominated in foreign currencies, prior to deposit. I have not been provided with account statements regarding any FCNR accounts held by the Veluchamys or their children. The Canara Bank website describes FCNR accounts as "A unique scheme to guard against currency fluctuation risk."   It states "accounts are maintained in foreign currencies and are held in the form of term deposits only," and "USD…is accepted for a minimum period of one year and a maximum period of five years."   *See* http://www.canarabank.com/english/scripts/FCNR.aspx, accessed April 26, 2013.  If these monies are determined to be the same, this would increase the monies transferred by the Veluchamys to approximately $26.4 million between July 3, 2009 and September 23, 2010.

15.     Of the $25.6 million the Veluchamys transferred to India between July 3, 2009 and September 23, 2010:

i.      The Veluchamys transferred approximately $10.6 million and approximately $5 million in 2009 and 2010, respectively, to the Canara Bank accounts of Arun and Anu in India.  Approximately $1.6 million of these monies, which Arun and Anu transferred to Appu Hotels, Ltd. and Sree Jayajothi Cements, appear to have remained in India, with Arun and Anu receiving shares in Appu Hotels, Ltd. and Sree Jayajothi Cements.  Arun and Anu transferred the remaining $14 million back to the United States, where they were used for purposes that included acquiring shares in Veluchamy family businesses, repaying purported loans owed to their parents, acquiring interests in real estate from their parents, and capitalizing Oakbrook Financial.[9] See Sections VI through VIII for further discussion.

ii.     Mr. Veluchamy repatriated and deposited approximately $4 million into E*Trade Account #5018, an account held jointly in the names of Arun and Anu but apparently controlled by Mr. Veluchamy.  The Veluchamys' children later commingled approximately $2.8 million that their parents had transferred to them in India with the $4 million their father allegedly placed in E*Trade Account #5018 (ostensibly without their knowledge), and then used the commingled funds to finance acquisitions of three commercial real estate properties from their parents (*i.e.*, 5300 Katrine, 1400 Centre Circle, and 5200 Thatcher) as well as to make $850,000 of transfers to Qualteq.  See Sections VII, XII, and XVII for further discussion.

---

[9]     Some of the monies Arun and Anu transferred to the U.S. appear to have subsequently been returned to India, as discussed further below.

    iii.    The Veluchamys transferred approximately $5.5 million to one of their Indian spinning mills, Jaya Velu Spinning Mills,[10] in July 2010, allegedly to pay purported working capital loans that the Veluchamys allege they guaranteed. Jaya Velu Spinning Mills appears to have accounted for these transfers as share capital advances to the Veluchamys (*i.e.*, equity). I noted no apparent demands for repayment by the guarantors in the document production provided to me as of the date of this report. These monies appear to have remained in India. See Sections VIII and XV for further discussion.

    iv.    Approximately $0.3 million was transferred to Appu Hotels, Ltd. from Mrs. Veluchamys' Canara Bank account in India and appears to have remained in India. See Sections VIII and XV for further discussion.

16.    The Veluchamys received the $25.6 million transferred from the United States at bank accounts they maintained at Canara Bank in India that were not disclosed in the Veluchamys' personal financial statements as of December 31, 2007[11] or as of December 31, 2008,[12] despite the fact that both personal financial statements solicited such information.[13] The Veluchamys denied the existence of these foreign accounts when filing their joint income tax returns for 2008 and 2009 to the Internal Revenue Service. In particular, in Part III "Foreign Accounts and Trusts" of Form 1040 Schedule B of the Veluchamys' 2009 personal income tax returns, the Veluchamys answered "No" in response to inquiries regarding whether they had "an interest in or a signature or other authority over a financial account in a foreign country, such as

---

[10]    Filings with the Indian Ministry of Corporate Affairs describe this entity's name as "Jaya Velu Spinning Mills," although other documents in this case, including the Veluchamys' personal financial statements as of December 31, 2007, describe the entity as "Jayavelu Spinning Mills."

[11]    This personal financial statement was dated September 16, 2008.

[12]    This personal financial statement was dated June 2, 2009.

[13]    *See* BOA Exhibits 16 and 17.

a bank account, securities account, or other financial account"[14] such as their accounts at Canara Bank in India.  When asked if the Veluchamys' response to this question in their tax returns was incorrect, Mr. Veluchamy asserted his Fifth Amendment rights.[15]   The Veluchamys' concealment of these foreign bank accounts is a red flag.

17.     After my first affidavit, dated March 16, 2011, observed that the Veluchamys had transferred as much as $24 million to India between July 3, 2009 and September 23, 2010, the Veluchamys' lawyer represented to Judge Milton I. Shadur that the Veluchamys had transferred money to India, because, "They had debts in India.  They paid those debts in 2009."[16]

18.     Thereafter, between April 6, 2011 and April 13, 2011, the Veluchamys began to offer a different explanation of their transfers of cash to India.  First, on April 6, 2011, documents were produced that indicated for the first time that the Veluchamys purportedly had entered into seven agreements to indemnify Arun,[17] Anu, and the Veluchamy Family Foundation[18] for up to $19.3 million should each of these parties incur losses of their equity investments in First Mutual.  Of the $19.3 million the Veluchamys purportedly agreed to pay in the event of loss, $15 million appeared to restrict the use of the purported indemnity payments by Arun and Anu[19] and related to equity capital purportedly contributed to First Mutual (in

---

[14]     *See* BOA Exhibit 188 at PEV 0138.

