**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Case No. 11 B 33413** |
| PETHINAIDU VELUCHAMY and | ) | |
| PARAMESWARI VELUCHAMY | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| BANK OF AMERICA, N.A., | ) | |
| DERIVATIVELY ON HALF OF THE | ) | |
| ESTATE OF PETHINAIDU AND | ) | |
| PARAMESWARI VELUCHAMY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary No. 12 A 01715** |
| | ) | |
| ARUN VELUCHAMY, ANU VELUCHAMY, | ) | |
| SONIA VELUCHAMY, OAKBROOK | ) | |
| FINANCIAL, INC., VELUCHAMY 2009 | ) | |
| DYNASTY TRUST, VASUDEVAKI NAIDU | ) | |
| JAGANATH NAIDU, RAJIV | ) | |
| PARTHASARATHY, ARJUN | ) | |
| PARTHASARATHY, PETHINAIDU | ) | |
| VELUCHAMY, AND PARAMESWARI | ) | |
| VELUCHAMY, | ) | |
| | ) | |
| Defendants | ) | |

**Amended Memorandum of Decision on the Entry of Final Judgment**
**and Proposed Findings of Fact and Conclusions of Law**

This adversary proceeding, filed in a voluntary Chapter 7 bankruptcy case, is before the court for decision after trial.  The debtors in the bankruptcy case are a married couple who owned and operated several successful businesses.  One of their businesses, a bank in Chicago, failed after the debtors had incurred or guaranteed large amounts of debt to support it.  When the debtors did not pay these debts, their lender sued them, and after judgment was entered against them, they filed this bankruptcy case.

The adversary proceeding was brought on behalf of their Chapter 7 estate.  The complaint alleges that the debtors engaged in a wide-ranging scheme to hinder, delay, or defraud their creditors, principally by transferring cash and other assets to their son and

daughter. As discussed below, the evidence at trial established all of the major allegations of the complaint, but the estate is not entitled to each of the remedies it requests, and a bankruptcy judge's authority to enter judgment does not extend to every count. As a result, judgment will be entered now as to certain counts of the complaint, and for the other counts, findings of fact and conclusions of law will be proposed for entry of judgment by the district court.

## I. Jurisdiction

Under 28 U.S.C. § 1334(a), the federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code (Title 11, U.S.C.). The district courts may refer these cases to the bankruptcy judges for their districts under 28 U.S.C. § 157(a), and the District Court for the Northern District of Illinois has made such a reference through Internal Operating Procedure 15(a).

After a case is referred to a bankruptcy judge, 28 U.S.C. § 157(b)(1) authorizes the judge to issue final judgments in "core proceedings" arising under the Bankruptcy Code, and § 157(b)(2) gives several examples of core proceedings. However, under Article III of the Constitution, a bankruptcy judge, lacking the life-tenure and protected compensation that Article III requires for federal judges, may only enter final judgment on matters of "public right," even though the statute includes matters of "non-public right" within its examples of core proceedings. *Stern v. Marshall*, 131 S. Ct. 2594, 2611–12 (2011). At least without the consent of the parties, disputes over non-public rights can only be treated by a bankruptcy judge through the issuance of proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1), with judgment entered by the district court after de novo review of the proposed findings and conclusions. *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2173–74 (2014).[1]

This adversary proceeding deals primarily with efforts by the debtors' estate to avoid fraudulent transfers. Fraudulent transfer actions are among the matters that the statute lists as core proceedings. 28 U.S.C. § 157(b)(2)(H). In *Arkison,* the Supreme Court considered a bankruptcy judge's constitutional authority to enter final judgment on fraudulent transfer actions but did not decide the question. Rather, the Court noted that the district court had given de novo review to the bankruptcy judge's entry of judgment, as it would have given to proposed findings and conclusions, and the Court held that this review cured any error in the entry of judgment by the bankruptcy judge. *Id.* at 2175. The Supreme Court has not yet decided whether, consistent with its reasoning in *Stern v. Marshall,* fraudulent transfer actions are generally outside a bankruptcy judge's authority to enter judgment.

---

[1]*Arkison* expressly left undecided whether party consent would permit a bankruptcy judge to issue final judgment on a matter otherwise requiring Article III adjudication. 134 S. Ct. at 2170 n.4. The Seventh Circuit, however, has held that consent cannot have this effect. *See Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 773 (7th Cir. 2013), *cert. granted* 134 S. Ct. 2901 (2014).

Without a decision from the Supreme Court defining the breadth of *Stern*, the lower courts have disagreed about the extent to which Article III prohibits bankruptcy judges from entering final judgments on various matters listed as core proceedings in § 157(b)(2). *See Albert v. Site Management, Inc.*, 506 B.R. 453, 458 (D. Md. 2014) (discussing conflicting decisions). However, the Ninth Circuit's decision in *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency)*, 702 F.3d 553 (9th Cir. 2012), *aff'd on other grounds*, *Arkison*, 134 S. Ct. at 2175, convincingly holds that bankruptcy judges generally may not enter final judgment in fraudulent transfer actions. The basis for this conclusion is that (1) in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989), the Supreme Court held that fraudulent transfer actions were non-public actions giving rise to a right to jury trial, and (2) in *Stern*, 131 S. Ct. at 2614, the Court equated the right to Article III adjudication with the jury trial right, specifically citing *Granfinanciera*.

The leading contrary decision, *In re Refco, Inc.*, 461 B.R. 181, 186–87 (Bankr. S.D.N.Y. 2011), suggests that the public right analysis of *Stern* is only an alternative holding by a plurality of the Court and that the concurring opinion of Justice Scalia suggests a different analysis for fraudulent transfers—first, that a bankruptcy judge may be constitutionally authorized to issue a final judgment on matters for which such judgment entry is "a firmly established historical practice," *Stern*, 131 S. Ct. at 2621 (Scalia, J., concurring), and second, that historically, fraudulent transfer actions have been subject to final judgment by bankruptcy judges. There are difficulties with each step in this analysis. First, in *Arkison,* a unanimous court failed to adopt a historical analysis of bankruptcy court adjudicative authority, but rather read *Stern* this way: "Because '[n]o "public right" exception excuse[d] the failure to comply with Article III,' we concluded that Congress could not confer on the Bankruptcy Court the authority to finally decide the claim." 134 S. Ct. at 2172 (quoting *Stern*, 131 S. Ct. at 2611). To determine whether a bankruptcy judge may finally adjudicate a matter, then, the test of *Arkison* is not historical practice but the status of the matter as a public right. Second, even if *Stern* had adopted historical practice as the test of decisional authority, there is no firmly established historical practice of final judgments being entered by bankruptcy judges or referees in fraudulent transfer actions. To the contrary, the *Refco* decision itself notes that before the Bankruptcy Code was enacted in 1978, such actions were "plenary," requiring that they be adjudicated by the district court. *Refco*, 461 B.R. at 188 n.5. Standing on their own, then, fraudulent transfer actions are not constitutionally subject to final judgment by a bankruptcy judge.

In one context, however—where the defendant in a fraudulent transfer action has filed a claim against the bankruptcy estate—a bankruptcy judge may enter final judgment in the action. Two steps lead to this result. First, disputes over creditors' claims are "'integral to the restructuring of the debtor-creditor relationship'" and so are "subject to resolution by the bankruptcy court." *Stern*, 131 S. Ct. at 2617 (2011) (quoting *Langenkamp v. Culp*, 498 U.S. 42, 44, (1990)); *see* 28 U.S.C. § 157(b)(2)(B) (listing "allowance or disallowance of claims against the estate" as a core proceeding). Second, § 502(d) of the Code makes adjudication of fraudulent transfer claims a necessary part of claims adjudication by requiring disallowance of the claim of a creditor who is a defendant in a fraudu-

lent transfer action unless the defendant has paid the amount of any monetary judgment and turned over any property ordered to be returned. A pending fraudulent transfer action against a creditor is therefore a defense to the creditor's claim against the estate. *See Stern*, 131 S. Ct. at 2616–17; *see also Langenkamp,* 498 U.S. at 44–45 (1990); *Katchen v. Landy,* 382 U.S. 323, 336 (1966) (using the same reasoning to find no right to jury trial in preference actions against defendants who had filed claims against the estate).

In the bankruptcy case now before the court, two of the three parties against whom fraudulent transfer actions are being pursued—the debtors' children—have filed claims against the estate. Judgment may be entered on the fraudulent transfer actions brought against those defendants. For the defendant who has not filed a claim, proposed findings of fact and conclusions of law are required.

In addition to seeking recovery on fraudulent transfer claims, the adversary proceeding seeks a turnover of estate property. Such actions are statutorily core proceedings. 28 U.S.C. § 157(b)(2)(E). However, a decision of the Seventh Circuit, *In re Wellness Int'l Network, Ltd*., 727 F.3d 751 (7th Cir. 2013), *cert. granted, Wellness Int'l Network, Ltd. v. Sharif*, 134 S. Ct. 2901 (2014), holds that if a dispute over whether particular property is part of a debtor's estate depends on the application of state law, it is a non-public matter and not constitutionally capable of final adjudication by the bankruptcy judge. Although the Supreme Court has granted certiorari to review this decision, *Wellness* suggests that a dispute over the ownership of estate property should not be finally adjudicated by a bankruptcy judge. Therefore, at least under the current decisional law in the Seventh Circuit, turnover actions of the sort asserted by the estate in this proceeding are best treated by a bankruptcy judge through proposed findings and conclusions.

To allow for efficient review of this court's decision, judgment will be entered under Fed. R. Civ. P. 54(b), incorporated into Fed. R. Bankr. P. 7054, on those matters within the adjudicative authority of a bankruptcy judge. The district court will then be able to consider an appeal of the judgment together with a review of the proposed findings and conclusions, advancing the interests of all of the parties in a prompt resolution.

## II. Findings of Fact

### A. Parties

#### 1. Plaintiff

The bankruptcy estate of Pethinaidu Veluchamy and Parameswari Veluchamy is being represented by Bank of America, the plaintiff in this proceeding. The bank holds judgments against the debtors totaling over $47 million. *See Bank of America, N.A. v. First Mutual Bancorp et al*., Case No. 2009-CV-5108; *Bank of America, N.A. v. Pethinaidu Veluchamy et al*., Case No. 2009-CV-5109. Because Bank of America's interests are aligned with those of the trustee and other creditors, the bank was granted derivative standing to pursue this adversary proceeding on behalf of the estate. Order Granting Motion to Approve, Case No. 2011-BK-33413, Docket No. 506. And because the bank

functions in this proceeding only as estate representative, this decision refers to the plain-tiff as "the Estate."

### 2. The debtors

Pethinaidu Veluchamy and Parameswari Veluchasoniamy, the debtors in this case, are among the defendants in the proceeding. To distinguish them from their children, this decision refers to Pethinaidu as "Mr. Veluchamy," to Parameswari as "Mrs. Veluchamy," and to the debtors together as "the senior Veluchamys."

### 3. The debtors' children

The majority of the counts in the Estate's complaint seek relief from the senior Veluchamys' children: their son, Arun, and their daughter, Anu, the primary recipients of the alleged fraudulent transfers. To distinguish the Veluchamy children from their parents, this decision refers to them by their first names.

### 4. Sonia Veluchamy

The only other defendant still involved in the proceeding is Sonia Veluchamy, Arun's wife, who is also referred to by her first name.

### 5. Others

Although other family members are alleged to have participated in the senior Veluchamys' fraudulent transfers, no recovery is now being sought against them. They are also generally referred to by their first names.

## B. Background

The senior Veluchamys were wealthy individuals who owned and operated several businesses, including direct-mailing and marketing operations. *See* PX 351 at 30–41 (61–72).[2] Mr. Veluchamy's first company was University Subscription Service, which he

---

[2] Where a cited document has internal page numbers differing from the page numbers of the document as filed in Portable Document Format (PDF), the references in this opinion set out the internal page numbers first, followed by a parenthetical setting out the PDF page numbers.

Abbreviations in the citations are as follows: for Estate's trial exhibits, "PX;" for exhibits offered by the senior Veluchamys, "P&PX;" for exhibits offered by Arun and Anu, "A&AX;" for the transcript of the trial held June 10–14, 2013, "Trial Tr.;" for the Answer to Complaint and Affirmative Defenses filed on behalf of Pethinaidu and Parameswari Veluchamy (Docket No. 45), "Senior Veluchamy Answer;" for the Plaintiff Estate Representative's Post-trial Brief (Docket No. 312), "Estate Post-trial Br.;" for the

started while selling magazine subscriptions door-to-door as a college student. Trial Tr. 1135. In 1978, Mr. Veluchamy started Unique Mailing Services (UMS), which provided direct mailing services to major corporations. Trial Tr. 1136. Following the success of UMS, Mr. Veluchamy acquired Creative Automation Company, which provided database management and printing services. *Id*. He continued expanding his holdings, acquiring and developing companies that related to his mailing services, and he began offering add-on services to his clients, including the printing of insurance ID cards and the manufacture of gift and credit cards. Trial Tr. 1137. By 1995, the senior Veluchamys had created a successful and wide-ranging set of integrated businesses. *See* Trial Tr. 1138.

The senior Veluchamys then began investing in banking institutions. In 1995, Mr. Veluchamy acquired Security Bank in Downers Grove, Illinois. Trial Tr. 1139. In 1998, he acquired Chicago's Mutual Bank, into which he merged Security Bank. Trial Tr. 1140. The banking investments became a major problem for the senior Veluchamys. Beginning in 2005, due to concerns about its loan practices and financial condition, Mutual Bank became the subject of investigations by the Federal Deposit Insurance Corporation (FDIC) and the Illinois Department of Financial and Professional Regulations. Senior Veluchamy Answer ¶ 31. In an attempt to rescue Mutual Bank from insolvency, the senior Veluchamys borrowed $30 million and personally guaranteed a loan of $10 million, both from a predecessor of Bank of America. Senior Veluchamy Answer ¶ 28; Trial Tr. 1141–43. In 2008, those loans went into default. Senior Veluchamy Answer ¶ 29. At this point, the Federal Deposit Insurance Corporation found that Mutual Bank was undercapitalized, and it required the bank to obtain additional funds. *Id*. at ¶ 31. The senior Veluchamys failed to raise the necessary funds, and as a result, in July 2009, the FDIC shut the bank down. *Id*.

On August 19, 2009, Bank of America filed an action in the United States District Court for the Northern District of Illinois against the senior Veluchamys and others to collect the outstanding loans. Senior Veluchamy Answer ¶ 30. On December 30, 2010, the district court entered a judgment against the senior Veluchamys for over $43 million. Senior Veluchamy Answer ¶ 4. In attempting to collect this judgment, Bank of America brought a motion to compel the return of assets that the senior Veluchamys had transferred to their family members and others. Senior Veluchamy Answer ¶ 4. In response, in August 2011, just before the bank's motion was to be tried in the district court, the senior Veluchamys both filed this personal Chapter 7 bankruptcy case and caused their business entities to file Chapter 11 bankruptcy cases in Delaware. Senior Veluchamy Answer ¶ 4. The Chapter 11 cases were later transferred to this court and are now pending as *In re Qualteq*, Case No. 2012-BK-05861.

---

Post-trial Brief of Debtor Defendants Pethinaidu Veluchamy and Parameswari Veluchamy (Docket No. 330), "Senior Veluchamy Post-trial Br.;" for Anu and Arun Veluchamys' Joint Response to Plaintiff's Post-trial Brief (Docket No. 316), "A&A Post-trial Br.;" for the Plaintiff Estate Representative's Consolidated Post-trial Reply Brief (Docket No. 327), "Estate Post-trial Reply Br."; and for Sonia Veluchamy's Response to Plaintiff's Post-trial Brief (Docket No. 318), "Sonia Post-trial Reply Br."

**C. Overview of the asset disposition**

In 2007, before the senior Veluchamys defaulted on their loans from Bank of America, their self-reported net worth was nearly $500 million. PX 351 at 30–31 (61–62), ¶ 43. But at the time they filed their bankruptcy petition in 2011, the senior Veluchamys reported a negative net worth of about $55 million. PX 351 at 31–32 (62–63), ¶ 44. The Estate's complaint alleges that the senior Veluchamys disposed of a large part of the $500 million in asset value through fraudulent transfers. These allegations were proven at trial. As detailed below, the senior Veluchamys removed from their ownership almost all of their major assets before they filed for bankruptcy. Nearly all of the asset transfers were made gratuitously or for much less consideration than the value of the transferred assets.

The massive loss of the senior Veluchamys' wealth was the result of an intentional scheme. The scheme had three parts. First, the senior Veluchamys transferred millions of dollars to their children, Arun and Anu. Second, the senior Veluchamys sold stock and real estate to Arun and Anu at discounted prices. Finally, the senior Veluchamys gave their remaining cash and assets to other family members as well as Arun and Anu. *See* PX 351 at 74–75 (105–06), ¶ 103.

To further the scheme, the senior Veluchamys both created false documents and destroyed authentic ones. When Bank of America discovered the transfers to Arun and Anu, the senior Veluchamys fabricated documents to make the transfers look legitimate. For example, in order to justify $18.6 million in cash transfers to Arun and Anu, the senior Veluchamys created "Indemnity Agreements," that purported to protect investments made by Arun and Anu. PX 20–25. However, as discussed below, the evidence is clear that these documents are backdated records of non-existent agreements.

Document destruction took place in two waves. In July 2011—a month before filing for bankruptcy and contrary to their former document retention policy—the senior Veluchamys ordered their employees to destroy thousands of corporate financial records. Trial Tr. 908–09. And in April 2012, while their bankruptcy case was pending, the senior Veluchamys ordered another round of document shredding, this time focusing on Mr. Veluchamy's personal files. Trial Tr. 963–64.