[15]     *See* deposition of Mr. Veluchamy dated April 7, 2011, p. 166.

[16]     *See* Transcript of Proceedings – Motion Before the Honorable Milton I. Shadur in Case No. 09 C 5108 and Case No. 09 C 5109 on March 16, 2011, p. 11.

[17]     Sonia, Arun's wife, was also an indemnified party in the purported indemnity agreements dated September 29, 2008 and March 30, 2009 with the Veluchamys.

[18]     The Veluchamy Family Foundation is a 501(c)(3) private foundation organized and controlled by the Veluchamys and their children.

[19]     In particular, two of the agreements involving Arun and Anu stated that they were "family members that are involved in various family businesses, including VMark, and its affiliates" and described the agreement to indemnify them as being subject to Arun and Anu "agreeing to a restriction that the indemnified funds shall be returned for use as capital or loans for the benefit of the business known as Vmark Inc., an Illinois corporation, and

exchange for bank shares) by Arun and Anu between October 23, 1998 and December 18, 2006—years before the establishment of the purported indemnity agreements.   In total, the Veluchamys newly identified the following seven purported indemnity agreements:

> i.   A purported indemnity agreement with the Veluchamy Family Foundation dated "as of" July 28, 2008 for $2 million;[20]

> ii.   Three purported indemnity agreements with Arun[21] dated "as of" July 31, 2008, September 29, 2008, and March 30, 2009 totaling $9.6 million;[22] and,

> iii.   Three purported indemnity agreements with Anu dated "as of" July 31, 2008, September 29, 2008, and March 31, 2009 totaling $7.7 million.[23]

19.   Prior to approximately April 6, 2011, the Veluchamys had produced no documents describing these purported indemnity agreements, and the Veluchamys' personal financial statements made no reference to any such obligations as of either December 31, 2008 or April 30, 2010.[24]   The Veluchamys' failure to disclose the existence of these purported indemnity agreements in their personal financial statements is a red flag.

---

its affiliates" and agreeing "to provide whatever personal guaranties and/or use of personally owned collateral is required for the benefit of [the Veluchamys], as additional consideration for this Indemnity."   This language appeared to dictate that, pursuant to the direction of Mr. and Mrs. Veluchamy, $15 million of alleged indemnity payments paid to Arun and Anu must remain in or be used for Veluchamy family businesses, which the Veluchamys continued to operate and/or benefit from through at least the date of their bankruptcy filing in August 2011.

[20]   *See* BOA Exhibit 49 at PEV 0739.

[21]   Sonia, Arun Veluchamy's wife, was also an indemnified party in the purported indemnity agreements dated September 29, 2008 and March 30, 2009 with the Veluchamys.

[22]   *See* PEV 0717-26.  Note: Range contains BOA Exhibit 53 at PEV 0717-20.

[23]   *See* PEV 0729-38.

[24]   The absence of these obligations in the personal financial statements as of April 30, 2010 is notable, because by that time the event triggering the indemnity obligations had occurred (*i.e.*, closure of Mutual Bank by the FDIC) and the Veluchamys alleged that they still owed millions of dollars to their children and/or the Veluchamy Family Foundation as of that time.   Later, in July 2010, the Veluchamys transferred approximately $7 million to

20.     After furnishing copies of these purported indemnity agreements, the Veluchamys were unable to provide original native versions of the purported indemnity agreements or signed copies of the purported indemnity agreements.  The inability to provide either native versions of the purported indemnity agreements or signed copies of the purported indemnity agreements is a red flag.

21.     In addition to not disclosing the existence of the purported indemnity agreements in their personal financial statements as of December 31, 2008 and April 30, 2010, the Veluchamys' accountant testified the Veluchamys never told him of these purported indemnity agreements.[25]  The Veluchamys' failure to disclose these purported indemnity agreements to their accountant is also a red flag.  I understand that none of the Veluchamy family members' personal tax returns appear to have reflected the indemnity payments allegedly made by the Veluchamys to Arun and Anu.[26]  The accountant for the Veluchamy family testified that he "absolutely" would have included the effects of indemnity payments on Arun's and Anu's tax returns had he known about them.[27]  The Veluchamys' failure to advise their accountant of the purported indemnity payments is also a red flag.

22.     As outlined in Section XIX, it appears Mr. Veluchamy was involved in altering Oakbrook Financial's accounting records on or after March 4, 2011.  These alterations, as well as the apparent concealment of the original accounting records by Oakbrook Financial, appear to

---

their children allegedly pursuant to these undisclosed indemnity obligations.  *See* BOA Exhibit 17 for the personal financial statements as of December 31, 2008 and BOA Exhibits 18 and 35 for the personal financial statements as of April 30, 2010.

[25]     Bradford R. Dooley, a Certified Public Accountant providing accounting and tax services to the Veluchamys, their children, and the Veluchamy family businesses, testified that he was unaware of the existence of the purported indemnity agreements or purported indemnity payments made to the Veluchamys' children prior to Counsel identifying them to him during his deposition on June 17, 2011.  *See* deposition of Bradford R. Dooley dated June 17, 2011, pp. 99-109.