**D. The disposition of specific assets**

**1. Alleged fraudulent transfers of cash**

Beginning September 1, 2009 and continuing until October 20, 2010, the senior Veluchamys gratuitously transferred $18,605,101 to their children. PX 372. To conceal the transfers, the senior Veluchamys wired the money to their Indian bank accounts. PX 351 at 76–77 (107–08), ¶¶ 106–07. From these accounts, they transferred the money to foreign accounts of Arun and Anu, who then repatriated the money. PX 351 at 77–78 (108–09), ¶¶ 107–09. Mr. Veluchamy acknowledged that one reason for routing the transfers through his Indian bank account was to avoid the enforcement power of the

FDIC. Trial Tr. 82–85. The date and amount of each transfer are set out in the following charts (PX 372):

**Payments to Arun**

|   | Date | Amount |
|---|------|--------|
| 1 | 9/1/09 | $1,900,000 |
| 2 | 9/8/09 | $1,750,000 |
| 3 | 10/5/09 | $60,500 |
| 4 | 10/7/09 | $500,000 |
| 5 | 10/8/09 | $1,361,052 |
| 6 | 7/13/10 | $263,157 |
| 7 | 7/14/10 | $1,115,789 |
| 8 | 7/28/10 | $298,947 |
| 9 | 8/2/10 | $361,702 |
| 10 | 8/20/10 | $31,915 |
| 11 | 9/13/10 | $417,391 |
| 12 | 9/27/10 | $435,000 |
|   | Total | $8,495,453.00 |

**Payments to Anu**

|   | Date | Amount |
|---|------|--------|
| 1 | 9/1/09 | $2,400,000 |
| 2 | 9/8/09 | $1,750,000 |
| 3 | 10/5/09 | $60,500 |
| 4 | 10/7/09 | $500,000 |
| 5 | 10/8/09 | $1,361,095 |
| 6 | 7/13/10 | $263,157 |
| 7 | 7/14/10 | $1,115,789 |
| 8 | 7/28/10 | $298,947 |
| 9 | 8/2/10 | $310,638 |
| 10 | 8/20/10 | $31,914 |
| 11 | 9/13/10 | $617,391 |
| 12 | 9/27/10 | $435,000 |
| 13 | 10/20/10 | $965,217 |
|   | Total | $10,109,648.00 |

The senior Veluchamys do not deny making these payments. Senior Veluchamy Answer ¶ 40. However, they initially contended that the payments were not intended to defraud their creditors, but rather were made to comply with indemnity agreements. *See* Trial Tr. 86; Senior Veluchamy Answer ¶ 42. The senior Veluchamys provided copies of three pairs of indemnity agreements, dated July 2008, September 2008, March 2009, one of each pair for Arun and one for Anu. PX 20–25. The September 2008 and March 2009 agreements for Arun also list Sonia as an indemnitee. PX 23; PX 24. The signatures of the senior Veluchamys and each indemnitee appear on each of the indemnity agreements.

The Estate argued that the indemnity agreements were falsely dated and actually created after the payments were made. None of the defendants now argue to the contrary. The senior Veluchamys do not mention the indemnity agreements in their post-trial brief. Arun and Anu, accepting that the payments to them were fraudulent, argue only about the appropriate measure of damages. *See* A&A Post-trial Br. 19–22 (26–29). However, the falsity of the indemnification agreements remains critical, because it bears both on the general credibility of the senior Veluchamys and on their children's knowing participation in the fraudulent transfers. And in two distinct ways, the evidence at trial convincingly supports the Estate's position that the indemnity agreements are fabrications.

First, the stated rationale for the indemnity agreements is that Arun and Anu required protection from losses to induce them to make or retain investments of over $18 million in Mutual Bank. *See, e.g.,* PX 25 at 1 ("[I]n consideration for Indemnitee [Anu] depositing the Contributed Capital into Mutual, Indemnitors [the senior Veluchamys] agree to indemnify Indemnitee in the event of the loss of this Contributed Capital if Mutual is taken over by the FDIC."). But there is no credible evidence that Arun or Anu made any capital deposits to Mutual Bank at the times identified by the senior Veluchamys. The senior Veluchamys testified that the deposits began in 1998 and 1999, when Arun was 22 years old and Anu was 17. PX 670 at 516–23 (100–101), 530–35 (103–104). The senior Veluchamys initially suggested that Anu was able to contribute funds she earned through summer jobs and that Arun may have made his payments through distributions he received on VMark stock that he owned. PX 670 at 518–19, 532 (100, 104). But the defendants failed to show any documentation either of large amounts of money being received by Arun and Anu during 1998 and 1999 or of any transfers of money from Anu and Arun to Mutual Bank. When asked where records of such transfers could be found, Mr. Veluchamy testified that share certificates would have been issued, but when asked about records of shareholdings, he stated that, although his corporate attorney once had possession of the records, the attorney refused to provide them, and that Mr. Veluchamy had no idea where the records were located at the time of his testimony. PX 670 at 519–520 (100–01). The absence of any documentation for transfers of $18 million to Mutual Bank makes it quite likely that Arun and Anu made no contributions to Mutual Bank in 1998 and 1999.[3]

Second, the evidence overwhelmingly established that the indemnity agreements were backdated:

• If the senior Veluchamys had actually agreed in 2008 to indemnify Arun and Anu for the $16 million in contributions listed in the agreements, they would have assumed a major contingent liability that would have been required to be reported in their financial statements for 2008. Trial Tr. 491. But the financial statement for 2008 that Mr.

---

[3] Ten years later, in 2009, Arun and Anu filed tax returns showing a complete loss of investments in Mutual Bank. PX 436; PX 448. However, it is most likely that if Arun and Anu made any investments in the bank, the investments would have been made after 2005, when the bank was experiencing financial distress and needed capitalization.

Veluchamy provided to Bank of America reflects no such liability.  PX 68; Trial Tr. 490–91.

  • If the funds transferred to Arun and Anu in 2009 and 2010 had been indemnity payments, the payments would have reduced any loss incurred by Arun and Anu in whatever interest they had in Mutual Bank and would have generated a loss to the senior Veluchamys, all of which should have been discussed with the accountant who prepared their tax returns.  Yet the senior Veluchamys never told their accountant about any indemnification agreements or payments, and the 2009 tax returns he prepared reflected unreduced losses for Arun and Anu in Mutual Bank stock and no loss for the senior Veluchamys resulting from indemnification payments.  Trial Tr. 888–93; PX 436 (Arun 2009 Tax Return); PX 448 (Anu 2009 Tax Return); PX 498 (Senior Veluchamy 2009 Tax Return).

  • The defendants were unable to remember who prepared the indemnification agreements, when or where they were signed, or where the original documents can be found.  Trial Tr. 300, 404, 1013–14, 1405–07; PX 670 at 499–500 (95–96), 512–515 (99), 538–39 (105); PX 678 at 352–53 (64); PX 688 at 134–43 (29–30); PX 680 at 21–22.

  • When the question of the cash payments to Arun and Anu arose in the district court action brought against the senior Veluchamys by Bank of America, the senior Veluchamys' lawyer did not tell the court that they were indemnity payments but rather that they were payments to the senior Veluchamys' creditors in India.  PX 543 at 11 (2).

  • When Bank of America asked about the computer used to create the agreements, Mr. Veluchamy stated that it had been destroyed during a snowstorm.  Trial Tr. 178–79. But two weeks after being questioned about their computers, the senior Veluchamys had their computers replaced, PX 114, preventing any examination of the computers to determine whether they contained information regarding the creation of the indemnity agreements.

  • Finally, when asked whether the agreements were falsifications, both Arun and Anu invoked their privilege against self-incrimination, from which their knowledge of the false nature of the indemnification agreements can be inferred.  Trial Tr. 442, 1015; *see Harris v. City of Chicago*, 266 F.3d 750, 753 (7th Cir. 2001) (assertion of the self-incrimination privilege during civil proceedings allows the court to make an adverse inference).

  The cash payments from the senior Veluchamys to Arun and Anu, then, were proven to be gratuitous transfers, and the creation of the indemnity agreements was proven to be a knowing attempt by all of the Veluchamy defendants, operating in concert, to defraud the senior Veluchamys' creditors by making the gratuitous transfers look like the payment of contractual obligations.

### 2.  Alleged subsequent transfer of cash to Sonia

In June 2010, Anu transferred $500,000 of the cash she received from her parents into an account of Oakbrook Financial, Inc., a corporation formed to provide funding for various corporations controlled by the senior Veluchamys.  Trial Tr. 1362 (deposit by Anu); Trial Tr. 1359, PX 351 at 278-90 (309-21) (business of Oakbrook Financial); Sonia Post-trial Br. 3 (7) (source of funds deposited by Anu).  In exchange, Oakbrook Financial issued 50,000 shares of stock to Sonia.  Trial Tr. 1361-62.  Anu treated her transfer of funds as a loan to Sonia, and Sonia's husband Arun later repaid it.  Trial Tr. 1362-63.  Sonia did not receive cash directly from the senior Veluchamys and derived no direct benefit from the cash transfers from the senior Veluchamys made to Anu.  The issuance of Oakbrook Financial stock to Sonia was not a transfer of assets of the senior Veluchamys intended to hinder, delay, or defraud their creditors.

### 3. Alleged fraudulent transfer of VMark stock

Before the senior Veluchamys defaulted on their obligations to Bank of America, they owned 70% of VMark, a holding company that in turn owned seven profitable direct marketing companies.  Trial Tr. 1305–07 (Mr. Veluchamy identifying the VMark subsidiaries); PX 351 at 139 (170), ¶ 201.  The remaining VMark stock was owned by Arun and Anu, 15% each.  PX 351 at 139 (170), ¶ 201.  On August 20, 2009, the day after Bank of America filed its district court action against them, VMark sold new voting stock to Arun and Anu, reducing the senior Veluchamys' stake in VMark's voting stock to 35%.  *See* PX 544 at 1 (stock purchase agreement); PX 351 141–42 (172–73), ¶ 204 (expert review of VMark documents).  Less than three weeks later, on September 8, 2009, VMark made a second sale of stock to Arun and Anu, including both additional voting stock and new nonvoting stock.  PX 544 at 5 (stock purchase agreement).  The effect of these transactions was to transfer control of VMark to Arun and Anu and greatly dilute the senior Veluchamys' interest in the corporation, from 70% to 19.8% in voting stock and from 70% to 52.0% in nonvoting stock.  PX 351 at 150 (181), ¶ 210; PX 366.  The transfer of control to Arun and Anu prevented any creditor who seized the senior Veluchamys' VMark stock from being able to control the corporation and its subsidiaries.

The price paid by Arun and Anu for the stock was a fraction of its value.  Although the valuation of VMark was the subject of conflicting testimony at trial, discussed below in connection with an assessment of the relief awarded on Count III, the evidence established that the stock in the first transfer was worth $2.75 per share, and the stock in the second transfer was worth $1.99.  For voting stock, Arun and Anu only paid $0.63 per share in the first transfer, and $0.61 per share in the second one; for the nonvoting stock involved in the second transaction, they paid $0.60 per share.  PX 544.  When Arun and Anu were questioned about how the price was determined and whether they had purposefully paid less than VMark was worth, they both asserted their privilege against self-incrimination.  PX 687 at 112–14 (28–29) (Arun); PX 689 at 65–66 (12) (Anu).  As with the cash transfers, a negative inference is appropriate.

The Estate, then, proved the VMark stock was sold to Arun and Anu with the intent to hinder, delay, or defraud creditors.

### 4. Alleged fraudulent transfers of the stock of domestic businesses

In November 2010, Mr. Veluchamy sold his interests in four U.S. companies to Arun and Anu. PX 510 (Creative Investments sale agreement); PX 512 (Veluchamy LLC); PX 513 (Unique Mailing Services); PX 514 (University Subscription Service). The Estate seeks to avoid three of these transfers, detailed below:

| Date | Company | Stake | Cost to Each |
|------|---------|-------|--------------|
| 11/18/2010 | Creative Investments | 10% each | $29,106.86 |
| 11/23/2010 | Veluchamy LLC | 12.5% each | $5,376.69 |
| 11/23/2010 | Unique Mailing Services | approx. 2.5% each | $24,012.28 |

These sales were not negotiated at arm's length; instead, Mr. Veluchamy chose a price for each stock and his children paid it. PX 680 at 201–05 (36–37) (Arun stating that there was no price negotiation). When asked whether the sales were part of a scheme to keep assets away from their parents' creditors, both children asserted their privilege against self-incrimination. PX 687 at 118–24 (30–31) (Arun); PX 689 at 141–45 (31–32) (Anu). Again, a negative inference is appropriate.

Although the Estate failed to establish the value of the stock of Creative Investments and Veluchamy LLC, it did establish the value of the Unique Mailing Services stock transferred to Arun and Anu. This value was substantially greater than the price set by their father for that stock. *See* discussion of Count VIII below. Regardless of the value of the consideration paid, however, in the context of the senior Veluchamys' overall program of asset distribution, each of these stock transfers was intended to limit the assets that could be reached by creditors.

### 5. Alleged fraudulent transfers of interest in a Bear Stearns limited partnership

In July 2010, the senior Veluchamys transferred their investment in Bear Stearns Venture Partners, L.P. to Arun and Anu. PX 545 (transfer agreement). Although the senior Veluchamys claim that Arun and Anu paid $650,000 for the investment, the defendants provided no evidence of any payment, and when Anu was questioned about the asserted repayment, she asserted her privilege against self-incrimination, PX 689 at 140 (30), again leading to a negative inference. The Estate has established that Arun and Anu received the Bear Stearns limited partnership investment gratuitously.

### 6. Alleged fraudulent transfers of domestic real estate

Beginning in October 2009, the month after Bank of America brought its district court action against them, the senior Veluchamys sold three properties located in Downers Grove, Illinois to Arun and Anu. PX 403 (October 20 closing statement); PX 598

(December 29, 2009 closing statement); PX 599 (March 3, 2010 closing statement). Although Arun and Anu paid for these properties, the money they used came, at least in part, from funds that Mr. Veluchamy deposited into an E*Trade account that Arun and Anu owned.  Trial Tr. 540–42; PX 351 at 101–07 (132–38).[4]

As with the stock sales, the prices for these properties were not negotiated at arm's length, but even if the prices did accurately reflect the property values, the transactions were for less than reasonably equivalent value to the senior Veluchamys because of Mr. Veluchamy's contribution to the purchase funds.  The net effect of the purchases was that Arun and Anu removed the Downers Grove property from the reach of the senior Veluchamys' creditors by buying property from their parents using, in part, their parents' own money.  As with the transfers discussed above, the context of the real estate sales establishes that they were intended to hinder, delay, or defraud the senior Veluchamys' creditors.

### 7. Alleged fraudulent transfers of stock in Indian corporations

#### a.  Non-transfers of stock on May 1, 2008

Before discussing the senior Veluchamys' actual transfers of stock in Indian corporations, which began in 2009, it is necessary to discuss stock transfers that the senior Veluchamys assert occurred in 2008.  The senior Veluchamys produced Indian government-issued 7B stock sale forms, showing a May 1, 2008 transfer of their stock in seven Indian corporations to Mrs. Veluchamy's sister Renugadevi and others.[5]  Six of these corporations were controlled by the senior Veluchamys or their family members.  One—Appu Hotels—was not.  However, much like the falsified indemnity agreements, all of the May 1, 2008 transfer documents were proven to be backdated fabrications.  There are four distinct bases for this conclusion.

#### i. Absence of motivation

In May 2008, the senior Veluchamys were in pressing need of cash.  Only three months earlier, they had borrowed funds from Bank of America's predecessor to meet the

---

[4] The E*Trade account contained commingled funds deposited both by Arun and Anu and by Mr. Veluchamy, including $3,999,890 deposited by Mr. Veluchamy on October 8, 2009, shortly before the first Downers Grove property sale.  Approximately $2.9 million from the account was used in the Downers Grove purchases.  PX 351 at 102–04 (133–34), ¶¶ 140-42.

[5] The May 1, 2008 forms introduced by the senior Veluchamys involved the stock of Appu Hotels (P&PX 81), Versatile Card Technology Private Ltd. ("VCT India") (P&PX 82, 83 (undated), 84, 85), Jayavelu Spinning Mill (JSM) (P&PX 86), Parameswari Spinning Mill (PSM) (P&PX 87), Paragon Paper (P&PX 99), Aruppukottai Spinning Mill (P&PX 100), and CAC Software (P&PX 101, P&PX 102 (undated)).

FDIC's demand that they provide additional capital to Mutual Bank; by September of that year, the regulators had found Mutual Bank undercapitalized, requiring the infusion of yet additional funds; and in November, the bank loans became due. In May, then, the senior Veluchamys would have been taking reasonable steps to raise cash. Yet all but one of the purported May 1 transfer forms—the one involving Appu Hotels stock—either state that the consideration is "nil" or leave the line for consideration blank. *See* P&PX 84; P&PX 85; P&PX 86; P&PX 87. For the JSM, PSM, and VCT India stock, Mr. Veluchamy testified that transferees were going to guarantee loans taken out by the corporations. Trial Tr. 1250–52. But even if that were the understanding, the transferees' guarantees would only have supported the corporations whose stock they were receiving, while greatly reducing the senior Veluchamys' interest in the corporations with no consideration—in cash or otherwise—going to the senior Veluchamys. Mr. Veluchamy offered only one reason other than procuring guarantees to explain why, at a time when cash was essential, he had decided that he did not want to do business in India anymore. Trial Tr. 263; PX 670 at 113 (17). Neither of these explanations for cash-free transfers by the cash-needy senior Veluchamys is reasonable. It is more likely that the May 1, 2008 transfers did not take place.

### ii. Content of the transfer documents

The content of the 7B forms gives another indication that they are not authentic. Most of the forms are dated May 1, 2008, and all are executed by Mr. and Mrs. Veluchamy as transferors, but four of them—P&PX 81, 82, 84, and 85—state that the location for the execution is Chennai, while two others—P&PX 86 and 87—give Aruppukottai as the location. Mr. Veluchamy testified that he and his wife executed documents at both locations on the same day, traveling by air to make this possible. Trial Tr. 324–26. Their travel documents, however, make this unlikely.