[26]     *See* affidavit of John R. McGrath filed June 3, 2011.

[27]     *See* deposition of Bradford R. Dooley dated June 17, 2011, pp. 124-125, 126-128, 132-136.

have resulted in the concealment of information that contradicted the existence of the indemnity agreements as late as March 4, 2011.  This is also a red flag.

23.     Later, on April 13, 2011, Mr. Veluchamy professed numerous reasons for transferring the monies to India that included demonstrating wealth for purposes of "raising the money for [First Mutual]," that the broker assisting with this effort "wanted the broker fee in advance," that "[National City] asked [the Veluchamys] to close all [their] accounts," and that "I had debt close to $40 million in India, me and my wife.  They were calling the loan; that's the reason."[28]   According to Mr. Veluchamy, after his efforts to save First Mutual did not materialize, he "wanted to send and start paying [his] indemnification debt to [his] son and daughter."[29]   Other than transferring monies in India to his adult children pursuant to the purported indemnity agreements—a task that could have been accomplished domestically—the reasons provided by Mr. Veluchamy for initial transfers of funds to India in 2009 appear inconsistent with the documents, testimony, and ultimate use of the monies once in India.[30]   As shown at **Exhibit 3** and discussed in Section VII below, of the $14.8 million the Veluchamys transferred to their accounts at Canara Bank in India during 2009, they transferred virtually all of this money either directly to Arun and Anu's Canara Bank accounts in India ($10.6 million) or back to the United States, where Mr. Veluchamy deposited it—ostensibly without the children's knowledge—in E*Trade Account #5018 held jointly in the children's names but apparently

---

[28]     *See* deposition of Mr. Veluchamy dated April 13, pp. 307-311.

[29]     *See* deposition of Mr. Veluchamy dated April 13, p. 311.

[30]     Rather, I observed (i) that Mr. Veluchamy's initial transfer to India on July 3, 2009 was represented at the time to State Bank of India (Chicago) to be "for purchase of equipment"—a purpose that Mr. Veluchamy admitted was false in deposition testimony (*See* BOA Exhibit 47, deposition of Mr. Veluchamy dated April 13, 2011 pp. 284, 318-319.), (ii) that no "in advance" payments to brokers by the Veluchamys using these monies appears to have occurred, (iii) that the Veluchamys opened numerous bank accounts domestically during 2009 and appeared to close their PNC (National City Bank) accounts, in part, as a consequence of that bank refusing to wire monies to India on their behalf, and (iv) no evidence that foreign banks were "calling the loan" during 2009 beyond Mr. Veluchamys' assertion.

controlled by Mr. Veluchamy ($4 million).  Mr. Veluchamy admitted on April 13, 2011 that these purported indemnity obligations to his children were obligations in the United States.[31]

24.     In total, between September 1, 2009 and October 20, 2010, the Veluchamys transferred $18.6 million[32,33] to accounts of Arun (approximately $8.5 million) and Anu (approximately $10.1 million) pursuant to purported indemnity agreements, as discussed in Sections VI through VIII below.  Approximately $17.6 million[34] of the $18.6 million the

---

[31]     *See* deposition of Mr. Veluchamy dated April 13, 2011, pp. 300-301.

[32]     Prior to May 22, 2012, the Veluchamys alleged that they had transferred $18.6 million to their children during 2009 and 2010 as purported indemnity payments. Then, on May 22, 2012 the Veluchamys altered their characterization of their payments to their children.  In particular, in their Fourth Amended Statement of Financial Affairs filed May 22, 2012—approximately nine months after their Chapter 7 filing and approximately eighteen months after purportedly preparing a schedule documenting indemnity payments to his children as of September 30, 2010 totaling $18.6 million—the Veluchamys re-characterized the their transfer payment of $965,217 to their daughter Anu in India on October 20, 2010, removing it from their Statement of Financial Affairs entirely.  Prior to this time, the Veluchamys had maintained both in citation examinations and bankruptcy filings that this payment was an indemnity payment to their daughter.  For purposes of this report, I continue to describe indemnity payments totaling $18.6 million to the Veluchamys' children consistent with the Veluchamys' pre-May 22, 2012 representations as well as Arun's prior representations (*see* AKV1995).  Regardless of whether this $965,000 transfer from the Veluchamys was a purported indemnity payment, Arun and Anu used this money to buy $965,000 of stock in Sree Jayajothi Cements, an Indian company run by one of Mrs. Veluchamy's relatives.  If the $965,000 was not, in fact, a purported indemnity payment, it appears to be a transfer by the Veluchamys of $965,000 without consideration, which the children used to purchase stock in an Indian company owned by one of the Veluchamys' relatives.  See Section VIII for additional discussion.

[33]     The Veluchamys transferred approximately $17.6 million of this $18.6 million to Arun and Anu at their accounts at Canara Bank in India.