PX 290 is a receipt for air travel by the senior Veluchamys. It shows that Mrs. Veluchamy purchased a ticket calling for travel on April 30, 2008 from Chennai (Airport Code MAA) to an airport near Aruppukottai (Madurai Airport, Code IXM), with a return flight to Chennai on May 4. For Mr. Veluchamy, the receipt shows the same April 30 flight to Madurai, with no return flight. If Mr. Veluchamy's testimony were accurate, the senior Veluchamys flew to Aruppukottai on April 30, signed two of the transfer documents there on the following day, and then, on that same day, flew back to Chennai to sign four additional transfer documents, even though Mrs. Veluchamy was not scheduled to return to Chennai for another three days. The senior Veluchamys gave no reason for a one-day trip to Aruppukottai, contrary to their scheduled travel, and no documentation of alternative flights.

The unlikelihood of accurate 7B forms is compounded by the notarizations that appear on them. The four forms listing Chennai as the location of the transfer have different notaries listed as witnessing the senior Veluchamys' signatures. *Compare* P&PX 81 (notarized by K. Rangarajan) *with* P&PX 82, 84, and 85 (notarized by D. Rajeswari). On the other hand, the two forms listing Aruppukottai as the location, P&PX 86 and 87,

14

are both notarized by D. Rajeswari. So, for the forms to be accurate, the senior Veluchamys would have had to sign two transfer forms in Aruppukottai before D. Rajeswari, who then—like the senior Veluchamys—would have traveled the same day to Chennai, where the senior Veluchamys would have signed three additional transfer forms before D. Rajeswari but then gone to K. Rangarajan for notarizing their signatures on the remaining form.

Finally, there are discrepancies in the copies of some of the forms. The senior Veluchamys presented a copy of one 7B form, which they had in their possession, purporting to transfer shares in the Aruppukottai Spinning Mill. PX 35 at 3. At trial, they introduced a copy of the same form, certified by the company as being in its possession. P&PX 100. These documents should be identical, but they are not. *Compare* PX 35 at 3 *with* P&PX 100 at 2 (noticeably different typing of "1st day of May, Two Thousand and Eight"). Similarly, the 7B form transferring Paragon Paper that was turned over during discovery does not match the certified copy presented by the defendants at trial. *Compare* PX 35 at 5 (with "Aruppukottai" typed as the place) *with* P&PX 99 at 2 (the purported original with no location typed in). During cross examination, Mr. Veluchamy was unable to explain why copies of the documents he prepared for submission to the stock-issuing corporations would be different from the copies maintained by the corporations themselves. Trial Tr. 1247–48.

The 7B forms, then, indicate that they were not created at the time or places they state.

### iii. Compliance with Indian law

The next difficulty with the transfer forms is that if they were effective, then either the transferees or the corporations whose stock was transferred would have violated Indian law governing stock transfers.

All of the companies whose stock was purportedly transferred on May 1, 2008 were subject to reporting requirements under India's Companies Act of 1956. *See* The Companies Act of 1956, No. 1 of 1956, § 159, India Code, *available at* http://indiankanoon.org/doc/1239729. Two forms, required by this law, give rise to the problem with the purported transfers.

First, Form 7B—the evidence offered by the senior Veluchamys to prove the validity of the May 1, 2008 transfers—is necessary for non-exchange transfers of corporate stock. To effect a transfer, the owner of the stock must obtain a date-stamped Form 7B from a government official. *See* The Companies Act of 1956, No. 1 of 1956, § 108(1), India Code, *available at* http://indiankanoon.org/doc/1935707. The parties then have two months from the date stamped on the form to complete it—including a notarized signature of the seller—and to deliver it to the company whose shares are being transferred. *Id.* at § 108(1)(b)(ii). If the form is not delivered within that time, the transfer is void unless an extension is obtained from a government official under § 108(1D) of the Companies Act. *See id.* at § 108(1D) (allowing the government to extend the time to avoid hard-

ship); *Vishnu Dayal Jhunjhunwalla v. Union of India,* (1981) 66 CompCas 684 (1989)
(Allahabad H.C. India.), *available at* http://indiankanoon.org/doc/422195 (upholding an
extension of time necessary to prevent the voiding of a stock transfer).[6]

The second form, Form 20B, is a report of a corporation's officers and sharehold-
ers, which must be filed annually under § 159 of the Companies Act. Once the company
accepts a transfer of shares, it must reflect the change on its next Form 20B filing. *See*
The Companies Act of 1956, No. 1 of 1956, §§159 and 162, India Code, *available at*
http://indiankanoon.org/doc/672967. Failure to comply timely and accurately with this
reporting requirement subjects companies and their officers to fines that accrue daily. *Id.*
at § 162. The annual filings act as prima facie evidence of share ownership. *Id.* at § 164,
*available at* http://indiankanoon.org/doc/310282.

At trial, the Estate presented 20B forms filed in 2008, 2009, and 2010 by the cor-
porations whose stock was treated in the May 1, 2008 transfer forms. If the senior Velu-
chamys had actually transferred their stock in these corporations on May 1, 2008, the
transfers would be reflected in the 20B forms. No such transfers are recorded. *See* PX
42 at 3–4 (JSM Form 20B filed after JSM's general annual meeting of September 29,
2008, showing no change in the senior Veluchamys' ownership as of that date); PX 37 at
4–5 (PSM Form 20B showing the same); PX 10–11 (20B forms filed by Appu Hotels in
2008 and 2009, showing no transfer of the senior Veluchamys' stock in 2008).[7]

---

[6] Mr. Veluchamy gave a different view of Indian corporate law, testifying that if a
Form 7B is not submitted to the stock-issuing company before the deadline set out in the
Companies Act, any party to the transfer can validate it by paying a late fee. Trial Tr.
1259–60. The defendants have pointed to no authority for this proposition, which is both
contradicted by the terms of the Companies Act and inconsistent with the case law re-
flecting efforts by transferees to obtain retroactive extensions of the filing deadline,
which would be unnecessary if payment of a fee allowed late filing.

[7] In 2012, the Veluchamy-controlled corporations produced amended 20B forms
that do reflect the May 1, 2008 transfers. *See* PX 95 at 1 (listing revised 20B forms for
JSM, filed on June 18, 2012); PX 96 at 1 (same for PSM). However, Mr. Veluchamy
admitted that his brother-in-law, Rajaram, created these amended forms after Mr. Velu-
chamy asked him to make the changes. Trial Tr. 274; *see also* Trial Tr. 1221–22; *see al-
so* PX 80 at 8 (amendment to the Form 20B of Aruppukottai Spinning Mill—which was
controlled by Mrs. Veluchamy's family—filed by Renugadevi using a letter substantively
identical to the one used by Rajaram). Mr. Veluchamy did not make this request until
shortly after the senior Veluchamys had been questioned about their ownership of the
corporations during this bankruptcy case. *See* PX 95 at 13 (stating that the amendment
was requested on May 4, 2012); Trial Tr. 273–74 (discussing the timing of the amend-
ment). Mr. Veluchamy admitted that he was unable to obtain an amended Form 20B for
Appu Hotels, the only company treated in a May 1, 2008 transfer form that was not con-
trolled by the senior Veluchamys. The consistent failure of Appu Hotels to recognize a
May 1, 2008 transfer of the senior Veluchamys' stock is substantial evidence of the falsi-

Because stock transfers allegedly made on May 1, 2008 did not appear in the subsequent 20B forms of companies whose stock was transferred, then—if the 7B transfer forms are authentic—two possibilities exist. Either the forms were not given to the stock-issuing companies within two months after they were stamped—which would make the transfers void—or the companies, having received the forms within the two-month period, violated Indian law by not reporting the change in stock ownership. The much more likely explanation, consistent with the other evidence, is that the stock transfer forms were not, in fact, completed in May 2008.

### iv. Subsequent transfers

Finally, both the senior Veluchamys and Renugadavi's husband were involved in transfers of stock made after May 1, 2008 that contradict a transfer from the senior Veluchamys on that date.

If the May 1, 2008 transfers had actually occurred, the senior Veluchamys would have given nearly all of their shares in JSM and PSM to Renugadevi at that time. P&PX 86; P&PX 87. Yet on October 12, 2009, they transferred the same number of shares to Arun and Anu. PX 47 at 22 (JSM); PX 39A at 21 (PSM). [8]

Appu Hotels stock transactions present a similar contradiction. Before the purported 2008 transfers, the senior Veluchamys owned 9,033,341 shares of Appu Hotels stock. PX 9 at 22. A May 1, 2008 transfer of 5,301,562 shares of that stock to Kathir Anand, reflected on P&PX 81, would have left the senior Veluchamys with 3,731,779 shares. Yet on September 30, 2009, they transferred a total of 4,275,717 shares to Arun and Anu. PX 12 at 62 (2010 Form 20B of Appu Hotels). There is no evidence that the senior Veluchamys received additional Appu Hotels stock between the two purported transfers.

To summarize, the evidence convincingly establishes that the May 1, 2008 transfer forms are false, backdated documents reflecting transactions that did not occur, so that all of the stock set out in those forms remained in the possession of the senior Velu-

---

ty of the other corporations' amended 20B forms. *See also Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013) ("[D]ocuments prepared with an eye toward litigation raise serious trustworthiness concerns because there is a strong incentive to deceive. . . .").

[8] Renugadevi's husband, Rajaram, was a director of both JSM and PSM. Despite the senior Veluchamys' purported transfer of their shares in these corporations to his wife in 2008, Rajaram registered those shares as transferred from the senior Veluchamys to Arun and Anu in 2009. PX 47 (JSM's 2010 Form 20B) at 7 (Rajaman's certification), 16 (Rajaman's status as director), 18 (transfer of shares to Arun and Anu); PX 39A (PSM's 2010 Form 20B) at 7, 16, 21 (same).

chamys as of that date.  With the falsity of the May 1, 2008 documents established, the
allegations of actual fraudulent transfers of stock in the Indian companies can be evaluat-
ed.

### b. JSM and PSM

In October 2009, as noted above, the senior Veluchamys transferred most of their
shares of two "spinning mills" in India—JSM and PSM—to Arun and Anu.  PX 47 at
17–18; PX 39A at 19, 21.[9]  The transfers were made for no consideration.  PX 351 at
336–37, 365–66 (367–68, 396–97) (expert review of the senior Veluchamys' bank ac-
counts).

The defendants do not contest the absence of any consideration for these transfers.
Instead, both the senior Veluchamys and Arun and Anu argue that there was no transfer
in 2009 because the shares had already been transferred to Renugadevi on May 1, 2008.
Senior Veluchamy Post-trial Br. 24–26 (29–31); A&A Post-trial Br. 44 (51).  As dis-
cussed above, that argument is flatly contradicted by the evidence.

Arun and Anu make an additional argument—that there is no proof that they
knew the stock of JSM and PSM was transferred to them, so they cannot be liable for the
transfers.  *See* A&A Post-trial Br. 44–45 (51–52).  As discussed below in connection with
Count IX, this argument has no legal basis.  But it is also factually unfounded; in several
ways, the evidence establishes that Arun and Anu did have timely knowledge of the stock
transfers.  First, before the 2009 transfer of shares to them, Arun and Anu had no role in
JSM and PSM.  *See* PX 37; PX 42 (2008 20B forms of JSM and PSM in which Arun and
Anu do not appear).  But within a month of receiving the shares, Arun and Anu became
directors of both mills.  *See* PX 47 at 4–5; PX 39A at 16, (2010 Forms 20B listing Arun
and Anu as directors, effective November 16, 2009).  Second, Arun and Anu guaranteed
loans for the spinning mills, which was regularly required only of directors who owned
significant stock.  Trial Tr. 1332–35.  Third, Arun and Anu themselves transferred their
JSM and PSM stock back to their parents in 2010, which would have required their nota-
rized signatures on a Form 7B.  *See* PX 40A at 20.  And finally, Arun and Anu asserted
their privilege against self-incrimination when asked about the spinning mill stock trans-
fers to them, Trial Tr. 454, 1029, giving rise to a negative inference supporting the evi-
dence of their knowledge.

The Estate established that the JSM and PSM stock was transferred to Arun and
Anu, with their knowledge and without consideration, on October 12, 2009.

---

[9] The spinning mills apparently manufactured fabric from raw materials.  *See* PX
14 at 10 (corporate purpose stated in JSM's "Memorandum of Association").

c. Dharani Sugars.

A 2007 financial statement of Mr. Veluchamy, PX 3 at 3, which he prepared in September 2008, sets out the senior Veluchamys' ownership of 550,474 shares of Dharani Sugars stock, valued at $1 million.  In the Statement of Financial Affairs that they filed in this bankruptcy case, the senior Veluchamys stated that they transferred all of their Dharani Sugars stock to Arun and Anu (275,237 shares each) on September 9, 2009, in exchange for "value received" of $110,000 from each of the children.  PX 98 at 18.  The publicly available records of Dharani Sugars confirm the stock transfer, but not its date. As of the quarter ending December 31, 2009, Mr. Veluchamy was still listed by Dharani Sugars as owning 550,474 shares of its stock.  PX 351 at App. C, p. 3 (643).  For the quarter ending September 30, 2010, Dharani Sugars listed Arun and Anu as each owning 275,236 shares.  *Id.* at App. C, p. 6 (646).  The transfers, then, occurred sometime during the first three quarters of 2010.  *Id.* at 466 (497), ¶ 730.  The Estate's expert found no evidence that any payment on account of Dharani Sugars stock was made to the senior Veluchamys, Trial Tr. 572, and the defendants introduced no evidence of any consideration for the stock transfers.

The only defense raised by Arun and Anu in connection with the transfer of Dharani Sugars stock is that they were unaware of it.  However, given their extensive involvement in the asset transfers of their parents, it is most likely that Arun and Anu knew that Mr. and Mrs. Veluchamy transferred the Dharani Sugars stock to them, even if Dharani Sugars never communicated with them.  Moreover, when Arun was asked about the transfer of Dharani Sugars stock, he asserted his privilege against self-incrimination. PX 687 at 155 (39).  The evidence, then, establishes that Arun and Anu knowingly received a gratuitous transfer of the Dharani Sugars stock.

d. Appu Hotels

Mr. Veluchamy's 2007 financial statement lists ownership of 10,569,473 shares of stock of Appu Hotels (listed as "Royal LeMeridian," *see* Trial Tr. 184), valued at $15 million.  PX 3 at 3.  The senior Veluchamys' Statement of Financial Affairs states that on September 1, 2009, they transferred 2,310,689 shares of this stock to Arun, in exchange for "value received" of $866,508.40, and 1,965,088 shares to Anu, in exchange for "value received" of $736,908.00.  PX 98 at 18.  A publicly available document of Appu Hotels, its 2010 Form 20B, confirms the senior Veluchamys' transfers to Arun and Anu but reports that the transfers occurred on February 28, 2010.  PX 12 at 62.  Because Appu Hotels had records of the stock transfers and no reason for issuing false information, its statement of the transfer date is more reliable than the one given by the senior Veluchamys.

In addition to transferring a portion of jointly-owned Appu Hotels shares to Arun and Anu, Mrs. Veluchamy sent approximately $310,000 to Appu Hotels on August 2, 2010.  PX 83; PX 351 at 450 (481), ¶ 705.  On the same day, Arun and Anu each deposited funds with Appu Hotels.  PX 240 at 20 (Arun's bank account statement); PX 509 at 20 (Anu's bank account statement).  Later, in November 2010, Appu Hotels announced the

19

results of a new stock issue and listed the subscribers to a stock offering who were being issued new shares. PX 570 at 8. Arun and Anu were among these subscribers, *id*. at 10, but the amounts for which they were credited substantially exceeded the amounts that can be traced to their own deposits, PX 351 at 439–40 (470–72), ¶ 690. Mrs. Veluchamy received no new stock in connection with her deposit, PX 570, and the senior Veluchamys were unable to state any consideration for the deposit, *see* PX 98 at 22 (Statement of Financial Affairs, listing the "value received" for the August 2, 2010 transfer to Appu Hotels as "Investigation Continues"). The most reasonable conclusion from this evidence is that Mrs. Veluchamy's deposit was part of the consideration for the new stock issued to Arun and Anu, with the stock given to each having a value of $155,000, half of Mrs. Veluchamy's August 2 deposit. This conclusion is bolstered by a negative inference drawn from Arun and Anu asserting their privilege against self-incrimination when asked if their parents had given them funds to purchase stock in Appu Hotels. Trial Tr. 448–49, 1017–18.[10]

As with the Dharani Sugars stock, there is no evidence of any consideration received by the senior Veluchamys for the transfers of Appu Hotels stock to Arun and Anu. These transfers were also gratuitous.[11]

### e. VCT India.

Mr. Veluchamy's 2007 financial statement lists ownership of all of the stock of Versatile Card Technology (P) Ltd. ("VCT India"), valued at $10 million. PX 3 at 3. The senior Veluchamys documented transfers of this stock in a particularly complicated manner, conflicting with the actual events:

• First, included among the fabricated May 1, 2008 transfer forms were two forms that show transfers of 1,888,400 shares VCT India stock from the senior Velu-

---

[10] The Estate argues that other shares of Appu Hotels received by Arun and Anu in the November 2010 stock issuance should be considered fraudulently transferred by the senior Veluchamys because the senior Veluchamys provided a portion of the funds that Arun and Anu used to purchase the stock. However, the transfers from the senior Veluchamys of cash included in the transfers that the Estate separately seeks to recover, as reflected in the charts of cash payments set out above. Arun and Anu's use of these cash payments to purchase Appu Hotels stock does not create an additional fraudulent transfer from their parents.

[11] In pre-trial testimony at the meeting of creditors held under § 341 of the Bankruptcy Code, Mr. Veluchamy testified that he and Mrs. Veluchamy transferred the Dharani Sugars stock to Arun and Anu to pay debts that the senior Veluchamys owed them. PX 670 at 2010 (414). In cross-examination at trial, Mr. Veluchamy gave the same explanation for the Appu Hotels stock transfer. Trial Tr. 208. This testimony was thoroughly impeached, Trial Tr. 210–18, and none of the defendants now argue that the transfers of either corporation's stock paid debts owing to Arun and Anu.

chamys, one to Arun, P&PX 84, and one to Anu, P&PX 85. The May 1, 2008 transfer
forms also showed transfers of 5,506,663 shares to Mrs. Veluchamy's sister Renugadevi
and her husband Rajaram. P&PX 82; P&PX 83 (undated, but otherwise identical in ap-
pearance to P&PX 82). Though signed by the recipients, these forms, like the others with
the May 1, 2008 date, were not created on that date and resulted in no actual stock trans-
fer. *See* PX 55 at 1, 13 (VCT India's 2009 Form 20B, showing Mr. and Mrs. Veluchamy
still owning virtually all of the VCT India stock as of August 24, 2009).