[34]     As noted above, in 2009 the Veluchamys transferred $10.6 million to their children's accounts at Canara Bank in India.  During 2010, the Veluchamys transferred at least approximately $10.8 million to their accounts at Canara Bank in India.  The $10.8 million transferred to India by the Veluchamys, along with $1.8 million transferred to their accounts from Veluchamy family businesses located in India and $0.8 million of unknown FCNR deposits, were collectively used to transfer approximately $7 million in total to the Veluchamys' children pursuant to purported indemnity agreements as well as approximately $6.4 million to the Veluchamys' businesses located in

Veluchamys transferred to their children were made to Arun's and Anu's accounts at Canara Bank in India.  Like their parents, Arun and Anu denied the existence of the Canara Bank accounts in India in their 2009 income tax returns that they used to receive these cash transfers.[35] That the Veluchamys' children also chose to receive these transfers of wealth using concealed foreign bank accounts rather than their numerous available domestic accounts in 2009 is a red flag.

25.    The purported indemnity agreements—and the Veluchamys' purported indemnity payments to their children pursuant to those agreements—served a key role in a byzantine series of transactions during 2009 and 2010 outlined throughout this report that enabled the Veluchamys to (i) transfer ownership interests in both the Veluchamys' privately held domestic businesses and real estate properties to their children, (ii) strip Veluchamy family businesses of their obligations to the Veluchamys in apparent violation of agreements with their lenders with the Veluchamys' receipts immediately returned to the Veluchamys' children as additional purported indemnity payments and/or transferred to India for investment in Indian business activities, and (iii) supplant prior investments in the Veluchamy family businesses with investments from a newly formed finance company called Oakbrook Financial, that was controlled by members of the Veluchamy family and capitalized with monies from Mrs. Veluchamy, purported indemnity payments, and monies provided by Arun's wife, Sonia, allegedly secured by Arun's transfer of assets to her that he originally acquired with indemnity monies.  In short, these agreements and the payments they purported to justify had the effect of ensuring that the Veluchamys would not have cash or claims against family businesses when creditors came calling, while also diluting their ownership in family businesses in favor of their children and providing their children with millions in cash.

---

India, and approximately $0.3 million to Appu Hotels, Ltd., an entity for which the Veluchamys disclosed they were shareholders in their personal financial statements as of December 31, 2007.  This activity is detailed at **Exhibit 4** and discussed further in Section VIII and Section XV below.

[35]    *See* BOA Exhibit 90 at AKV1862 for Schedule B to Arun's 2009 personal income tax return and BOA Exhibit 109 at ARV000630 for Schedule B to Anu's 2009 personal income tax return.

i.   During 2009, the Veluchamys made approximately $10.6 million of
purported indemnity payments to their children in India as well as an
additional $1 million of purported indemnity payments to their children in
the United States as outlined further in Sections VII, XI, and XII below and
as shown at **Exhibit 3**.   Analysis of $7.8 million of initial purported
indemnity payments made in early September 2009 shows that Arun and Anu
used approximately $4.8 million of the transfers to acquire newly issued
voting and nonvoting shares in VMark (a holding company with operating
subsidiaries that the Veluchamys valued at $121.3 million in their December
31, 2007 personal financial statements), diluting their mother's interest.
VMark, in turn, at a time when the Veluchamys allege VMark was struggling
and owed creditors millions, immediately transferred these monies to its
subsidiaries, which in turn, through a series of intercompany transfers, repaid
millions of purported undocumented loans[36] to the Veluchamys.   Some of
these transfers to the Veluchamys appear to have violated agreements with
lenders at the time, and served to disengage the Veluchamys financially from
VMark.   The Veluchamys and their family apparently ignored other
alternatives for resolving these debts that would have had no cash cost to
VMark's subsidiaries (*e.g.* debt-to-equity conversion) and would have
deepened the Veluchamys' financial ties to the businesses.   Likewise,
approximately $0.3 million of purported indemnity payments were
transferred to Unique Mailing Services.   In turn, Unique Mailing Services
repaid approximately $0.3 million of purported loans to the Veluchamys.   As
with VMark, other alternatives appear to have been ignored.   Lastly,

---

[36]      I have not determined whether transactions referred to as "loans" by the Veluchamys, Arun, or Anu are
appropriately described as such or are more appropriately described as equity investments or other related party
transactions.   Additionally, further complicating the issue, Mr. Veluchamy testified that his references to equity
contributions and loans are considered to be the same.   *See* deposition of Mr. Veluchamy on behalf of Avadamma,
LLC dated June 9, 2011, p. 52.

indemnity payments made to Arun and Anu also contributed to repayment of approximately $3.3 million of undocumented loans[37] the Veluchamys allegedly made to Arun and Anu at an unknown time in the past.  These transfers significantly reduced the relationships in which the Veluchamys were creditors of their children and the Veluchamy family businesses, with no apparent pay down of third party debts.  After these payments from Veluchamy family businesses and their children, the Veluchamys gathered the returned indemnity monies and again transferred them to their children in India (approximately $2.8 million) and in the United States ($1 million) as purported indemnity payments.  The Veluchamys wired additional monies totaling $4 million to India before that money was purportedly repatriated and deposited by Mr. Veluchamy in E*Trade Account #5018, an account in the name of Arun and Anu that Mr. Veluchamy apparently controlled.  Arun and Anu subsequently used the $1 million provided to them in the United States, along with approximately $0.3 million of remaining indemnity monies on-hand at VMark, to acquire shares in the initial public offering of Omeros Corporation in October 2009.  The $2.8 million provided to Arun and Anu in India was immediately transferred back to the United States and deposited in E*Trade Account #5018, where the funds were commingled with $4 million deposited there by Mr. Veluchamy.  The Veluchamys'