  • Second, VCT India's 2010 Form 20B shows that transfers to Arun and Anu in
the amounts set out in the May 1, 2008 7B forms actually occurred on July 15, 2010. PX
56 at 13–14. The timing of these contemporaneously reported transfers is consistent with
the general activity of the senior Veluchamys to reduce their asset holdings beginning in
late summer 2009, and there is no reason to doubt the accuracy of the report. The 2010
transfers gave Arun and Anu each a 12% ownership interest in VCT India (1,888,400
shares of the 15,734,246 total), with the senior Veluchamys retaining 76%. *Id*. at 8 (total
shares), 12–13 (shares held by Arun, Anu, and the senior Veluchamys).

  • Third, VCT India's 2011 Form 20B shows that the transfers to Renugadevi and
Rajaram in the amounts set out in the May 1, 2008 forms actually occurred on Octo-
ber 1, 2010. These transfers gave Renugadevi and Rajaram each a 35% interest in the
corporation and reduced the senior Veluchamys' interest to 6%. PX 57 at 1, 12–14. The
total of outstanding shares remained 15,734,246. *Id*. at 8.

  • Finally, in 2012, VCT India prepared an amended 2008 Form 20B. P&PX 10.
The amended Form 20B, in addition to recognizing the May 1, 2008 transfers and elimi-
nating the subsequent transfers, increased—without explanation—VCT India's outstand-
ing stock by 4 million shares, to 19,734,246, and increased the senior Veluchamys'
shareholding by the same 4 million shares over the amount stated in the 2011 Form 20B.
*Id*. at 9, 13.

  As discussed above, the May 1, 2008 transfers did not take place, and the
amendments made to the 2008 Form 20B are false. As with the other corporations whose
stock was treated in the May 1, 2008 transfer forms, it is very unlikely that the 20B forms
filed by VCT India in 2009, 2010, and 2011 all failed to report stock transfers that oc-
curred in 2008, and falsely reported transfers occurring in 2010.[12]

  All of the transfers of the senior Veluchamys' VCT India stock were without
compensation to them. *See* Senior Veluchamy Post-trial Br. 36 ("The Debtors do not de-

---

[12] The documentation of the VCT stock transfers provides a basis for understand-
ing the creation of the May 1, 2008 forms. The senior Veluchamys held all of their VCT
stock until 2010, when they made separate transfers of the stock, first to Arun and Anu,
and later to Renugadevi and Rajaram. Then, in 2012—to make the 2010 transfers appear
to have taken place earlier and be less obviously fraudulent—the senior Veluchamys cre-
ated the fictitious 2008 transfer forms.

ny that they transferred virtually their entire ownership in this relatively prosperous company for no cash consideration."). The Estate, then, established that Arun and Anu each received a fraudulent transfer of a 12% equity interest in VCT India on October 1, 2010.

### 8. Alleged fraudulent transfers of Indian real estate

On December 30, 2010—the same day that Bank of America obtained a $43 million judgment against them—the senior Veluchamys transferred real estate in Chennai, India to their children for no consideration. *See* Senior Veluchamy Answer ¶ 85; PX 101, 102 (transfer deeds to Anu and Arun); Trial Tr. 291–92. Only Anu disputes the transfer, arguing that she never had dominion or control over the property. *See* Anu Post-trial Br. 2.

This assertion is contradicted in two ways. First, VCT India filed a governmental form, PX 597, reporting that on October 10, 2011, it entered into a security agreement for a loan from ING Vysya Bank Limited. The form attached a letter from ING setting out the terms of the loan. *Id*. at 7–9. Among the terms are the deposit of the deeds for Chennai property, a mortgage on the property, and a personal guarantee from Anu. *Id*. at 8. It is very unlikely that the loan would have closed three days later without Anu's cooperation in providing the required mortgage, deed transfer, and guarantee. Second, Anu asserted her privilege against self-incrimination when questioned about whether she had taken action to amend the deed to the Chennai property. PX 689 at 55–56 (9). A negative inference is appropriate. Therefore, even if lack of knowledge of the transfer were a defense to a fraudulent transfer action, that defense would not be applicable here.

### 9. Alleged retention of jewelry, cash, and Indian corporate stock.

In addition to its fraudulent transfer claims, the Estate has alleged that the senior Veluchamys retained ownership of a number of assets, either hiding them or falsely asserting to have transferred them, in an attempt to avoid surrender to the trustee. The evidence at trial supports some, but not all, of the Estate's allegations.

#### a. Jewelry

 Before the senior Veluchamys began disposing of their assets—until May 2009—they maintained a policy with Farmers Insurance listing twenty pieces of jewelry with an appraised value of approximately $900,000, as listed in PX 523:

| | Jewelry Insured By Farmers (PX 523, item numbers as listed) | Value |
|---|---|---|
| 1 | Lady's 18k Y/G oyster perpetual Datejust watch with President's bracelet, gold dial & sweep second hand. Bracelet has concealed clasp. 10 single cut diamonds and bezel with 40 full cut diamonds. | $17,950 |
| 2 | Men's 18k Y/G oyster quartz day/date watch with fluted bezel, gold dial & sweep second hand. Bracelet is President's style with concealed clasp. Model/Style #7432329 19018 1432329 | $16,500 |

| 3 | Ladies' Fancy Link Necklace w/556 Round Bead/Prongs set Diamonds. Total Weight is 36.14 carats. Necklace appears to be handmade. Total weight of item is 130.6 grams. | $53,800 |
| 4 | 15" necklace of straight line design containing 61 prong set diamonds of graduated size. Total CT ST is 11.08. Center gem has threaded hold for pendant (see next item). Total 37.3 gram weight. | $20,220 |
| 5 | Detachable bead/prong set pendant (worn with previous item) containing 60 round diamonds having total 2.60 CT WT. Total pendant weight 7.7 grams. | $4,200 |
| 6 | Lady's fancy link bracelet; prong/bead set with 165 round brilliant diamonds. Total DWT 7.43—slide box and tongue clasp with 2 safety catches. Total weight of bracelet is 33.0 grams. | $12,200 |
| 7 | Ladies' ruby/diamond necklace with attached pendant. Alternately prong and bead set are 260 rubies and diamonds. Total gem weight is 12.75 CT. Total weight of necklace is 40.2 grams. | $13,300 |
| 8 | Ruby/diamond hinged bangle bracelet with 22 marquis shaped rubies & 132 round diamonds. Total gem weight is 7.0 CTS. Slide tongue claps [sic] with safety catch. Total item weight 19.9 grams. | $9,135 |
| 9 | Hinged bangle bracelet containing 50 prong-set diamonds. Total gem weight 13.17 CTS. Slide tongue clasp with safety chain. Item measures 4.96 mm with 31.4 total gram weight. | $27,300 |
| 10 | Endless bangle bracelet with 49 round bead-set diamonds totaling 1.47 CT. WT. Bracelet has total gram weight of 17.4 CT [sic] (this item matches next item). | $3,400 |
| 11 | Endless bangle bracelet (matches previous item) containing 49 round bead-set diamonds having total 1.47 CT. WT. Item total gram weight 18.2. | $3,400 |
| 12 | Pair of diamond stud earrings for pierced ears with threaded posts & screw backs. Total gem weight is 2.0 CTS. Total weight of set is 3.4 grams. | $13,100 |
| 13 | Pair of diamond stud earrings for pierced ears. Gems are prong set in basket head. Total CT. WT. is 2.88. Pair is 3.4 total grams. | $22,250 |
| 14 | 1 Ladies' 18 KWG diamond solitaire pendant containing prong-set round brilliant diamond @ 1.58 CTWT. | $21,400 |
| 15 | Ladies' 18 KWG "Tank Francaise" watch. Quartz movement, water resistant to 100 feet, sapphire crystal-grained silver dial, & sapphire crown. | $12,500 |
| 16 | One custom made 16 ¼ inch white gold necklace. 436 stone center stone 5.05 CT. Included appraisal on file with all details. | $235,000 |
| 17 | One pair of white gold stud style earrings. Round brilliant cut diamonds, approximately 4.00 CT per earring. Total weight 8.04 CT. | $300,000 |
| 18 | OME gentleman's yellow gold ring with radiant center stone. 3.02 CT and 2 round cut diamonds .28 CT. | $57,500 |
| 19 | One lady's white gold ring, 3.9 CT center stone, 2.01 CT and 2 round diamonds 1.08 CT. | $40,700 |
| 20 | One lady's white gold eternity band, with 23 round/brilliant cut diamonds. | $5,000 |

    The first 17 of these items also appear on a personal articles endorsement attached to the Farmers Insurance policy in June 2005. PX 502 at 5–7. Mrs. Veluchamy has

acknowledged owning the last three items, claiming to have sold them in December 2010.
*See* Senior Veluchamy Post-Trial Br. 43 (48).

The senior Veluchamys cancelled their Farmers Insurance policy in May 2009,
PX 351 at 227 (258), ¶ 338, and, at the same time, entered into a new policy with Chubb
Insurance that included two of the jewelry pieces covered by the Farmers policy (items
14 and 17), and added two new pieces, shown on PX 506 at 20 (19):

|   | New Jewelry Insured By Chubb (PX 506 at 19, item numbers as listed) |   |
|---|---|---|
| 2 | Diamond Flower Necklace | $425,000 |
| 4 | Diamond Opera Necklace | $92,000 |
|   | **Subtotal** | **$517,000** |

Finally, effective on November 1, 2009, the Chubb policy was amended to delete
coverage for all four pieces of jewelry that had been covered and to add two new pieces,
shown on PX 506 at 110–11 (109–10):

|   | New Jewelry Insured By Chubb (PX 506 at 109–10, item numbers as listed) |   |
|---|---|---|
| 5 | 2.14 Carat D If asher cut diamond ring set in white gold | $55,000 |
| 6 | 22 Karat yellow gold coin necklace, 888 grams | $35,000 |
|   | **Subtotal** | **$90,000** |
|   | **Total** | **$1,495,855** |

The senior Veluchamys have argued that at the time this case was filed in 2011,
they had neither possession nor control over any of the jewelry.  But the insurance policy
lists make it likely that, at least in 2009, the senior Veluchamys owned all 24 pieces of
the jewelry then listed in their insurance policies.  Insurance law requires that a party in-
suring property have an "insurable interest" in the property, and an insurable interest in
property exists only where the insured would "profit by or gain some advantage by its
continued existence and suffer loss or disadvantage by its destruction."  *Lieberman v.
Hartford Fire Ins. Co.*, 287 N.E.2d 38, 40 (Ill. App. Ct. 1972).  If a party has transferred
its interest in insured property, it may not recover under the insurance policy, *Farmer v.
Koen*, 542 N.E.2d 1326, 1328 (Ill. App. Ct. 1989), and it is unlikely that the senior Velu-
chamys would pay insurance premiums on property for whose loss they could not recover.
*See* PX 502 at 5 (showing a premium of $10,766.26 for the jewelry then covered).  And
since the senior Veluchamys owned the jewelry that they were insuring in 2009, there
would have to be reliable evidence that they transferred ownership between that time and
the filing of the bankruptcy case in order for the jewelry not to be property of the estate.
There is none; the defendants have given two conflicting versions of the disposition of
the jewelry after 2009, neither of which is credible.

The first version is set out in deposition testimony of Anu, given on June 27, 2011
in connection with Bank of America's district court litigation.  PX 688 at 283–85 (58).
Anu testified that two of the 17 pieces of jewelry listed in the 2005 Farmers Policy, item
15 and either item 12 or 16, belonged to her, but that all the other items were owned by

24

relatives in India, were left with her for safekeeping in 2004, and were brought back to India by the relatives at the end of 2009.  PX 688 at 291–306 (60–63).  In particular, she testified that item 2 on the Farmers list, a men's watch, was owned by her cousin Mani, who took it back with him to India.  *Id*. at 299–303 (61–62).  Anu testified that she personally owned the last additions to the Chubb list, PX 506 at 110–11 (109–10) (items 5 and 6), but that the other jewelry items insured by Chubb, PX 506 at 20 (19), were owned by relatives in India.  PX 688.  This testimony, then, was that the senior Veluchamys never owned any of the 24 items of jewelry that they insured in 2009.

Anu's version of the ownership of the jewelry was initially supported, in large part, by the senior Veluchamys.  On June 28, 2011, the day after Anu's deposition testimony, the senior Veluchamys discussed the 17 items of jewelry listed in PX 502 with their attorney, as directed by the district court judge.  After this discussion, the attorney gave the judge his clients' position on the jewelry items, saying that Mr. Veluchamy would tell the court that item 2 "is not and was not his watch," and that, "'[t]he other 16 items I have gone through item by item with Mrs. Veluchamy, and she is prepared to tell your Honor that she has none of these items today; that she does not recognize any of these specific items of jewelry as she owned earlier in the decade [sic].'"  PX 678 at 591–93 (115).

The second version of the disposition of the jewelry came ten days later, on July 8, 2011, during a deposition of Mrs. Veluchamy in the district court litigation.  In that deposition, Mrs. Veluchamy disavowed the conversation that she had with her attorney on June 28.  She then testified that she only told her attorney that she did not recognize any of the items on the Farmers Insurance list because "I was very nervous and my mind was blocked" and because "if you see Indian jewelry, everything looks same [sic]" and so, not wanting to make a mistake and "because my mind was blocked," she had told her attorney "I don't remember."  PX 678 at 593–95 (115–16).

In her July 8 testimony, Mrs. Veluchamy recognized all 24 of the pieces of jewelry insured in 2009, and her statements about their status almost universally contradict Anu's testimony.

• First, Mrs. Veluchamy did not adopt—for any piece of jewelry—Anu's testimony that Indian relatives owned the jewelry.

• Second, Mrs. Veluchamy testified that Mr. Veluchamy does own the watch listed as item 2 and that he sent it to a jeweler in India to be repaired.  PX 678 at 497–500 (94–95).

• Third, Mrs. Veluchamy testified that Anu herself owned several pieces of jewelry—Farmers items 3, 4, 6, 8, 11, and 13—that Anu testified were owned by relatives in India.  *Compare* PX 688 at 291–302 (60–62) (Anu's testimony) *with* PX 678 at 665–67, 673–80, 694–700 (134–136, 137, 141, 142) (Mrs. Veluchamy's testimony).  The conflict as to item 3—a 15-inch necklace—is particularly stark.  Anu specifically identified this necklace as belonging to a relative in India who left the necklace with Anu in 2004 and

brought it back to India in late 2009.  PX 688 at 311–12 (65).  Mrs. Veluchamy, on the other hand, testified that the necklace was a present to Anu on her 16th birthday, and that Anu sold the necklace in India in 2009 or 2010 because it was no longer fashionable.  PX 678 at 500–05 (95–96).

• And finally, Mrs. Veluchamy testified to selling or giving away 11 pieces of jewelry that Anu said were taken back to India by family relatives.  *See* Senior Veluchamy Post-trial Br. 42–43 (47–48) (chart explaining alleged disposition of jewelry, summarizing Mrs. Veluchamy's testimony regarding sales and gifts of the jewelry).

In addition to being contradictory, the two versions of the treatment of the Veluchamy jewelry after 2009 each lack credibility.  Anu's testimony that the bulk of the insured jewelry was brought to the United States in 2004 is contradicted by Farmers Insurance documentation showing that several items had been insured on the senior Veluchamy's policy since 1998.  *See* PX 688 at 304–12 (63–65) (Anu unable to explain the pre-2004 listings).

The most recent testimony of Mrs. Veluchamy is dubious on at least two grounds. First, her initial inability to remember her purported jewelry sales is quite improbable.  In her final version, given in July 2011 testimony, Mrs. Veluchamy recounted sales of jewelry that she conducted in India in December 2010.  These were major transactions, consisting of eleven pieces of jewelry with a total appraised value of $770,585.  Mrs. Veluchamy testified to negotiating the sales with multiple jewelers to get better prices, PX 678 at 511–12 (98), and to obtaining $186,000 to $197,000 for them (the total receipts shown in the chart in the Senior Veluchamy Post-trial Brief at 45–46 (47–48)), which she said she expended on "saris and travel expenses," PX 678 at 494, 529, 563 (94, 101, 108), and on a $133,000 transfer to VCT India, made at Mr. Veluchamy's direction, *id*. at 618 (122).  Yet in her earlier deposition, given in April 2011, four months after the asserted December sales, Mrs. Veluchamy testified that she did not know whether she had sold jewelry for anything more than $50,000 during the prior three years, and when asked later why she gave this answer, she replied that she had not remembered the December 2010 sales at the time of her April 2011 testimony.  *Id*. at 654–59 (131–32).

The second, and more significant difficulty in Mrs. Veluchamy's testimony, is the statement made to her attorney, less than two weeks before her detailed July 2011 testimony, that she recognized none of the pieces of jewelry on the Farmers Insurance list. Her explanation of her mind being blocked and all Indian jewelry looking alike is not reasonable in light of the extensive sales endeavors she was later able to describe.

Because neither Anu's nor Mrs. Veluchamy's testimony about the jewelry is credible, it is most likely that the senior Veluchamys continued to have ownership and control over all of the jewelry that they were insuring in 2009.  The conflicting accounts appear to be the result of an inability of Anu and Mrs. Veluchamy to coordinate a consistent fictitious explanation for the loss of the jewelry.  The assertion by Anu and Arun of their

privilege against self-incrimination provides a confirming inference that the senior Velu-chamys continue to own and control the jewelry.[13]

### b. Corporate stock.

In addition to giving Arun and Anu shares of Indian company stock, the senior Veluchamys also purported to make several transfers of stock to other relatives or entities. The Estate contends that these purported transfers did not occur, so that the stock is still owned or controlled by the senior Veluchamys and should be turned over to the trustee. The evidence as to these transactions varies.