---

[37]     Mr. Veluchamy, Arun, and Anu each claimed they had limited knowledge of these purported loans.  As discussed further in Sections VII, XI, and XVII, these payments may reflect partial repayment of approximately $3.4 million of undocumented loans made by the Veluchamys to each of their children immediately prior to the time the Veluchamys and their children contributed shares of operating subsidiaries to VMark on January 1, 2007 in exchange for shares in VMark.  Based on MILLER-AP003777, these undocumented loans appear to have been made to increase the children's ownership stake in the companies from approximately 3.2 percent collectively (1.6 percent each) to approximately 30 percent collectively (15 percent each).  Arun and Anu's personal financial statements indicated they had balances of approximately $3.4 million and $3.2 million, respectively, as of December 31, 2008.  I have not seen any evidence that these loans were ever repaid.

children then used the commingled funds in this account to (i) acquire from the Veluchamys properties located at 5300 Katrine, 1400 Centre Circle, and 5200-5220 Thatcher, and (ii) make payments to Qualteq, Inc. (d/b/a VCT-NJ), a subsidiary of VMark, Inc.'s subsidiary Versatile Card Technology, Inc.  Although I understand that the Veluchamys allege that the 5300 Katrine, 1400 Centre Circle, and 5200-5220 Thatcher transactions served to repay third party creditors, my analysis showed that the Veluchamys appear to have been fully compensated for the debts they repaid on behalf of Veluchamy family businesses, with repayments transferred by the Veluchamys to their children, to India, to relatives, to Anar Real Estate (an entity controlled by the Veluchamy family), or to pay legal fees.[38]

ii.  Between July 13, 2010 and October 20, 2010, the Veluchamys made approximately $7 million of additional purported indemnity payments to their children in India as outlined further in Section VIII below and as shown at **Exhibit 4**.  The majority of these monies—approximately $5.4 million— appear to have been used to provide debt and equity capital to Oakbrook Financial, a finance company formed by members of the Veluchamy family in July 2010 that exclusively provided financing to Veluchamy family businesses and family members.   As outlined in Section XIV, the Veluchamys used Oakbrook Financial as a vehicle to extend loans to their family businesses and family members, to withdraw and redistribute cash from Veluchamy family businesses to other Veluchamy family businesses or family members, and to encumber the Veluchamys' assets as well as their businesses' assets.  In some cases, the loans extended by Oakbrook Financial were secured by Mrs. Veluchamy pledging her shares in Veluchamy family businesses in addition to securing the loans with all the assets of the

---

[38]    *See* Sections XI and XII and **Exhibits 5** through **9** for additional discussion of monies received by the Veluchamys subsequent to the sales of various real estate properties between October 2009 and March 2010.

borrowing entity.  Ultimately, Oakbrook Financial provided the Veluchamy family with a vehicle to replace millions of cash extracted by the Veluchamys from Veluchamy family businesses during 2009 and 2010 with loans from an entity that they directly financially backed at its inception and indirectly financially backed with approximately $5.4 million of purported indemnity payments provided to their children in India in 2010.  Although the Veluchamys provided financial backing to Oakbrook Financial, they purported to neither own nor control this entity.

iii.   In addition to capitalizing Oakbrook Financial, Arun and Anu transferred approximately $671,000 of purported indemnity payments they received during 2010 to Appu Hotels, Ltd., a company in India in which the Veluchamys are shareholders. See **Exhibit 4** and Section VIII.  According to the Veluchamys and their children, they allegedly made these transfers to help pay a capital call directed to Mr. Veluchamy, although, as discussed in Section XV, Arun and Anu appear to have received shares in Appu Hotels, Ltd. as a consequence of their transfers as part of a stock offering.  Both Arun and Anu have asserted their Fifth Amendment rights when questioned regarding the circumstances surrounding their apparent acquisition of these shares.  Likewise, as show at Exhibit 4, Arun and Anu transferred indemnity payments totaling approximately $965,000 to Sree Jayajothi Cements, a business in India in which Mrs. Veluchamy's brother is involved.  The Veluchamys allege that these transfers were to repay debt in India, although as discussed in Section VIII, Arun and Anu received shares in Sree Jayajothi Cements in return for this transfer.  Both Arun and Anu have asserted their Fifth Amendment rights when questioned regarding the circumstances surrounding their apparent acquisition of these shares post-bankruptcy.  In both of these cases, Arun and Anu purport to have acted effectively as an agent on behalf of their father, although I note no apparent business purpose for them to act as an intermediary on behalf of their father.  This is a red flag.

26.    As a consequence of the transfers summarized above and detailed in Sections VI through VIII, Arun and Anu acquired millions of dollars and numerous assets as summarized in

21

**Exhibit 10** and in Section IX below.     As discussed in Section X below, from a financial, investigative, and accounting perspective, the obligations allegedly incurred and/or the transfers made by the Veluchamys allegedly pursuant to these purported indemnity agreements bear traits consistent with numerous factors set forth in the Illinois Uniform Fraudulent Transfer Act as relevant in determining actual fraudulent intent.