### i. Transfer of Appu Hotels shares to Kathir Anand

According to the senior Veluchamys, 5,301,562 shares of Appu Hotels were transferred to a creditor, Kathir Anand, on May 1, 2008. Senior Veluchamy Answer ¶ 95; P&PX 81. Like the other asserted May 1, 2008 transfers, this transaction did not occur: Appu Hotels shows no transfer to Anand on any of its 20B forms. PX 9–12. The shares purportedly transferred by the May 1, 2008 Form 7B are still held by the senior Veluchamys. PX 559 (2012 Form 20B of Appu Hotels, showing the senior Veluchamys owning 6,393,756 shares of its stock).

### ii. *Shares of PSM, JSM, and VCT India stock pledged to Arjun Parthasarathy.*

According to the 20B forms filed by each company in 2011, as of March 31, 2011, the senior Veluchamys owned 944,118 shares of VCT India, 2,000,000 shares of JSM, and 311,396 shares of PSM. PX 57 at 3; PX 44A at 4; PX 40A at 4. According to the Fifth Amended Statement of Financial Affairs filed by the senior Veluchamys, they have not sold or given these shares to anyone. *See* Bankr. Docket No. 531.

At one time, the senior Veluchamys claimed that all of these shares were pledged to Arjun Parthasarathy, and that, sometime after this bankruptcy case was commenced, Arjun seized the shares pursuant to his security interest. *See* Senior Veluchamy Answer ¶ 69. In their post-trial brief, however, this argument was abandoned; Arjun is not men-tioned. There is no evidence refuting the 20B forms showing that the shares are owned and controlled by the senior Veluchamys.

---

[13] Arun and Anu asserted the privilege when asked whether the jewelry was being held for their parents in India. PX 689 at 49–52 (8); PX 687 at 81–84 (21). Because Arun and Anu have been shown to be acting in concert with their parents in their disposi-tion of assets, a negative inference may be drawn against the senior Veluchamys as well. *LiButti v. United States*, 107 F.3d 110, 122 (2d Cir. 1997).

iii. Shares of Aruppukottai Shri Vijayalakshmi Textile Mill held by
Mrs. Veluchamy.

According to the original 20B form filed by Aruppukottai Shri Vijayalakshmi
Textile Mill (Aruppukottai Mill) for 2011, Mrs. Veluchamy owned 4,125 shares in the
company on September 29, 2011, during the time this bankruptcy case was pending. PX
34 at 4. This is the same number of shares that the company reported Mrs. Veluchamy
owning in 2010. PX 33 at 4 (20B form for 2010).

Mrs. Veluchamy's stock in Aruppukottai Mill, however, was the subject of one of
the May 1, 2008 transfer forms. P&PX 100. Like the other Veluchamy-controlled com-
panies whose stock was treated on those forms, Aruppukottai Mill issued amended 20B
forms in 2012 reflecting that the 2008 transfer had been effective. *See* PX 80 at 8, 13
(amended 20B form for 2008, filed after June 4, 2012, the date given for a board meeting
that considered the amendment). As discussed above, the May 1, 2008 transfer docu-
ments are backdated fabrications, and the amended form is false. The Estate has estab-
lished that Mrs. Veluchamy continues to own the shares of Aruppukottai Mill reflected in
the original 20B form for 2011.

iv. Shares of other Indian corporations

The Estate similarly argues that the senior Veluchamys failed to effect four other
transfers of Indian corporate stock that are listed on each company's 2011 20B form:

• shares of JSM and PSM transferred to Renugadevi on December 9, 2010 (PX
44A at 16; PX 40A at 20);

• shares of VCT India transferred to Renugadevi and Rajaram on October 1, 2010
(PX 57 at 14);

• shares of CAC Software Consultancy transferred to Renugadevi and Rajaram on
October 1, 2010 (PX 73 at 14); and

• shares of Paragon Paper transferred to Renugadevi on December 9, 2010 (PX 31
at 11).

Each of these transfers was set out earlier in one of the May 1, 2008 transfer
forms discussed above. The Estate proved that the May 1, 2008 transfer forms were fab-
rications and that in 2012, the corporations filed false amended 20B forms attempting to
validate them. However, the 2010 transfers listed above are recorded on the original 20B
forms for 2011. The only evidence indicating that any of these forms are incorrect is the
testimony of Mr. Veluchamy, insisting that the May 1, 2008 transfer forms were all valid
and that he made no later transfers. Trial Tr. 317–18, 1262–64, 1309–10. That testimony
is not credible. Although the transfers of these companies' stock in October and Decem-
ber 2010 were undoubtedly fraudulent, the transfers—as far as the evidence indicates—

28

were nevertheless effective, and they are consistent with the senior Veluchamys' overall pattern of transferring their assets before they filed their bankruptcy case. *See supra* n.12.

### c. Cash

In July 2010, the senior Veluchamys made deposits of approximately $5.5 million to the account of one of the spinning mills, JSM, at Canara Bank. Senior Veluchamy Answer ¶ 97; PX 351 at 355–57 (386–88), ¶ 577. Mr. Veluchamy testified that the funds were sent to reduce amounts due on lines of credit that JSM and PSM had established with Canara Bank. Trial Tr. 1189–90. This is unlikely. First, no documentation was introduced that would confirm this testimony: no record of any debt from JSM and PSM to Canara Bank; no demand for payment on account of any such debt, directed either to the corporations or to the senior Veluchamys; and no actual debt payment by the corporations. Second, the senior Veluchamys produced letters from the bank itself to their accountant stating that their payments to the bank were equity contributions to JSM, not loan repayments. PX 351 at 357 (388). But at the same time, there is no evidence that the cash was treated by JSM as an equity contribution. The senior Veluchamys received no stock of JSM (or PSM) for these cash deposits.[14] And the financial records of JSM and PSM neither account for the deposits nor indicate that any of the cash was returned to the senior Veluchamys. PX 351 at 357–59 (388–90), ¶¶ 577–80, 379–80 (410–11).

Accordingly, the evidence establishes that the funds remain on deposit with JSM, subject to direction from the senior Veluchamys as to how they should be treated.

### III. Conclusions of Law

### A. Matters to be determined

The Estate's complaint sets out twenty-three counts in its complaint. Several counts have already been disposed of, as set out below:

| Count | Nature of Claim | Disposition |
|-------|-----------------|-------------|
| V | Fraudulent transfer of $5.9 million to Oakbrook Financial as subsequent transferee of asserted indemnity payments. | Default judgment entered for $5.9 million in conjunction with Count VI |

---

[14] The last Form 20B of JSM filed before the cash deposits, dated September 24, 2009, lists the senior Veluchamys as owning 9,999,998 shares. JSM's first Form 20B filed after the cash transfers, dated September 20, 2010, lists them as owning 2,000,000 shares—reflecting a reduction for 7,999,998 shares transferred to Arun and Anu, with no increase for the deposited funds. PX 47 at 17–18. The relevant 20B forms of PSM are similar, showing a reduction in the senior Veluchamys stockholding as a result of transfers to Arun and Anu, with no increase due to the deposited cash. *Compare* PX 38 at 4 *with* PX 39A at 19, 21.

| VI | Fraudulent transfer of $610,000 to Oakbrook Financial | Default judgment entered against Oakbrook for $5.9 million in conjunction with Count V |
|---|---|---|
| XI | Fraudulent transfer of Avadamma LLC shares to Arun, Anu, and Veluchamy 2009 Dynasty Trust | Not being pursued by the Estate. Judgment for defendants |
| XIII | Fraudulent transfer of $2.8 million judgment and other assets to Vasudevaki Naidu, Jaganath Naidu, and Rajiv Parthasarathy | Consent judgment entered against defendants |
| XIV | Fraudulent transfer of VMark shares to Oakbrook Financial | Default judgment entered for surrender of shares |
| XV | Fraudulent transfer of shares in Parameswari Spinning Mill, Jayavelu Spinning Mill, and Versatile Card Technology (P) Ltd. to Arjun Parthasarathy | The Estate failed to serve Arjun.[15] This count will be dismissed on that basis. |

The remaining counts, which still need to be resolved, are set out below.

| Count | Nature of Claim |
|---|---|
| I | Fraudulent transfer of $18.6 million to Arun and Anu as asserted indemnity payments |
| II | Preferential cash transfers to Arun and Anu |
| III | Fraudulent transfer of controlling shares of VMark to Arun and Anu |
| IV | Fraudulent Transfer of investment in Bear Stearns Venture Partners, L.P. to Arun and Anu |
| V | Fraudulent transfer of $500,000 of Oakbrook Financial stock to Sonia |
| VII | Fraudulent transfer of Downers Grove Real Estate to Arun and Anu |
| VIII | Fraudulent transfer of shares in Creative Investments, Veluchamy LLC, and Unique Mailing Services to Arun and Anu |
| IX | Fraudulent transfer of shares in Parameswari Spinning Mill and Jayavelu Spinning Mill to Arun and Anu |
| X | Fraudulent transfer of shares in Dharani Sugars, Appu Hotels, and Versatile Card Technology (P) Ltd. to Arun and Anu |
| XII | Fraudulent transfer of property in Chennai, India to Arun and Anu |
| XVI | Surrender of $5.5 million held by Jayavelu Spinning Mills but controlled by the senior Veluchamys |
| XVII | Surrender of shares of seven Indian companies still held by the senior Veluchamys |

---

[15] At the outset of trial, the Estate informed the court that it had attempted to serve Arjun but had been unable to do so, and a deadline was set for the Estate to effect service. Trial Tr. 8-9.  Since the Estate failed to meet this deadline, Count XV will be dismissed without prejudice.

| XVIII | Surrender of $1.5 million in jewelry still held by the senior Veluchamys |
| XIX | Surrender of jewelry belonging to the estate but held by Arun and Anu |
| XX | Aiding and abetting the fraudulent scheme, against Arun and Anu |
| XXI | Conspiracy to fraudulently transfer assets, against Arun and Anu |
| XXII | Surrender of overpayment of taxes, against the senior Veluchamys |
| XXIII | Fraudulent transfer of funds used to purchase Appu Hotels stock for Arun and Anu |

These counts raise claims of three kinds: (1) avoidance of fraudulent transfers, (2) surrender of estate property, and (3) collective responsibility. The three kinds of claims are treated separately below.

## B. Fraudulent transfer claims

### 1. Proof of fraudulent transfers

Section 548(a)(1)(A) of the Bankruptcy Code allows a trustee to avoid transfers of property that the debtor made during the two years before the filing of the bankruptcy case with actual intent to hinder, delay, or defraud creditors. The trustee must prove the elements of a fraudulent transfer action—including the amount of any damages—by a preponderance of the evidence. *Bellardita v. Vita Bella Group Homes, Inc. (In re Bellardita)*, 2008 WL 4296554 at * 5–6 (Bankr. E.D. Cal. Sept. 19, 2008); *Baldi v. Lynch (In re McCook Metals)*, 319 B.R. 570, 587 (Bankr. N.D. Ill. 2005).

All of the transfers that the Estate challenges occurred within the two-year limitation period, and the required intent has been shown. Under § 548(a)(1)(A), "badges of fraud" are relevant in determining whether a debtor transferred property with the actual intent to defraud or hinder creditors. *See Frierdich v. Mottaz*, 294 F.3d 864 (7th Cir. 2002). The badges of fraud include "whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became insolvent at the time of the transfer." *Id*. at 870 (citing 5 *Collier on Bankruptcy* ¶ 548.04[2][b], pp. 548–26 to 548–28 (15th ed. rev. 2002)). Not only did the senior Veluchamys repeatedly transfer high value assets to relatives—most for much less than they were worth—but they made the transfers when they were subject to having very large judgments entered against them. Moreover, they supported their transfer activity with document destruction, false document creation, and false testimony. The Estate has amply established that the senior Veluchamys acted with the intent required under § 548(a)(1)(A).

2. **Remedies**

For each of the Estate's fraudulent transfer claims other than the one involving Sonia, the only issue remaining for decision is the nature and extent of the remedy. Under § 550(a) of the Bankruptcy Code, a fraudulent transfer may be addressed by requiring the transferee either to return the transferred property or pay what it was worth at the time of the transfer. The choice between the two is left to the court's discretion. *Gennrich v. Mont. Sport U.S.A., Ltd.* (*In re Int'l Ski Service, Inc.*), 119 B.R. 654, 657–58 (Bankr. W.D. Wis. 1990). If the transferred property has diminished in value, courts commonly require defendants to pay the value of the property rather than return it. *Id.* (citing 4 *Collier on Bankruptcy* ¶ 550.02 at 550–6 n.6).[16]

The remedies for a fraudulent transfer are subject to two affirmative defenses. First, § 548(c) of the Code reduces a transferee's liability by any value given by the transferee, but only if the transferee provides that value in good faith.

> [I]n evaluating whether a transferee has established an affirmative defense under Section 548(c), a court is required to consider whether the transferee actually was aware or should have been aware, at the time of the transfers . . . that the transferor-debtor intended to "hinder, delay, or defraud any entity to which the debtor was or became . . . indebted."

*Gold v. First Tenn. Bank Nat'l Assoc.* (*In re Taneja*), 743 F.3d 423, 430 (4th Cir. 2014) (quoting 11 U.S.C. §548(a)(1)). This defense is inapplicable here, because the principal transferees—Arun and Anu—were fully aware of their parents' efforts to hinder creditors, as indicated by their repeated actions in cooperation with their parents' transfers. What-

---

[16] Throughout their joint post-trial brief, Arun and Anu argue that, since they are willing to disclaim their interest in certain transferred property, the court should not impose money judgments against them. *See* A&A Post-trial Br. 3–4, 23 (10–11, 30). However, the defendants' preference does not remove the court's discretion. *See Int'l Ski Service*, 119 B.R. at 659 (ordering payment of money rather than return of property based on the preference of the trustee).

Arun and Anu have also offered to disclaim property not subject to fraudulent transfer claims, arguing that any judgment against them "should be adjusted and reduced by the amount recovered on account" of this property. A&A Post-trial Br. 23 (30). Arun and Anu cite no authority for this proposition, and there appears to be no authority suggesting that such a disclaimer would have any legal effect. Instead, Arun and Anu appear to be using "disclaimers" as a way of saying that they would not object to the identified property being used to satisfy any judgment against them. However, the absence of objection to a source for satisfying a judgment does not affect the appropriateness or the amount of the judgments that may be entered against them.

ever value they provided in connection with the transferred property was not provided in good faith.

On the other hand, Section 550(d) of the Code sets out a defense that does apply to some of the recoveries sought by the Estate; as discussed below, the trustee is entitled only to a "single satisfaction" for each avoided transfer.

### 3. Resolution of the fraudulent transfer counts

*Count I*

Count I of the amended complaint alleges that defendants Arun and Anu were the initial transferees of a series of fraudulent cash transfers, totaling $18.6 million. As discussed above, the senior Veluchamys made these payments with the intent to hinder and delay their creditors. Arun received $8,495,453 in fraudulent transfers; Anu received $10,109,648. They are liable to the Estate in those amounts, subject to the single satisfaction rule of 11 U.S.C. § 550(d).

Arun and Anu point out that they gave a portion of the cash transfers treated by Count I to Oakbrook Financial ("OBF") and that Count V of the complaint seeks recovery of $5.9 million from OBF as a subsequent transferee of the cash received by Arun and Anu. *See* 11 U.S.C. § 550(a)(2) (2012) (providing for liability of subsequent transferees). The Estate obtained a default judgment against OBF on Count V and has been able to recover $3,094,730 from OBF in satisfaction of this judgment. Arun and Anu argue that this amount should reduce their liability on Count I, to prevent the Estate from receiving more than a single satisfaction for the cash transferred to them. The Estate acknowledges that some reduction of the recovery from Arun and Anu is appropriate, but disagrees about the amount.

Default judgment was entered against OBF not only as a subsequent transferee under Count V, but also as the initial transferee of a separate transfer under Count VI. Count VI alleges a transfer of $610,000 from Mrs. Veluchamy to OBF. *See* PX 351 at 247–49 (278–80), ¶¶ 374–75. The Estate argues that the amount sought in Count VI should be removed from the Estate's recovery on the combined default judgment before the remaining recovery is used to offset Arun and Anu's liability under Count I.

Arun and Anu respond that the judgment on Count VI should not reduce the Count V offset because the elements of the fraudulent transfer alleged in Count VI were never actually litigated, as would be required to establish collateral estoppel against them. A&A Post-trial Br. 21–22 (28–29). But collateral estoppel is not relevant here. The issue is not whether the judgment on Count VI against OBF decides issues against other parties, but only whether it binds OBF; if so, funds paid by OBF on Count VI will reduce the amount that the estate recovered on Count V. And to be a binding, valid judgment against OBF on Count VI, litigation of all the elements of a fraudulent transfer was not required. Although a plaintiff must prove the amount of damages to support a default judgment, the defendant's default itself establishes liability. *In re Catt, II*, 368 F.3d. 789,

792 (7th Cir. 2004). The Estate has established the damages it alleged in Count VI: the Estate's expert identified an unexplained $10,000 payment from Mrs. Veluchamy to OBF, PX 351 at 247 (278), ¶ 374, and documented that Mrs. Veluchamy caused Automated Presort to send to OBF $600,000 that Automated Presort owed to her, PX 351 at 248 (279), ¶ 375. The default judgment against OBF on Count VI is therefore valid.

The remaining question is how to apportion the funds received by the Estate on its default judgment. Courts should apply the single satisfaction rule equitably. *See Dzikowski v. Northern Trust Bank of Fla., N.A. (In re Prudential of Florida Leasing, Inc.)*, 478 F.3d 1291, 1302 (11th Cir. 2007). Here, in order to allow a fuller recovery for the senior Veluchamys' creditors, it would be equitable to allocate the judgment funds recovered by the Estate first to Count VI, as to which there is no other source of payment, and then to Count I, since Arun and Anu are liable for the balance of the judgment on that count. This approach parallels the equitable practice of marshaling assets in order to ensure that secured claims supported by varying collateral receive the fullest possible recovery. *See In re Wm. Pietsch Co., Inc.*, 200 B.R. 207, 209–10 (Bankr. E.D. Wis. 1996) (explaining the marshaling doctrine).