27.     The large-scale transfers of cash described above—and the assets these cash transfers permitted Arun and Anu to acquire—were only part of a larger pattern of transactions the Veluchamys executed during 2009 and 2010 that served to transfer their domestic business and real estate interests from them to Arun and Anu and to encumber their assets to their relatives.  **Exhibits 11** and **12** summarize the assets the Veluchamys represented to lenders as of December 31, 2007 and December 31, 2008.   Commencing "as of" January 1, 2009 and continuing throughout 2010, the Veluchamys transferred ownership interests in both their privately held domestic businesses and various real estate properties from Mr. Veluchamy to Mrs. Veluchamy and from Mr. and Mrs. Veluchamy to their children, Arun and Anu.   By November 23, 2010, Mr. Veluchamy had transferred <u>all</u> former ownership interests in VMark, University Subscription Service, Inc., Unique Mailing Services, Inc., Veluchamy, LLC, Creative Investments, Meadowbrook Shopping Center, 1213 Butterfield Road, North Park Mall, 500 North LaSalle, 5300 Katrine Avenue, 1400 Centre Circle, and 5200-5220 Thatcher Road, either to his children or to Mrs. Veluchamy.[39]   See **Exhibit 13**.  In many instances, the Veluchamys were the source of the monies necessary for Arun and Anu to acquire the Veluchamys' assets—a fact that Mr. Veluchamy confirmed during his April 13, 2011 deposition testimony.[40]   See Sections XI and XII for discussion of transfers of the Veluchamys' interests in domestic non-marketable securities and domestic real estate interests, respectively, during 2009 and 2010.

28.     As is evident from review of **Exhibit 13**, Mrs. Veluchamy maintained interests in various Veluchamy family businesses and real estate after the transfers of ownership explained

---

[39]     *See* discussion of Mrs. Veluchamy's ownership in the next paragraph.

[40]     *See* deposition of Mr. Veluchamy dated April 13, 2011, pp. 330 – 341.

in this report.  However, in those instances where Mrs. Veluchamy retained some measure of ownership in Veluchamy family assets, her ownership interests were (i) significantly diluted by new capital participation in Veluchamy family businesses by her children and/or (ii) pledged to the benefit of other family members (*e.g.*, Jaganath and Vasudevaki Naidu and Rajiv Parthasarathy), Oakbrook Financial, or others, as shown at **Exhibit 14**.

29.      In at least one instance, Arun and Anu purportedly used the cash flows generated by the assets acquired *from their parents*, using monies provided to them *by their parents,* to acquire additional assets *from their parents*.  After Arun and Anu acquired the properties at 5300 Katrine, 1400 Centre Circle, and 5200-5220 Thatcher Road, between October 2009 and March 2010, they used cash flows from these properties to finance their July 1, 2010 acquisition of the Veluchamys' interest in Bear Stearns Venture Partners L.P. for $650,000 from the Veluchamys. See Section XIII for additional discussion of the Veluchamys' transfers of this domestically held marketable security to their children.

30.      The Veluchamys' transfers of their assets to relatives do not appear to have been limited to their U.S.-based assets.  As discussed in Section XV, contemporaneous corporate filings made to the Ministry of Corporate Affairs in India show that the Veluchamys transferred significant business interests to their children and various other family members in India during 2009 and later.  Some of these assets were not disclosed (or were disclosed inaccurately) in one or more of the Veluchamys' personal financial statements as of December 31, 2007, December 31, 2008, and April 30, 2010.  In a number of cases, business interests that the Veluchamys appeared to still hold as of August 16, 2011 were either not disclosed in their initial bankruptcy filings or were disclosed inconsistently with corporate filings made in India.  Many of the transfers documented in contemporaneous corporate filings in India were not disclosed in the Veluchamys' bankruptcy filings or, if disclosed, were disclosed inconsistently with contemporaneous corporate filings in India.  Such lack of disclosure and inconsistencies in information are red flags.  For many of the transfers either no consideration appeared to have been provided or the consideration (if any) received by the Veluchamys is unknown and undocumented.  In a number of cases, the Veluchamys have produced contradictory documents and/or have provided contradictory testimony, alleging that transfers happened at inconsistent times or involved different parties than described by the contemporaneous corporate filings in India.  Such inconsistency between the documents and testimony furnished by the Veluchamys

and the contemporaneous corporate filings in India is a red flag.  The Veluchamys further allege that numerous assets were in fact pledged in exchange for corporate loans and subsequently taken by the pledgees in India after their bankruptcy.  In numerous instances, the Veluchamys' children have transferred shares acquired by them into trusts in India—starting in October 2012 and continuing through at least November 2012.

31.    Likewise, I understand that on December 30, 2010—the day the court judgments in favor of Bank of America—the Veluchamys gave their ownership interests in property held in India to Arun and Anu Veluchamy.[41]  This property was the location of two Veluchamy family businesses in India.  When questioned regarding these transfers, Mr. Veluchamy testified that Arun and Anu did not pay the Veluchamys for these properties and were unaware the property had been transferred to them.[42]  In their initial bankruptcy disclosures filed on September 12, 2011, the Veluchamys disclosed the transfer of the lease rights for the properties at Poonamalli Road, St. Thomas Mount Chennai, India to Arun and Anu on December 29, 2010, one day before judgments were entered against the Veluchamys, with no consideration identified.[43]  At the 341 Meeting of Creditors on August 15, 2012, the Veluchamys testified that the property was on leased land, and there was little or no value to the building.[44]  These assertions appear to be inconsistent with the deeds showing the transfer of the Chennai property to Arun and Anu.  The deeds state the property is "free of encumbrance" and that Arun and Anu are the "absolute owner of the property" and "have absolute right, title and interest to the property."[45]  These assertions further appear to be inconsistent with representations made by Anu regarding the property to lenders in India.  Documents filed with the Indian Ministry of Corporate Affairs indicated that

---

[41]    *See* affidavit of Sundar Narayan dated June 1, 2011.