Accordingly, of the $3,094,730 paid by OBF, $610,000 will be applied to Count VI, leaving $2,484,730 as received from OBF on Count V. That amount will be divided evenly between Arun and Anu as an offset to their liability under Count I, reducing to $7,253,088 the amount that Arun must pay to the estate, and to $8,867,283 the amount that Anu must pay.

Apart from single satisfaction, Arun and Anu argue that since some of the money fraudulently transferred to them eventually flowed back to their parents, the Estate has "double or even triple-counted" its damages. A&A Post-Tr. Br. 19 (26). Under the defendants' theory, their parents' entire program of asset transfers should be considered as a single act, with liability imposed only for the net loss to the Estate. A&A Post-trial Br. 19 (26) n.6.

The Seventh Circuit has rejected this theory. *See Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir. 2002) (finding that under Indiana's fraudulent transfer act—substantively identical to § 548 and § 550—funds from a fraudulent transfer used by the transferee to benefit the debtor did not reduce the transferee's liability); *Helms v. Roti (In re Roti)*, 271 B.R. 281, 298 (Bankr. N.D. Ill. 2002) (reaching the same conclusion under § 548 of the Bankruptcy Code).[17]

---

[17] These holdings are consistent with the Bankruptcy Code's treatment of knowing participants in fraudulent transfers. As noted above, § 548(c) provides that only a good faith transferee can receive credit for any value given to the transferor. So knowing participants in a fraudulent transfer—those not acting in good faith—are penalized for their involvement in the scheme by denying them a reduction in liability on account of any payment they make for the transferred property. For example, if A transfers a car to B, and B pays A $1,000 for the car, knowing that the transfer is intended to defraud creditors,

Other courts have reduced an estate's recovery to the extent that a transferee returned a portion of the transferred property to the debtor pre-petition, but their holdings are not applicable here. *See Kingsley v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877 (11th Cir. 2008) (relying on § 105(a) of the Bankruptcy Code and noting that *Nostalgia Network* holds to the contrary); *Dahar v. Jackson (In re Jackson)*, 459 F.3d 117, 126–27 (1st Cir. 2006) (applying an "equitable deduction" pursuant to New Hampshire state law). Unlike non-bankruptcy law, the Bankruptcy Code expressly allows for full recovery of each fraudulent transfer of property, without deduction for consideration given by a knowledgeable participant in the transfer. And consistent with the holdings of both *Nostalgia Network* and *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014), § 105(a) "may not contravene specific statutory provisions." *Law*, 134 S. Ct. at 1194.

The Estate is entitled to an award unreduced by Arun and Anu's use of the fraudulently transferred funds. Moreover, even if the court had equitable authority to reduce Arun and Anu's liability for any return of funds to their parents, their active participation in their parents' fraudulent scheme would make the exercise of this authority inappropriate.

### Count II

Count II is an alternative pleading. It alleges that if any of the cash transfers set out in Count I are found to be genuine indemnity payments by the senior Veluchamys— and so not recoverable as fraudulent transfers—then the transfers would be recoverable as preferences under 11 U.S.C. § 547. Since the transfers alleged in Count I were all found to be fraudulent, the contingency with which Count II is concerned does not arise. Judgment on Count II will be entered in favor of the defendants.

### Count III

Count III involves sales of VMark stock to Arun and Anu in August and September 2009. Before these sales, the senior Veluchamys owned a substantial majority of VMark stock, giving them control of the corporation and the right to the bulk of its income. By causing VMark to sell a controlling interest to Arun and Anu, the senior Veluchamys transferred that control, together with their income rights, for less than fair value. This transfer of control and corporate ownership was not effectuated directly—the senior Veluchamys did not sell their own shares to Arun and Anu—but indirectly, by having VMark issue new shares. Indirect fraudulent transfers, though, are no less avoidable than direct ones. *Carmel v. River Bank Am. (In re FBN Food Services)*, 175 B.R. 671, 683 (Bankr. N.D. Ill. 1994) (collecting authority). Because the transfer of rights to VMark

---

B is liable for the value of the car, with no reduction for the $1,000 payment, even though this imposes a cost greater than the net benefit to the transferee. *See, e.g., Ahlgren v. Dailey (In re Schnoor)*, 510 B.R. 868, 875 (Bankr. D. Minn. 2014).

has been found to be a fraudulent transfer, the only remaining question is the relief to be granted.

Initially, a choice must be made between awarding the Estate either (1) the shares that Arun and Anu received in the avoided transfers and—since VMark was liquidated in the *Qualtec* bankruptcy—this would be the portion of the VMark sale proceeds attributable to those shares, or (2) the value of the shares at the time of the transfers. Arun and Anu propose surrendering their interests in the proceeds of the VMark bankruptcy sale. Since the VMark stock would be expected to decline in value during a bankruptcy liquidation, the Estate's preference for a cash award would be appropriate if the value of the stock at the time of the sales is established. The Estate has provided proof of that value.

1. Choice of valuation method.

The Estate's expert, G. William Kennedy, offered two ways to determine the value of the VMark shares transferred to Arun and Anu in 2009.

Using a market approach, Kennedy identified a group of publicly traded companies, chosen to be similar to VMark, and applied average sales and earnings multiples from these companies to VMark's sales and earnings to compute its value. PX 386 at 13–14, 27 (13–14, 27). The defendant's expert, Daniel Van Vleet, raised several challenges to this analysis, among them that Kennedy's comparison group included several companies that were much larger than VMark and others that were "penny stock" companies, whose financial condition put them in danger of being delisted from the exchanges on which their stock was traded. Trial Tr. 1051. Van Vleet also questioned the manner in which multiples were derived from the financial data of the control group companies. These concerns do not nullify Kennedy's market approach, but they are enough to make his alternative approach more persuasive.

That alternative approach, income capitalization, determines value by capitalizing normalized net cash flow. Trial Tr. 796–97. The level of annual earnings a company is likely to produce on a going forward basis is divided by the rate of return that a prospective purchaser would expect to receive on its investment. So, if a business has a normalized net cash flow of $1 million, and investors would expect to obtain a return of 12.5% on investments in that business, the value of the business would be $1 million/0.125, or $8 million.

In his income capitalization, Kennedy determined both a normalized net cash flow for VMark, PX 386 at 9, and an appropriate capitalization rate, PX 386 at 25. Van Vleet challenged aspects of this work, but with adjustments to address Van Vleet's concerns, Kennedy's income analysis provides a reasonable value of VMark's stock at the time of the transfers to Arun and Anu.

### 2. Correct Cash Flow

Kennedy concluded that VMark's normalized cash flow in 2009 was $8,502,049. *See* PX 386 at 29. Because Kennedy did not have access to cash flow statements, he estimated the future capital expenditures that would reduce normalized cash flow. Trial Tr. 815. In calculating cash flow, Kennedy also eliminated an expense for the compensation that the senior Veluchamys had been drawing, concluding that they were not providing compensable services to the corporations but simply taking equity distributions in the form of compensation. Kennedy did not reduce cash flow by any tax effect.

Van Vleet raised questions on each of these points. *See* A&AX 116.

- *Estimating Future Capital Expenditures.* First, Van Vleet argued that Kennedy incorrectly calculated VMark's need for future capital expenditures. According to Van Vleet, capital expenditures must equal depreciation costs or else "the assets of [the] company would disappear within five years because of lack of replenishment and replacement." Trial Tr. 1058. This is mistaken. The amount of depreciation that is taken for calculating income is not necessarily tied to the expected life of the property being depreciated or to the business's continuing need for the property. Fully depreciated property may continue to be used or it may be discarded either with no need for replacement or with the replacement incurring a lower cost. Kennedy's calculation, PX 386 at 29, adds a smaller amount of depreciation in calculating 2009 normalized cash flow than VMark had historically deducted from income, presumably because the deduction available to VMark would be declining. The amount that VMark would require in new capital expenditures is independent of this depreciation amount. Van Vleet had no other basis for asserting an error in the capital expenditure expense estimated by Kennedy.

- *Including Veluchamy Family Salaries in the Cash Flow.* Van Vleet next argued that Kennedy improperly added the Veluchamys' compensation to the annual cash flow, since only a controlling shareholder would have the ability to stop the senior Veluchamys from taking excessive personal payments from VMark. Trial Tr. 1077. This argument fails to recognize that the 2009 stock transfers did convey control of VMark from the senior Veluchamys to Arun and Anu. Although each sibling only received 25.1% of voting stock, the distribution of stock was to Arun and Anu together. *See Citizens Bank & Trust Co. v. Comm'r,* 839 F.2d 1249, 1255 (7th Cir. 1988) (suggesting that a control premium should be included in a valuation when there is a high likelihood that siblings will work together to control a business); I.R.S. Technical Advisory Memorandum 8149011 (Aug. 31, 1981) ("Where a controlling interest in stock is owned by family members, either by majority control or by de facto control, there is a unity of ownership and interest such that the family owned shares should be valued according to that controlling interest."). The VMark companies had management separate from the Veluchamys, Trial Tr. 809, and a third-party who received the interest transferred to Arun and Anu would be able to prevent the senior Veluchamys from withdraw-

ing inappropriate compensation. Increasing VMark's income by the amount of this compensation was appropriate.

- *Tax Effecting VMark*. Finally, although VMark's status as an S corporation meant that it incurred no income taxes, Van Vleet argued that its value should be reduced by the tax that a theoretical purchaser of VMark shares would incur on VMark's income. Trial Tr. 1059–63. The owner of an S corporation's stock avoids the double taxation experienced by the owner of an ordinary C corporation (whose income would be taxed at the corporate level and then a second time on any dividend distribution), but there is still taxation of the individual owner on the income of the S corporation. Van Vleet stated that the proper way to include this tax effect in the valuation of an S corporation is to charge the corporation's income with taxes at a rate reduced by its owners' tax savings. Trial Tr. 1061–62. Kennedy, on the other hand, noted that the impact of income taxation on the value of an S corporation is the subject of debate within the valuation profession, not only as to how but also as to whether taxation on the owners should have an effect. Trial Tr. 804. And he relied on judicial decisions holding that it is not appropriate to reduce the value of an S corporation by the potential tax effects on its owners. *See, e.g., Wall v. Comm'r*, 81 T.C.M. (CCH) 1425, *9 n.19 (2001).

Van Vleet's opinion has merit. Purchasers of S corporations would in fact experience a reduction in the value of the corporations' earnings because of the need to pay personal income taxes on those earnings, and recognizing that tax effect in valuing S corporations is appropriate. However, Van Vleet's actual calculations do not reflect his approach to tax-affecting S corporation income; he simply reduced VMark's income by the marginal rate of individual owners, which is a higher effective tax rate than C corporations would pay, and he recognized no reduction to reflect the savings resulting from the elimination of double taxation. *See* A&AX 116 at 10 ("For the purposes of [Van Vleet's] analysis, [he] selected a 38% tax rate based on 35% and 3% Federal and State ordinary income tax rates, respectively."), 42 (outlining how Van Vleet adjusted VMark's income by reducing "Income Before Taxes" by 38%). Rather than attempting to correct Van Vleet's calculations to reflect the approach to which he testified, and recognizing that there is judicial support for recognizing no tax effect on S corporation value, the best application of the evidence is to use the midpoint between Van Vleet's estimated tax-affected net cash flow—$7,346,574—and Kennedy's cash flow without tax effects—$8,502,049. That midpoint cash flow, $7,924,311, will be substituted in Kennedy's calculation of value.

### 3. The Correct Capitalization Rate

Van Vleet also raised valid questions about two of Kennedy's calculation of the discount rate, but the calculation can be corrected to address them.

Van Vleet first questioned Kennedy's use of a company specific discount. Trial Tr. 1074 (explaining that the valuation industry has "moved away from" company specific risk premiums). At trial, Kennedy admitted that he was aware of no source that pro-

vides any method for determining a company-specific risk premium. Trial Tr. 789. Rather than Kennedy's company-specific risk premium, it is more appropriate to use the 2.98% Industry Risk Adjustment proposed by Van Vleet, derived from the Ibbotson study, a source used and referenced by both experts. Trial Tr. 1071; A&AX 116 at 29.

Van Vleet's proposed use of an additional, small-firm risk premium is also appropriate, though not to the extent he suggests. Kennedy noted recent empirical studies finding that small-firm risk premiums are currently not being employed by purchasers, but he acknowledged that in some years a small-firm risk premium might still be found. Trial Tr. 785–88, 870–71. At the same time, Van Vleet, though recommending use of a small-firm risk premium, acknowledged the studies indicating that more recently the premium had disappeared. Trial Tr. 1115. Based on the evidence presented, an all-or-nothing approach to the small firm-risk premium is not the best response. Rather, since the use of the premium has at least diminished in recent years, a small firm risk premium of 2.95% will be substituted for the 5.9% small-firm risk premium suggested by Van Vleet.

Finally, Kennedy provided both a low and a high estimate of the general equity risk premium, based on two reliable sources. *See* PX 386 at 25 (using 4.36% and 5.00%). Van Vleet did not raise any issue with either number; however, neither expert identified which risk premium was more reliable. Therefore, instead of the low or the high estimate, 4.68%, the midpoint in the range of general risk premiums, is the best reflection of the evidence.

With the required adjustments to Kennedy's calculation, the appropriate capitalization rate for VMark is calculated as follows:

| Type of Discount | Percentage | Explanation of Findings |
|---|---|---|
| Risk Free Rate | 4.14% | Based on long-term Treasury bond returns |
| Equity Risk Premium | 4.68% | As discussed above |
| Small-firm Risk Premium | 2.95% | As discussed above |
| Company-specific Risk Premium | 0% | As discussed above |
| Industry Risk Adjustment | 2.89% | As discussed above. |
| Long Term Growth Rate | (3%) | Adopted from Kennedy (not challenged by Van Vleet) |
| **Total Capitalization Rate** | **11.66%** | |

Dividing the annualized cash flow—$7,924,311— by this capitalization rate produces a value for VMark at the relevant time of $67,961,500.

### 4. Discounting the Value of VMark for Lack of Marketability

Both experts agreed that the value of VMark should be discounted for lack of marketability, recognizing that because VMark is not traded on an organized exchange, a seller would face difficulty in finding ready buyers. Kennedy recommended a 15% dis-

count.  Trial Tr. 797–98.  Van Vleet recommended a 35% discount.  Trial Tr. 1075–78.
The difference between the two was the question of control.  Van Vleet's higher discount
was based on the increased difficulty that would be encountered in selling an interest in a
business controlled by others.  Trial Tr. 1078; A&AX 116 at 49.  Because, as discussed
above, Arun and Anu did receive a controlling interest in VMark (based on the voting
shares they were sold), Kennedy's discount is more appropriate.

Accordingly, the value of VMark in August 2009 is 85% of $67,961,500, or
$57,767,275.[18]

### 5. The percentage of VMark transferred to Arun and Anu

The Estate argues that 50.6% of VMark was transferred to Arun and Anu, since
14,624,562 shares—or 50.6% of the total outstanding shares—were received by Arun and
Anu during these transactions.  However, Arun and Anu point out that the 19:1 stock split
that created the non-voting class of shares did not dilute Mrs. Veluchamy's ownership
and that those shares should not be considered as fraudulently transferred to Arun and
Anu.  They argue that only 21.6% of VMark was transferred to Arun and Anu.  A&A
Post-trial Br. 38–39 (45–46).

To determine the appropriate amount of damages, the two transfers of VMark
stock to Arun and Anu must be evaluated separately.  *See* 11 U.S.C. § 550(a) (trustee
may recover the value of property transferred); 11 U.S.C. § 101(a)(54)(d) (defining trans-
fer as "each mode" of disposing of property).

The first transfer involved an issuance of 500,000 shares each of voting stock to
Arun and Anu on August 20, 2009.  PX 544 at 4 (noting a total sale of 1 million shares).
This increased the total amount of outstanding VMark shares to 21 million.  Therefore,
the 500,000-share transfers each represent 2.381% of VMark's outstanding shares.  Using
the value of VMark as determined above—$57,767,275—Arun and Anu are each liable
to the Estate for $1,375,438 for the initial stock transfers.

Next, on September 8, 2009, Arun and Anu each received 770,000 voting shares
and 3,192,300 non-voting shares.  PX 544 at 5–9.  This increased VMark's total outstand-
ing shares to 28,924,600.  Combining the voting and non-voting shares, Arun and Anu
each received 3,962,300 VMark shares—13.699% of VMark outstanding stock—in the
second transfer.  The liability of Arun and Anu for the value of the second stock trans-
fers—13.699% of $57,767,275—is $7,913,539 each.

---

[18] This value is consistent with the actual 2012 sale of VMark in the *Qualtec*
bankruptcy, which generation consideration of $51 million, and which the *Qualtec* trustee
testified would probably have been $10 million higher in a non-bankruptcy context.  Trial
Tr. 974, 993–94.

Arun and Anu are therefore each liable under Count III in the amount of
$9,288,977.

*Count IV*

Count IV deals with the fraudulent transfer of the Bear Stearns partnership inter-
est, and the Estate and the Veluchamy children again dispute whether the transferred
property or its value is the appropriate remedy.  A Bear Stearns financial performance
summary reported that the partnership had a $419,510 "unrealized value" at about the
time of the transfer.  PX 351 at 217–18 (248–49), ¶ 318.  In its post-trial brief, the Estate
requests a higher value—$650,000—the price that Arun and Anu were nominally
charged for the transfer.  Estate Post-trial Reply Br. 42 (51).  The Estate, however, has
not met its burden in establishing that either of these values is accurate.

The Estate produced no evidence that the unrealized value of the partnership in-
terest would have been available to Arun and Anu.  *See* PX 351 at 219 (250), ¶ 321.  In-
stead, as the defendants argue, minority shares of limited partnerships would have to be
discounted based on any alienability limitations on the shares.  *See Estate of Bischoff v.
Comm'r*, 69 T.C. 32, 49 (1977).  Limitations on the sale of Bear Stearns partnership in-
terests were not discussed or examined by the Estate.