[42]    *See* deposition of Pethinaidu Veluchamy dated July 19, 2011, pp. 944-950.

[43]    *See* Pethinaidu and Parameswari Veluchamy Statement of Financial Affairs Part 10 filed September 12, 2011.

[44]    *See* 341 Meeting of Creditors Volume 8 dated August 15, 2012, pp. 1504-1513.

[45]    *See* affidavit of Sundar Narayan dated June 1, 2011, Exhibits 1 and 2.  *See also* 341 Meeting of Creditors Volume 8 dated August 15, 2012, Exhibits 101, 102.

after transfer of the property, Anu pledged her interest in this property in conjunction with obtaining a loan for VCT India,[46] stated she owned the property, and valued her share of the property at 220.62 million rupees, or about $4.5 million.[47]

32.     Activity by the Veluchamy family in India is not limited to transfers. Approximately one month after Bank of America obtained judgments against Mr. and Mrs. Veluchamy on December 30, 2010, the Veluchamys and their children created two new entities in India, Jayaarun Spinning Mills Private Limited and Jayaanu Spinning Mills Private Limited. Mr. and Mrs. Veluchamy initially denied having any ownership or involvement in these spinning mills, contemporaneous incorporation filings contained their signatures, copies of their passports, and documentation indicating that meetings regarding the incorporation took place at their residence in Oak Brook, Illinois.[48]  Such inconsistency between the testimony of the Veluchamys and the contemporaneous corporate filings in India is a red flag.  Mr. Veluchamy later explained that the two businesses were created solely for the purpose of providing additional power resources to Sri Parameswari Spinning Mills and Jayavelu Spinning Mills and did not own any assets.  Contemporaneous corporate filings with the Ministry of Corporate Affairs in India contradict the purpose of the businesses described by Mr. Veluchamy.  This contradiction is also

---

[46]      Of note, Anu was the first Veluchamy family member to testify about the Chennai properties.  On June 27, 2011, Anu testified that she was not familiar with a property in Chennai where CAC Software was located, and stated she was not sure who owned CAC Software.  *See* deposition of Anu dated June 27, 2011, pp. 398-403.  At the time of her testimony, contemporaneous MCA filings showed Anu was both a Director and shareholder of CAC Software as described in more detail in paragraphs 670 to 683 above.  Anu testified at that time that she did not know anything about this property in Chennai or the transfer of the property to her and her brother in December 2010 until her attorneys told her within the past month.  *See* deposition of Anu dated June 27, 2011, pp. 404-408.

[47]      *See* VCT India Form 8 and attachments dated October 10, 2011.

[48]      According to Mr. Veluchamy, he was uninvolved in these entities and his signature was possibly forged. Mr. Veluchamy stated: "I never had a meeting. I never had a resolution signed, all those things.  They just made it up, all those things…They might have taken my signature from somewhere...I never had a meeting here.  I think the people in India, they do all those things, you know."  *See* 341 Meeting of Creditors Volume 2 dated May 14, 2012, pp. 465-470.

a red flag.  Moreover, Mr. Veluchamy's assertion that these two new entities lacked assets is inconsistent with their disbursements of millions of dollars to Arun and Anu.  I have been provided with insufficient information with which to ascertain the source of the new spinning mills' capitalization, however approximately $3 million was transferred out of these businesses subsequent to their incorporation and provided to Arun and Anu.  Of the $3 million paid by these entities to the Veluchamys' children, at least $1.5 million was transferred from India to U.S. bank accounts in the weeks following the bankruptcy filings of the Veluchamys and the Chapter 11 Debtors.  This inconsistency between Mr. Veluchamy's testimony and the apparent assets of the two newly incorporated is also a red flag.

33.     The Veluchamys and their children appear to have transferred significant cash to India, which has been used to invest in various Indian businesses (other than the two new spinning mills) in 2010 and 2011.  During 2010, the Veluchamys transferred approximately $5.8 million to India, which was later transferred to Jaya Velu Spinning Mills ($5.5 million) and Appu Hotels, Ltd. ($0.3 million).  Also during 2010, Arun and Anu transferred approximately $1.6 million of purported indemnity funds provided to them by their parents to Appu Hotels, Ltd. and Sree Jayajothi Cements, in each case to receive shares in the respective companies in return. Then, during 2011, Arun and Anu withdrew millions of dollars from Oakbrook Financial—a business previously largely capitalized through a combination of Mrs. Veluchamy's money, purported indemnity payments, and assets provided by Sonia in exchange for assets acquired using indemnity monies—and transferred these monies to India to invest $3.6 million in Sri Parameswari Spinning Mills, Jaya Velu Spinning Mills, and Versatile Card Technology Private, Ltd., all of which are companies owned by the Veluchamy family.  In particular, Arun used approximately $2 million provided to him by Oakbrook Financial to invest approximately $1.9 million in Jaya Velu Spinning Mills in March 2011.  Likewise, Anu used approximately $1.7 million provided to her by Oakbrook Financial in May 2011 to acquire approximately $1.5 million of shares in Sri Parameswari Spinning Mills in November 2011 and to invest $0.3 million in Versatile Card Technology Private, Ltd. in November 2011.  See Section XV for additional discussion.