Evidence supporting the $650,000 value is also absent.  The senior Veluchamys,
as part of their program of fraudulent transfers, stated that the price to be paid by Arun
and Anu for the Bear Stearns partnership interest was $650,000.  This is of no evidentiary
significance, since the senior Veluchamys had no apparent basis for setting this price,
there was no arm's length negotiation over the price, and Arun and Anu never actually
paid it.

Without more information regarding the value of the Bear Stearns account, order-
ing liability for its value at the time of the transfer is not possible.  Therefore, Arun and
Anu will be required, under 11 U.S.C. 550(a), to surrender to the estate the interests in
the Bear Stearns account that the senior Veluchamys transferred to them.

*Count VI*

Count VI alleges that Sonia Veluchamy (Sonia) is liable for $500,000 of the cash
transferred from the senior Veluchamys as purported indemnity payments, since Anu
used $500,000 of these funds to purchase shares of OBF for Sonia.  *See* PX 351 at 245–
47 (276–78).  Sonia does not deny that she was the recipient of $500,000 worth of OBF
shares; instead, she argues that she was not a transferee of fraudulently transferred funds.

Under § 550(a)(1) of the Bankruptcy Code, the initial transferee is liable to return
the transferred property or pay its value; alternatively, this liability can be imposed on
"the entity for whose benefit such transfer was made."  As noted above, Arun and Anu—
not Sonia—were the initial transferees of the senior Veluchamys' cash payments, and
judgment will be entered requiring them to return the funds they received.  *See supra* Part

III.B.  Nor was Sonia a beneficiary of the initial transfer.  *Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) explains that "[t]he paradigm 'entity for whose benefit such transfer was made' is . . . someone who receives the benefit but not the money" and gives as an example the guarantor of a loan that is paid by a fraudulent transfer to the borrower.  *Id*.  The payment itself, received by the borrower, benefits the guarantor by removing liability on the guarantee.  Sonia, in contrast, was not directly benefitted by the transfer of cash to Anu and so was not a beneficiary of that transfer.

A party who receives fraudulently transferred property from the original transferee—an "immediate or mediate transferee of such initial transferee"—may also be liable.  11 U.S.C. § 550(a)(2).  However, unlike initial transferees, those who benefit from a subsequent transfer but are not "transferees" are not liable; unlike subsection (a)(1), subsection (a)(2) does not impose liability on beneficiaries of subsequent transfers.  Thus, the issue is whether Sonia became a subsequent transferee of the cash transferred to Anu when Anu used that money to purchase 50,000 shares of OBF for Sonia.

A minimum standard for transferee status is "dominion over the money or other asset, the right to put the money to one's own purposes."  *Bonded Fin. Serv.*, 838 F.2d at 893.  Under this standard, Sonia was not a transferee of the senior Veluchamys' funds.  She had no control over the funds that were used to purchase shares in OBF; she simply accepted the shares purchased by Anu and apparently made herself indebted to Anu for the $500,000 purchase price.  *See* Trial Tr. 1362–63.  There is no evidence that she had the ability to use the funds for a purpose other than buying the shares.  Moreover, even if Anu had loaned Sonia $500,000 for whatever purposes Sonia wished, Anu would still have been the person exercising control over the funds: loaning them to Sonia would be no different from loaning them as an investment to some business enterprise.

Since Sonia was not shown to be a transferee of funds from the senior Veluchamys, a recommendation for the entry of judgment in her favor will be made.

*Count VII*

Count VII deals with the Downers Grove real estate.  Since the Estate has shown that the senior Veluchamys' transfers of this property to Arun and Anu were made with the intent to defraud or hinder their creditors, the only issue is the proper remedy.

The Estate's expert, Kennedy, testified to the value of the properties based on reports prepared for him by Colliers International (Colliers).  Arun and Anu have objected to this testimony under Rule 703 of the Federal Rules of Evidence, raising three issues: that Kennedy is not qualified to testify on the value of real estate; that even if he were qualified, he did not properly conduct the valuations and was merely "parrot[ing]" the opinions of Colliers; and finally, that the opinions of Colliers are inadmissible hearsay.  *See* A&A Post-trial Br. 10 (17).  None of these objections is valid.

First, Kennedy was properly allowed to testify as an expert on valuation.  Under Fed. R. Evid. 702, experts are qualified if they are able to use their knowledge, skill, ex-

perience, training, and education in a reliable manner that aids the trier of fact. *See Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990). ("[A]s the text of Rule 702 suggests, the central issue is whether the expert's testimony will assist the trier of fact."). Although Kennedy did not have a specialization in real estate valuation, he had significant experience—over 18 years—in valuing businesses, including the value of the real property owned by the businesses. Trial Tr. 679. This experience made clear that his opinion of property values was likely to aid in determining the business values at issue. His methods—comparing sales of similar buildings and tracking cash flows—are capable of being tested and are generally accepted in the industry. He was qualified to give his opinion.[19]

The second issue raised by Arun and Anu focused on the development of the valuations themselves. Rule 703 allows experts to base their opinion on data that other experts in their field would "reasonably rely on." Fed. R. Evid. 703. However, an expert may not merely repeat the opinion of other experts. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 409 (6th Cir. 2006). According to the defendants, Kennedy merely relayed the opinions of Colliers. Experts, however, may rely on the opinion of other experts when the opinion falls within the testifying expert's expertise. *Dura Auto. Sys. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002) (explaining that a primary physician may rely on a radiologist's reading of an X-ray when making a diagnosis). The work done by the Colliers experts was not outside the scope of Kennedy's expertise. Kennedy was capable of evaluating the appropriateness of that work, and he did so. Trial Tr. 695–96.

This observation eliminates Arun and Anu's final objection. Although they are correct that the Colliers report is not independently admissible, the report was properly used by Kennedy in forming his opinion of the value of the Downers Grove real estate. And far from criticizing any aspect of that opinion, Arun and Anu note that it gives a more conservative valuation than the price obtained for the property in subsequent sales in bankruptcy. A&A Post-trial Br. 40–41 (47–48).

Arun and Anu, then, are liable to the Estate for the following property values found by Kennedy, PX 386 at 2: 1400 Centre Circle LLC, $3,200,000; 5200 Thatcher LLC, $2,800,000; 5300 Katrine LLC, $3,300,000—a total of $9,300,000. The liability of each of defendant on Count VII is $4,650,000.

---

[19] Arun and Anu argue that experience in valuing businesses is insufficient to qualify a witness as an expert on real estate appraisal, citing *Levit v. Spatz (In re Spatz)*, 209 B.R. 907, 918 (Bankr. N.D. Ill. 1997), *rev'd on other grounds,* 222 B.R. 157 (N.D.Ill.1998). While the bankruptcy judge in *Spatz* did prevent a witness with qualifications similar to Kennedy's from testifying as to the value of real estate, the decision was based on differences in the work that she had performed previously and the valuation issues then relevant; the decision was affirmed as an exercise of broad discretion. 222 B.R. at 171–72. Here, in contrast, Kennedy's experience valuing real estate was not shown to be dissimilar from the work done in valuing the Downers Grove properties.

*Count VIII*

Count VIII deals with transfers of the stock of four domestic corporations to Arun and Anu.

### 1–2. *Creative Investments and Veluchamy LLC*.

As discussed above, the Estate proved that the transfers of stock in Creative Investments and Veluchamy LLC were fraudulent. However, the Estate failed to prove the value of the transferred stock.

Similar to his valuation of VMark, Kennedy used an income capitalization methodology to determine value. *See* PX 386 at 30, 32. Both Creative Investments and Veluchamy LLC were single-asset businesses that managed industrial properties owned by the senior Veluchamys; their income was primarily rent from those other Veluchamy-owned businesses, and this rental income was the basis for the normalized net cash flow that Kennedy capitalized. Trial Tr. 815–16, 24.

Arun and Anu point out that Kennedy failed to verify that this rental income reflected market value. There is no reason to assume that rent that the senior Veluchamys required their own businesses to pay would equal the rents determined in an arm's length negotiation. An investor purchasing Creative Investments or Veluchamy LLC shares would want to know the likelihood that they would continue to receive their current rent after the senior Veluchamys no longer controlled the tenants. Kennedy did not attempt to determine whether the rents received by Creative Investments or Veluchamy LLC were at market rates for the relevant market area, and without this information, the income valuations are not reliable. So, even though Kennedy's valuations are admissible and represent the only affirmative evidence of value, Estate Post-trial Br. 63 (73), the Estate has not met its evidentiary burden.

The proper remedy is to require return of the transferred property. Since Creative Investments has not yet been sold in the Qualtec bankruptcy, the Estate may recover the 20% share of Creative Investments sold to Arun and Anu. Similarly, the Estate may recover the funds received by the Chapter 11 trustee attributable to the 25% stake in Veluchamy LLC transferred to Arun and Anu.

### 3. *Unique Mailing Service (UMS)*

Arun and Anu raise objections to the reliability of Kennedy's valuation of UMS because it was based on the book value of its assets: purchase price minus depreciation and corporate liabilities. PX 386 at 9 ("Asset Approach"). Although book value can vary from what a willing buyer would pay for the assets, it is reasonable evidence of value in the absence of a better indication of fair market value. *Bos Lines, Inc. v. Comm'r*, 354 F.2d 830, 839 (8th Cir. 1965). Arun and Anu also assert that Kennedy improperly used 2009 balance sheets of UMS that reflect conversions into equity of debt owed by UMS to Arun and Anu. *See* PX 351 at 155–56 (186–87) (Kleinrichert report noting the

debt-to-equity conversions). But they give no reason why Kennedy should not have rec-
ognized a financing change, actually implemented by UMS, that made its stock more
valuable. Finally, as Arun and Anu observe, A&A Post-trial Br. 42–43 (49–50), the rea-
sonableness of Kennedy's valuation of the corporation (at $1,239,227) was confirmed by
the sale of UMS in the Qualtec bankruptcy case (at $1,272,477). Kennedy appropriately
valued UMS at the time of the transfers.

Accordingly, since UMS had 49,000 shares at that time, *see* PX 367, Arun and
Anu are each liable for $31,613, the value of the 1,250 shares (2.551% of the total)
fraudulently transferred to them.

### 4. *University Subscription Services*

At trial, the Estate demonstrated that there was no equity in the shares of Univer-
sity Subscription Services transferred to Arun and Anu. In its post-trial briefs, the Estate
abandoned the claims dealing with the University Subscription Services transfer.

### *Count IX*

Count IX deals with the transfer of stock of JSM and PSM, the two spinning mill
corporations. Arun and Anu argue that they had no knowledge of the stock of these cor-
porations transferred to them, and so cannot be held liable for the transfers. *See* A&A
Post-trial Br. 43 (50). However, as discussed in the findings above, the evidence indi-
cates that they did know about the transfers.[20]

---

[20] The argument, moreover, has no legal basis. Most of the authorities cited by
Arun and Anu deal with some special statutory liability imposed on shareholders, not
with return of a fraudulent transfer. *See, e.g., Hardesty v. Corrothers*, 31 F. Supp. 365,
368 (N.D.W. Va. 1940) ("[A]cceptance of a beneficial legacy or transfer is presumed . . .
[b]ut such presumption does not go to the extent of creating the statutory liability upon a
shareholder in a national bank."). The only fraudulent transfer decision cited by Arun
and Anu, *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.
1988), simply holds that status as a transferee liable under § 550 requires "dominion over
the [transferred] money or other asset;" it does not impose a requirement that the recipi-
ent know of the transfer at the time it took place. A lack of knowledge could make it in-
equitable to require the recipient of a fraudulent transfer to pay the value of the property
at the time of its transfer, but lack of knowledge cannot prevent the recipient from being
ordered to return the property to the bankruptcy estate. *Cf. SEC v. Cavanaugh*, 155 F.3d
129, 137 (2d Cir. 1998) (dealing with an SEC action to recover the proceeds of fraudu-
lently transferred stock, and noting that if the transferee could "claim valid ownership of
those proceeds . . . almost any defendant [could] circumvent the SEC's power to recapture
fraud proceeds, by the simple procedure of giving stock to friends and relatives, without
even their knowledge").

The Estate also established a reasonable value for the shares transferred. Kennedy derived a value for JSM and PSM based on the book value of their equity and discounted that value by the percentage that the book value of two publicly traded spinning mills were discounted in the market, as well as by a 15% discount for a lack of marketability. PX 386 at 42–45. As noted above, book value—though not the ideal valuation method—is acceptable in the absence of other indications of value. Moreover, while the publicly traded spinning mills may have engaged in a different segment of the clothing business (manufacture of finished product rather than fabric), their operation in the general industry gives some basis for a conservative reduction of the book value that could otherwise have been used. Trial Tr. 838. And finally, again as discussed above, since the senior Veluchamys transferred controlling interests in JSM and PSM, the 15% marketability discount—rather than a higher discount based on lack of control—is appropriate.

The proper remedy under Count IX is therefore payment by Arun and Anu to the estate of the value of the JSM and PSM stock that they received. Adopting Kennedy's valuation of JSM and PSM as of October 12, 2009,[21] Arun and Anu are liable for 45.5% of JSM and 79.9% of PSM, or a total of $1,888,202, or $944,101 each.

*Count X*

For transfers of the stock of three other Indian corporations, covered in Count X, Arun and Anu again argue that they did not know of the transfer. As noted above, this argument is both legally and factually unfounded. The question for each transfer is the remedy.

### 1. Liability for Transfer of Dharani Sugars Stock

Dharani Sugars is publicly traded, so Kennedy used stock price information to value the shares transferred. *See* PX 386 at 46. Kennedy valued the shares as of September 1 and December 31, 2009, finding a value of $795,281 and $1,159,628.00, respectively. *Id*. According to the Estate's other expert, Kleinrichert, the transfer must have occurred in the first three quarters of 2010, because it was during this period that the transfer appears in the company's annual filing record. PX 351 at 466 (497), ¶ 730. The Estate has not established the exact date of transfer. However, the trading price of Dharani Sugar stock during the relevant period is readily available from sources of which judicial notice can be taken, including the online version of Business Standard, one of India's major business newspapers. Its listing of the prices for Dharani Sugars stock during the first three quarters of 2010 shows that the lowest closing price per share was

---

[21] According to the 20B forms introduced by the Estate, JSM and PSM recognized the transfers on October 12, 2009. PX 47 at 18; PX 39A at 21. Since this is the date that legal title passed to Arun and Anu, October 12, 2009 is the date of transfer.

40.05 rupees on August 13, 2010.[22]  The value of the stock transferred to Arun and Anu and would likely be at least this much.  At an exchange rate of 46.675 rupees per dollar, the 275,237 shares of Dharani Sugars stock transferred to both Arun and Anu had a value of at least $236,170.  They are each liable to the Estate for this amount.

### 2. Liability for Transfer of Appu Hotels Stock

Kennedy used a market approach to value Appu Hotels, comparing Appu Hotels to two other publicly traded hotel groups.  PX 386 at 17.  Arun and Anu raise concerns over the other companies used to determine the appropriate multiples for Appu Hotels.  Kennedy used hotel chains that exclusively operated five-star hotels.  Trial Tr. 832.  Appu Hotels may have operated at least one three-star hotel.  A&A Post-trial Br. 48 (55) (claiming that Appu Hotels only operated two hotels during the time in question without citing to the record).  Kennedy's comparison group, however, is meaningful, since Appu Hotels is in the same business group and in a significantly overlapping market.  Trial Tr. 833.  Therefore, Kennedy's opinion that Appu Hotels was worth $46,573,122 on February 28, 2010 is reasonable.  PX 386 at 2.  Arun and Anu received legal title to 3.5% and 3%, respectively, of the outstanding shares of the corporation on that date.  Arun is liable for $1,630,059, and Anu is liable for $1,397,194.[23]

### 3. Liability for VCT India Transfers

Kennedy also used the market approach to value VCT India.  Here, however, the companies he picked for comparison are too different from VCT India to be a reliable source for comparable multiples.  VCT India operates only in India and has a very close relationship with VCT Illinois, another Veluchamy-owned company.  Trial Tr. 834–35.  The companies picked by Kennedy as comparables were both large enterprises, one based in the Netherlands, the other in Japan.  Kennedy admitted that these choices were ones of necessity: they were the only ones he could find that were publicly traded companies and in the same business as VCT India.  Trial Tr. 836.  This is not enough to find that the multiples of these companies are comparable to those of VCT India.  So rather than being liable for the value of the transferred stock, Arun and Anu will be required to return to the estate the 1,888,400 shares of VCT India transferred to each of them by their parents.

---

[22] Price History of Dharani Sugars, Business Standard, http://www.business-standard.com/company/dharani-sugars-1225/price-history (last visited Dec. 9, 2014).  Any party may be heard on the propriety of this use of judicial notice by filing a motion under Fed. R. Bankr. P. 9023.  *See* Fed. R. Evid. 201(e).

[23] In its brief, the Estate seeks significantly greater liability by including in its liability calculation the shares of Appu Hotels that Arun and Anu received in August 2010.  That series of transactions, though, is the subject of judgments under Counts I and XXIII, and so is not a basis for liability under Count X.

*Count XII*

Count XII deals with the fraudulent transfer of two adjoining parcels of real estate in Chennai, India that the senior Veluchamys made to Arun and Anu, one parcel to each, on December 30, 2010. Again, the only remaining issue is the appropriate remedy. Relying on the assistance of Indian employees of Colliers, Kennedy found that the two parcels were worth a total of $8,097,890 at the time of the transfers. PX 386 at 22. As discussed above, Kennedy's use of Colliers to assist him was appropriate.[24] Arun and Anu have challenged Kennedy's valuation on four grounds, A&A Brief at 49 (56), but none of the challenges are effective.