34.     Analysis of activities by the Veluchamys, the Veluchamys' children, and Veluchamy family businesses, from a financial, investigative, and accounting perspective, indicates that despite the transfers of assets outlined in this report, control of the funds of

Veluchamy family businesses remained highly centralized among the Veluchamys and their children through their bankruptcy filings, with Veluchamy family businesses paying the personal expenses of the Veluchamys.  In addition to retaining their ability to control and/or influence funds of the Veluchamy family businesses, the Veluchamys appeared to control the use of personal assets of their children via purported indemnity agreements that governed indemnity payments transferred by the Veluchamys to their children.   Since at least December 31, 2008, the Veluchamys, the Veluchamys' children, and Veluchamy family businesses appeared to engage in many non-arm's-length transactions (including, but not limited to, the transfers made pursuant to purported indemnity payments discussed above, transfers of ownership of both business interests and real estate, undocumented loans, and loan repayments), the effect of which was to transfer millions of dollars of assets (*e.g.*, cash, business interests, real estate, and other investments) from the Veluchamys to their children.  Many of these transactions diverted assets to outside the United States and away from creditors (*e.g.*, transfers of jewelry that the Veluchamys insured for approximately $1 million).  The Veluchamys appear to have historically engaged in significant lending activities by and among one another, transferring money via undocumented loans between parties.   There were numerous instances of the Veluchamys settling purported individual obligations among one another via transfers between corporate interests.   On multiple occasions, the Veluchamys and their children used monies of the Veluchamy Family Foundation, a Section 501(c)(3) tax-exempt private foundation, for purposes directly benefitting the Veluchamy family or Veluchamy family businesses.   Additionally, my investigation identified many instances in which the Veluchamys commingled assets in accounts in the names of their children or Veluchamy family businesses.   Also, Veluchamy family real estate holding companies used a single commingled bank account, managed by Anar Real Estate, Inc. (a real estate management company owned and managed by the Veluchamys' children), for all cash activity involving Veluchamy family real estate properties.   Prior to bankruptcy, Veluchamy family real estate holding companies were permitted to borrow from one another via this commingled account.  See Section XVII below for additional discussion.

35.    Viewed in their totality, the Veluchamys' transfers outlined in this report appear (from a financial, investigative, and accounting perspective) to bear traits consistent with many of the Illinois Uniform Fraudulent Transfer Act's indicators of fraudulent intent.  For example, these transfers or obligations were made almost exclusively to insiders, the Veluchamys

appeared to retain possession or control after the transfers, the transfers or underlying obligations appear to have been concealed, the transfers or obligations were incurred at a time when the Veluchamys were under a threat of pending litigation or were already being sued, the transfers resulted in the transfer of substantially all interests in the Veluchamys' assets, the Veluchamys appear to have removed assets from the United States (*e.g.*, cash and jewelry), the Veluchamys claimed to have no money or assets subsequent to the transfers, the Veluchamys made the transfers after defaults on loans, and the Veluchamys pledged assets in foreign and domestic businesses to family members and a family owned finance company.

## II.    BACKGROUND

36.     I understand that Mr. and Mrs. Veluchamy reside in Oak Brook, Illinois.  I understand that the Veluchamys have two adult children; Arun is their son, and Anu is their daughter.

37.     I understand that the Veluchamys were borrowers under a Loan Agreement dated December 1, 2005, as amended by a First Amendment to Loan Agreement dated December 28, 2006, a Second Amendment to Loan Agreement dated January 31, 2008, and a Third Amendment to Loan Agreement, Forbearance Agreement, Waiver and Reaffirmation of Pledge Agreement, dated November 30, 2008, whereby LaSalle Bank, N.A. ("LaSalle") extended loans totaling $29 million in principal ($20 million via a revolving note and $9 million via a term note).  I understand that the Second Amendment to Loan Agreement described the $20 million revolving note maturity date as November 30, 2008 with a term loan installment of principal of $1 million due on the same day.  I understand that the Third Amendment to Loan Agreement, Forbearance Agreement, Waiver and Reaffirmation of Pledge Agreement established that the revolving note became due on June 30, 2009.

38.     I understand that First Mutual was a borrower under a Revolving Loan Agreement dated February 15, 2008 whereby LaSalle extended loans to First Mutual totaling $10 million in principal.  I understand that on September 26, 2008, Mr. Veluchamy executed a guaranty in favor of Bank of America, as successor to LaSalle and that subsequently the Revolving Loan Agreement dated February 15, 2008 was amended by a First Amendment to Loan Agreement, Forbearance Agreement, Waiver and Reaffirmation of Pledge Agreement and Guaranty dated November 30, 2008.  I understand that the Revolving Loan Agreement described the $10 million