First, citing PX 205 and PX 236, Arun and Anu assert that a third of the property conveyed to Arun and Anu "is owned by another party." A&A Post-trial Br. 49 (56). This is not supported by the evidence. PX 205 is a "Deed of Rectification," executed in September 19, 2011, which states that it is making corrections to the December 30, 2010 deed, PX 101, that transferred one of the parcels to Anu. Even if this deed reduced the conveyance to Anu, which it does not purport to do, this would not change the extent of the 2010 transfer at the time it was made. PX 236 is another Deed of Rectification, dated January 13, 2013, this one making changes to an earlier Rectification Deed dated November 11, 2011. The deed appears to deal with the property transferred to Arun in 2010, by PX 102, and to correct (among other things) a mistake in the earlier Rectification Deed that had incorrectly set out a description of the parcel transferred to Arun. *See* PX 236 at 3–6 (6–9). The document does not indicate any third party ownership, however, and, like PX 205, it could not have the effect of undoing any portion of the transfer made to Arun in 2010.

Second, Arun and Anu assert that the valuation is impaired by the failure of the Colliers personnel to examine the interior of the buildings on the transferred property. The Collier appraisal, however, is based on the demolition of these buildings and construction of a new apartment complex, the best use of the property. PX 386 at 81–82, 93. The condition of the present buildings is therefore not relevant.

The third challenge is that the valuation failed to take into consideration an easement shown on the deed to Arun, PX 102. What PX 102 actually includes, as Item No. II, is a conveyance of an "[u]ndivided half share in the common passage running between the property shown as Item No. I [the main parcel being conveyed] and Parameswari Gardens." Parmeswari Gardens appears to have been conveyed to Anu in PX 101 as Item No. II ("garden land" owned by Parameswari Veluchamy). In any event, it does not ap-

---

[24] Although the Colliers personnel who provided the real estate appraisals to Kennedy operated in India, Kennedy had multiple discussions with them. Trial Tr. 839–42, 852. Their methods of valuation were ones that Kennedy assessed, and he concurred in their conclusions. *Id*. at 857.

pear to present any obstacle to the development of the property.

Finally, Arun and Anu argue that because the transferred property is "located in a cantonment area, which is an area subject to the Indian army's control," it may be less attractive for redevelopment.  A&A Post-trial Br. 49 (56).  The only evidence they cite for this proposition is Kennedy's testimony.  That testimony is that he and the Colliers personnel specifically discussed this question and agreed that the property was suitable for development.  Trial Tr. 852–53.  The Colliers appraisal that Kennedy relied on states that the cantonment area is free of local zoning restrictions, PX 386 at 80, and is "thickly developed and has [a] limited land supply," *id.* at 82.

Beyond the failures of these challenges on their face, many issues relating to the value of the Chennai property would be known to Arun and Anu, who owned the property since the time of the 2010 transfers.  Arun, in particular, mortgaged his portion of the property.  PX 234; PX 235.  Yet when questioned about valuation issues, Arun and Anu both asserted their privilege against self-incrimination.  Mr. Veluchamy, who might have had even more relevant information, gave noncredible testimony—contrary to all of the documentary evidence and without corroboration from any source—that he and his wife did not hold title to the property but only rented it, and that townspeople were threatening to take the property for construction of a train station, rendering the property worthless.  Trial Tr. 1284–85.  None of the defendants provided any credible information bearing on the property's value.

Judgment on Count XII, then, will require Arun and Anu each to pay the estate $4,048,945, half of the total value of the property at the time of its transfer to them, as determined by Kennedy.

### Count XXIII

In August 2010, Mrs. Veluchamy sent $310,000 to Appu Hotels, which was used to buy stock for Arun and Anu.  No consideration was given for this transfer. Arun and Anu are therefore each liable for $155,000 for the fraudulently transferred funds.[25]

### Prejudgment Interest

A court may order prejudgment interest on avoidance awards unless "countervailing equities" outweigh the need to restore the estate.  *Gray v. Travelers Ins. (In re Neponset River Paper Co.)*, 219 B.R. 918, 919 (D. Mass. 1998).  No such equities exist in this case.  Therefore, prejudgment interest will be awarded to the estate, at the prime rate,

---

[25] The Estate alternates between describing the funds as $315,000 and $310,000. Kleinrichert, the Estate's expert, valued the transfer at $310,000.  PX 351 at 450 (481), ¶ 705 (converting 14,491,180 rupees to dollars) and that value will be used in the judgment.

starting on the date the complaint in this adversary proceeding was filed, November 8, 2012.

### C. Turnover claims.

#### 1. Establishing a right to turnover

Section 542(a) of the Bankruptcy Code requires anyone who has possession, custody, or control of estate property ("property that the trustee may use, sell, or lease") to deliver that property to the bankruptcy trustee "and account for, such property or the value of such property." This provision is enforced by orders to turn over property to the trustee. *See, e.g., Houghton v. Marcella (In re Marcella)*, 2009 WL 3348251 at *10 (Bankr. D. Mass. Oct. 15, 2009) (requiring turnover and noting that "[t]he statutory language is plain and the rule is clear"). The provision is applicable to both Chapter 7 debtors as well as to non-debtor parties. *See In re Trujillo*, 485 B.R. 238, 250 (Bankr. D. Colo. 2012) (although a debtor has a duty to "surrender" property to the trustee under § 521(a)(4), the debtor may retain possession of the property until the trustee requests delivery, and "if . . . debtor fails to comply, then the trustee may utilize § 542(a) to obtain a court order for turnover").

To obtain a turnover order against an entity, a trustee must establish that the property in question belongs to the estate and that the entity had control or possession of the property while the case was pending. *Braunstein v. Milhem (In re Milhem)*, 2007 WL 3226940 at *2. If so, the entity must turn over the property to the trustee or become liable for its value. *In re USA Diversified Prods., Inc.*, 100 F.3d 53, 56–57 (7th Cir. 1996) ("[S]ubsection (a) imposes on the possessor a legal duty to deliver up the value of the property that he possessed even if he no longer possesses it.").[26]

Turnover actions, however, are not meant to be substitutes for avoidance actions. *Id.* at 56 ("Section 542 is not about the obligations of transferees."). So if a debtor effectively transferred property before a bankruptcy was filed, the trustee cannot obtain an order of turnover against the transferee. See, for example, *In re Mobley*, 2012 WL 6086878 (Bankr. N.D. Ohio Dec. 6, 2012), a case in which the trustee sought turnover of the debtor's motorcycle. Because the motorcycle had been sold pre-petition, the estate had no interest in the property and an action under § 542 was not appropriate. *Id.* at *3.

Here, the issues in dispute are whether and to what extent the senior Veluchamys effectively transferred their interests in property before the bankruptcy was filed.

---

[26] As the Supreme Court pointed out in *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.12 (1983), there are only three exceptions to the turnover required by § 548(a): "when the property is of inconsequential value or benefit to the estate, § 542(a), when the holder of the property has transferred it in good faith without knowledge of the petition, § 542(c), or when the transfer of the property is automatic to pay a life insurance premium, § 542(d)."

**2. Joinder of Necessary Parties**

For several of the counts in which the Estate seeks a turnover of estate property, the senior Veluchamys argue that the Estate failed to join parties to whom they transferred their property before they filed the bankruptcy case, and that these counts should be dismissed for the non-joinder. *See* Trial Tr. 61.[27]

Joinder of parties is governed by Rule 19 of the Federal Rules of Civil Procedure, incorporated into Bankruptcy Rule 7019. Paragraph (a)(1) of the rule provides that a person subject to service of process must be joined if either of two grounds exists:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> > (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

The issue here arises under the second ground. The senior Veluchamys argue that the alleged transferees of their property have an interest in the property that would be difficult for the transferees to protect.

The senior Veluchamys, as the parties arguing for joinder of an absent person, have the initial burden of establishing that person's interest. *Am. Gen. Life & Accident Ins. Co. v. Wood,* 429 F.3d 83, 92 (4th Cir. 2005). If that initial showing is made, the opposing party may show that there is no basis for finding that the non-joined party has an interest in the property in dispute. *Hood ex rel Mississippi v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009). Thus, in *Dexia Credit Local v. Rogan*, 629 F.3d 612, 632 (7th Cir. 2010), the court found that joinder of an asset trust beneficiary was not required for the court to determine that the trust never obtained control over the funds in question. Similarly, in *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir.1994), a case dealing with the distribution of land in an Indian reservation, the court affirmed denial of a request for joinder of an Indian tribe because the evidence presented by the requesting party failed to show that the tribe had an interest in the land distribution. Here, the Estate has convincingly demonstrated that the May 1, 2008 transfer documents (and the amended 20B forms purporting to recognize the transfers stated on those documents) were fictitious and that the purported transferees never received an

---

[27] Defendants are allowed to raise the joinder issue at trial as well as by a dismissal motion. Fed. R. Civ. P. 12(h)(2)(c), incorporated into Fed. R. Bankr. P. 7012(b).

interest in the stock listed in those documents, so the joinder of the nominal transferees is
not required.  On the other hand, where the Estate has failed to show that transfer docu-
ments were ineffective, judgment will be entered against the Estate on the merits, so that
joinder again is not required.

### 3. Resolution of the turnover counts

*Count XVI*

Count XVI seeks return of the $5.5 million that Mr. Veluchamy deposited in a
bank account of JSM.  As discussed above, the senior Veluchamys failed to provide any
evidence that JSM took control of the funds and so became a necessary party.  Rather, the
evidence establishes that the funds are property of the estate, controlled by the senior Ve-
luchamys, and a recommendation for judgment requiring turnover of the funds will be
made.

*Count XVII*

Count XVII deals with Indian securities that the Estate asserts are still held or
controlled by the senior Veluchamys.  As discussed above, the stock involved in the as-
serted May 1, 2008 transfers remained property of the senior Veluchamys.

On the other hand, contemporaneously filed 20B forms for several of the Indian
companies reflect transfers in 2009 and 2010 that effectively conveyed securities held by
the senior Veluchamys.  Although the senior Veluchamys made these transfers to prevent
creditors from reaching their assets, § 542 only allows turnover of property that belongs
to the bankruptcy estate.

Consistent with the findings of fact proposed above (II.D.8.b) a recommendation
will be made for judgment requiring the senior Veluchamys to turn over to the estate the
stock listed in the contemporaneously filed 20B forms, specifically 944,118 shares of
VCT India, 2,000,000 shares of JSM, 311,396 shares of PSM, 4,125 shares of Aruppu-
kottai Shri Vijayalakshmi Textile Mill, and 5,301,562 shares of Appu Hotels.

*Count XVIII*

Count XVIII deals with the jewelry owned by the senior Veluchamys and listed in
the tables set out above.  For the reasons set out above in discussing this jewelry, a rec-
ommendation will be made that the jewelry be found to be estate property and that the
senior Veluchamys be ordered to turn over the jewelry to the estate.[28]

---

[28] The District Court required the senior Veluchamys to deposit funds and certain
pieces of jewelry with the court.  *See* PX 678 at 585–87 (113–14).  A judgment of turno-
ver would require the senior Veluchamys to cooperate with the Chapter 7 trustee in ar-
ranging for the trustee to take possession of the jewelry.  To the extent that the jewelry is

*Count XIX*

Count XIX seeks alternative relief, ordering Arun or Anu to return to the estate any jewelry of the estate found to be in their possession.  Because of the recommended finding that the jewelry is in the control of the senior Veluchamys, judgment for Arun and Anu will be recommended on Count XIX.

*Count XXII*

Count XXII seeks recovery of excess income tax payments made by the senior Veluchamys.  The Estate's supplemental report, Adv. Docket No. 355, states that the trustee has recovered all but $80,000 of the funds identified in this count and that the IRS claims that this $80,000 represents taxes owed by the senior Veluchamys.  The supplemental report acknowledges that the money in question has either been paid to the trustee or is properly held by the IRS.   Therefore, there will be a recommendation of judgment for the senior Veluchamys on this count.

### D. Collective Liability

The Estate presents two counts asking the court to expand liability for Arun and Anu based on their knowing participating in their parents' fraudulent scheme.

*Counts XX and XXI*

Count XX alleges that Arun and Anu aided and abetted their parents throughout this scheme.  Under Illinois law, to establish that a defendant is liable as an aider and abettor, the plaintiff must show, by clear and convincing evidence, that the defendant (a) aided a party who committed a wrongful act that caused an injury to the plaintiff, (b) was aware of its role when it provided the aid, and (c) knowingly and substantially assisted in the violation.  *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006).  Defendants aiding and abetting a wrongdoer are subject to joint and several liability for their principal's actions.  *Wolf v. Liberis*, 153 Ill. App. 3d 488, 496 (Ill. App. Ct. 1987).

Count XXI alleges civil conspiracy.  Under Illinois law, to establish that a defendant is liable as a civil conspirator, the plaintiff must show, by clear and convincing evidence, that the defendant had an agreement with another person to accomplish an unlawful purpose through concerted action and that a party to the agreement committed an overt act in furtherance of the conspiracy.  *Martinez v. Freedom Mortg. Team, Inc.*, 527 F.Supp.2d 827, 839 (N.D. Ill. 2007).  "[A] defendant who understands the general objec-

---

not available to be returned, the senior Veluchamys would be required to pay its value—as listed in the insurance policies—to their bankruptcy estate.  Any funds returned to them by the District Court could be used for that purpose.

tives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives is liable as a conspirator." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quoting *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Illinois 1994). "Co-conspirators are jointly and severally liable for each other's actions." *In re Liebl*, 434 B.R. 529, 537 (Bankr. N.D. Ill. 2010) (applying Illinois law).

The Estate, through clear and convincing evidence, has established each of the elements of the causes of action in both counts. The senior Veluchamys were shown to be the principals in a scheme to make their assets unavailable to creditors, and while the senior Veluchamys are not themselves liable for their fraudulent transfers—under 11 U.S.C. § 550 only transferees and beneficiaries of transfers are liable—they nevertheless committed wrongful acts by making the transfers. *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 764–65 (D.N.J. 2013). Arun and Anu, in turn, were shown to have known the objectives of their parents' scheme and willingly furthered it by signing false documents, repatriating money, and orchestrating the series of sales that removed assets from the reach of creditors. For each of fraudulent transfer counts discussed above, Arun and Anu worked in concert with their parents and with each other. To the extent that monetary liability has been found as to Arun and Anu, the two defendants are jointly and severally liable as aiders and abettors and as civil co-conspirators.

Judgment, then, will be recommended on Counts XXI and XXII as follows:

- **Count I**: Jointly and severally liable for $16,120,371.
- **Count III**: Jointly and severally liable for $18,577,954.
- **Count IV**: Although Arun and Anu were part of a conspiracy to remove the Bear Stearns account from the reach of their parents' creditors, no joint or several liability can attach, since no monetary remedy was established.
- **Count VII**: Jointly and severally liable for $9,300,000.
- **Count VIII:** Jointly and severally liable for $63,226.
- **Count IX:** Jointly and severally liable for $1,888,202.
- **Count X:** Jointly and severally liable for $3,499,593.
- **Count XII:** Jointly and severally liable for $8,097,890.
- **Count XIII:** Jointly and severally liable for $310,000.

### Conclusion

For the reasons set out above, either judgment or proposed findings and conclusions will be entered as to each count of the complaint requiring resolution, as follows:

| Count | Nature of the Claim | Findings | Proposed or Final |
|---|---|---|---|
| I | Fraudulent transfer of $18.6 million to Arun and Anu | Judgment for Estate.  Arun liable for $7,253,088; Anu, $8,867,283. | Final |
| II | Preference Payments made to Arun and Anu | Judgment for defendants. | Final |
| III | Fraudulent transfer of controlling shares of VMark to Arun and Anu | Judgment for Estate.  Arun and Anu each liable for $9,288,977. | Final |
| IV | Fraudulent transfer of Bear Stearns Venture Partners, L.P. shares to Arun and Anu | Judgment for Estate.  Arun and Anu ordered to turn over their interests in the shares. | Final |
| V | Fraudulent transfer of $500,000 of Oakbrook Financial stock to Sonia | Judgment for defendant. | Proposed |
| VII | Fraudulent transfer of Downers Grove properties to Arun and Anu | Judgment for Estate.  Arun and Anu each liable for $4,650,000. | Final |
| VIII | Fraudulent transfer of shares in Creative Investments, Veluchamy LLC, and Unique Mailing Services to Arun and Anu | Judgment for Estate.  Arun and Anu required to turn over interests in Creative Investments and Veluchamy LLC.  For UMS, each liable for $31,613. | Final |
| IX | Fraudulent transfer of shares in Parameswari Spinning Mill and Jayavelu Spinning Mill | Judgment for Estate.  Arun and Anu each liable for $944,101. | Final |
| X | Fraudulent transfer of shares in Dharani Sugars, Appu Hotels, and VCT India | Judgment for Estate.  Arun and Anu required to turn over interests in VCT India.  Arun liable for 1,866,229; Anu, $1,633,364. | Final |
| XII | Fraudulent transfer of property in Chennai, India to Arun and Anu | Judgment for Estate.  Arun and Anu each liable for $4,048,945. | Final |
| XVI | Surrender of $5.5 million held by JSM | Judgment for Estate.  Senior Veluchamys to turnover $5.5 million. | Proposed |
| XVII | Surrender of shares of seven Indian companies still held by the senior Veluchamys | Judgment for Estate.  Senior Veluchamys ordered to turn over shares. | Proposed |
| XVIII | Surrender of jewelry still held by the senior Veluchamys | Judgment for Estate. Senior Veluchamys ordered to turn over jewelry. | Proposed |

| XIX | Surrender of jewelry held by Arun and Anu | Judgment for defendants. | Proposed |
| XX | Aiding and abetting the fraudulent scheme, against Arun and Anu | Judgment for Estate. Arun and Anu are jointly and severally liable for $57,857,236. | Proposed |
| XXI | Conspiracy to fraudulently transfer assets, against Arun and Anu | | |
| XXII | Surrender of overpayment of taxes, right to which is controlled by the senior Veluchamys | Judgment for defendants. | Proposed |
| XXIII | Fraudulent transfer of funds used to purchase Appu Hotels stock for Arun and Anu | Judgment for Estate. Arun and Anu each liable for $155,000. | Final |

Dated: December 18, 2014

Eugene R. Wedoff
United States Bankruptcy Judge